UNITED STATES of America

v.

**Ali Hamza Ahmad Suliman AL BAHLUL.**

**No. CMCR 09–001.**

United States Court of Military Commission Review.

Sept. 9, 2011.

Colonel Peter E. Brownback, III, JA, U.S. Army was the military commission judge through arraignment, and Colonel

Ronald A. Gregory, U.S. Air Force, was the military commission judge for trial.

Michel Paradis argued the cause for appellant. With him on briefs were Major Todd E. Pierce, JA, U.S. Army, and Captain Mary McCormick, JAGC, U.S. Navy.

Captain Edward S. White, JAGC, U.S. Navy argued the cause for appellee. With him on briefs were Captain John F. Murphy, JAGC, U.S. Navy and Francis A. Gilligan.

Briefs of amici curiae urging reversal were filed for Robert David Steele and others in the U.S. Intelligence Community by McKenzie A. Livingston; for the National Institute of Military Justice, Human Rights Watch, Professor Stephen I. Vladeck and Professor David S. Weissbrodt by Victor M. Hansen, Geoffrey S. Corn, and Michelle M. Lindo McCluer; for the Montana Pardon Project, Clemens P. Work, and University of Montana Criminal Defense Clinic by Jeffrey T. Renz, assisted by law student Dylan McFarland; for the Historians, Political Scientists, and Constitutional Law Scholars by Sarah H. Paoletti; for the Human Rights Committee of the American Branch of the International Law Association by Jordan J. Paust, for the Office of the Chief Defense Counsel by Colonel Peter R. Masciola, U.S. Air Force and Adam Thurschwell, and for the National Congress of American Indians by John H. Dossett.

BEFORE THE COURT EN BANC, BRAND, PRICE, SIMS, GALLAGHER, PERLAK, ORR,[1] Appellate Military Judges.

## PUBLISHED OPINION OF THE COURT

PRICE, Judge:

I. INTRODUCTION ................................................... 1155

II. PROCEDURAL HISTORY ........................................... 1155

III. JURISDICTIONAL BASIS FOR REVIEW .............................. 1157

IV. ISSUES ON APPEAL .............................................. 1158
 A. Result of Court's Review ..................................... 1158

V. STATEMENT OF FACTS ........................................... 1159
 A. The Al–Qaeda Plan ........................................... 1159
 B. Appellant's Background, Conduct, and Trial .................... 1161

VI. STANDARD OF REVIEW ........................................... 1164

VII. MILITARY COMMISSION SUBJECT MATTER JURISDICTION ........... 1164
 A. Introduction ................................................. 1164
 B. Issue Presented ............................................. 1166
 C. The Law .................................................... 1167
 1. Military Commissions Act of 2006 ....................... 1168
 2. Congressional Authority to Define and Punish Offenses Against
 the Law of Nations ..................................... 1169
 3. The Law of Nations ..................................... 1173
 4. The Law of Armed Conflict ............................. 1174

1. Acting Chief Judge O'TOOLE and Judges THOMPSON, CONN, and GREGORY recused themselves from participation in appellant's case. Judges GALLAGHER, HOFFMAN, PERLAK, and SIMS joined the Court on November 30, 2010. Judges ORR and GREGORY joined the Court on March 17, 2011. Judge HOFFMAN retired on August 1, 2011.

a. Combatants—Lawful and Unlawful ...........................1177
 (1) Alien Unlawful Enemy Combatant (AUEC)—Common
 Element 1 ..........................................1182
 (a) AUEC and the Law of Armed Conflict .................1184
 (b) Irregular Warfare .....................................1184
 (c) U.S. Army 1914 and 1956 Manuals ......................1186
 (d) Terrorists...........................................1188
 (e) Conclusion ..........................................1188
 (2) Conduct in the Context of and Associate d with an
 Armed Conflict—Common Element 2 .....................1188

VIII. PROVIDING MATERIAL SUPPORT FOR TERRORISM, *EX POST
 FACTO,* AND INSTRUCTIONAL ERROR ...............................1190
 A. Providing Material Support for Terrorism—an Offense Under the
 Law of Armed Conflict ..........................................1191
 1. The Charge ......................................................1191
 2. The 2006 M.C.A. and 2007 M.M.C. ................................1192
 a. Material Support or Resources ...............................1193
 b. Terrorism defined ..........................................1194
 3. Non–U.S. Domestic Providing Material Support for Terrorism–
 Type Laws ......................................................1198
 B. Discussion..........................................................1202
 1. Criminal Organizations—International Military Tribunal at
 Nuremburg ......................................................1203
 2. Control Council 10—Nuremburg Military Tribunals ................1205
 3. Joint Criminal Enterprise .......................................1210
 C. Analysis.............................................................1214
 D. Complicity ..........................................................1215
 E. Aiding the Enemy .................................................1216
 F. Ex Post Facto .....................................................1218
 G. Instructional Error ...............................................1218

IX. CONSPIRACY TO VIOLATE THE LAW OF WAR AS AN OFFENSE
 TRIABLE BY MILITARY COMMISSION ............................1220
 A. Conspiracy—The Charge and Specification..........................1222
 B. Conspiracy under the 2006 M.C.A. and 2007 M.M.C. .................1223
 C. Analysis.............................................................1223
 1. Non–U.S. Conspiracy–Type Laws ..............................1227
 D. Conclusion .........................................................1230

X. SOLICITATION AS AN OFFENSE TRIABLE BY MILITARY
 COMMISSION.............................................................1231
 A. Solicitation—The Charge and Specification ..........................1231
 B. Solicitation under the 2006 M.C.A. and 2007 M.M.C .................1231
 C. Analysis.............................................................1232
 1. Solicitation–Type Laws ........................................1235

XI. FIRST AMENDMENT ISSUES .........................................1242
 A. Discussion..........................................................1242
 B. The Military Commissions Act and the First Amendment ..............1245
 C. Potential Chilling Effect on U.S. Citizens ..........................1250
 D. Military Commission Judge's Instructions ..........................1250
 E. Conclusion .........................................................1251

XII. 2006 M.C.A. AND BILL OF ATTAINDER .............................1251
 A. Bills of Attainder and Legislative Analysis ..........................1251
 1. Legislatively Determines Guilt ................................1252
 2. Legislatively Inflicts Punishment ..............................1252
 a. Historical Test .............................................1253

 b. Functional Test .......................................1254
 c. Motivational Test .......................................1254
 (1) Specificity of Identification ...........................1255
 (2) Lack of Judicial Trial ................................1256
 B. Conclusion ...............................................1256

XIII. EQUAL PROTECTION .........................................1256

XIV. WAIVER OF ASSIGNMENTS OF ERROR I, III to V ....................1256
 A. The Law ...............................................1257
 B. Analysis ...............................................1258

XV. SENTENCE APPROPRIATENESS .................................1258
 A. Applicable Law .........................................1259
 B. Analysis ...............................................1260
 1. The Offense and the Offender .............................1260
 2. Closely–Related Cases .................................1263

XVI. CONCLUSION ...............................................1264

 Judge SIMS concurring ......................................1264

## I. INTRODUCTION

In this appeal by Ali Hamza Ahmad Suliman al Bahlul, we review for the second time[2] a conviction under the Military Commissions Act of 2006, Pub. L. No. 109–366, 120 Stat. 2600 (Oct. 17, 2006), codified at 10 U.S.C. §§ 948a–950w (2006 M.C.A.) relating to the military commission trial of appellant, a citizen of Yemen.

A military commission comprised of military members determined that appellant was an alien unlawful enemy combatant, *see infra* nn. 23, 24, 53, and contrary to his pleas convicted him of: (1) providing material support and resources, including himself to al Qaeda,[3] an international terrorist organization then engaged in hostilities with the United States with exceptions; (2) conspiring with Usama bin Laden and other members and associates of al Qaeda to, *inter alia*, commit murder, attack civilians and civilian objects in violation of the law of war, commit terrorism, and provide ma-

terial support for terrorism with exceptions; and (3) soliciting various persons to commit these same offenses in violation of 2006 M.C.A. §§ 950v(b)(25), 950v(b)(28), and 950u.[4] The members sentenced appellant to confinement for life and the convening authority approved the sentence.

## II. PROCEDURAL HISTORY

One week after the September 11, 2001, attacks on the United States, Congress passed the Authorization for Use of Military Force resolution (AUMF). Pub. L. No. 107–40, 115 Stat. 224 (2001). The AUMF authorized the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks." *Id.* The President ordered the Armed Forces to Afghanistan "to subdue Al Qaeda and quell the Taliban regime that was known to support it." *Hamdi v. Rumsfeld,* 542

---

**2.** *United States v. Hamdan,* 801 F.Supp.2d 1247, 2011 WL 2923945 (USCMCR June 24, 2011).

**3.** "Al Qaeda" is spelled "al Qaida" in some quotations. Either spelling is correct.

**4.** The members excepted the words, "Armed himself with an explosive belt, rifle, and grenades to protect and prevent the capture of Usama bin Laden." Charge Sheet; Tr. 916–17.

U.S. 507, 510, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004).

In 2001, appellant was captured in Pakistan and turned over to the U.S. military. In 2002, he was transported to a military detention facility in Guantanamo Bay, Cuba, where he remains confined.

In July 2003, the President declared appellant eligible for trial by military commission on unspecified charges pursuant to his Military Order.[5] On February 23, 2004, the Deputy Appointing Authority referred to trial by military commission one charge and an accompanying specification alleging al Bahlul conspired with Usama bin Laden and other "members and associates of the al Qaeda organization, known and unknown, to commit" the offenses of "attacking civilians; attacking civilian objects; murder by an unprivileged belligerent; destruction of property by an unprivileged belligerent; and terrorism." 2004 Charge Sheet and Referral.

On November 8, 2004, a Federal District Court stayed a military commission trial until the Department of Defense complied with various requirements of the Court. *Hamdan v. Rumsfeld,* 344 F.Supp.2d 152, 173–74 (D.D.C.2004). The same issues were present in appellant's case, and on December 10, 2004, the Appointing Authority directed that appellant's case be "held in abeyance" pending the outcome of the appeal filed in *Hamdan.*

On June 29, 2006, the Supreme Court ruled in *Hamdan v. Rumsfeld,* 548 U.S. 557, 635, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), that the military commission scheme then in existence violated Article 36, Uniform Code of Military Justice (UCMJ) and did not satisfy the requirements of Common Article 3 of the Geneva Conventions.[6] Following the Supreme Court's decision in *Hamdan,* the military commission judge abated the proceedings in appellant's case. Tr. 8.

Congress subsequently passed the 2006 M.C.A., which President Bush signed into law. Remarks on Signing the Military Commissions Act of 2006, 42 *Weekly Comp. Pres. Doc.* 1831–33 (Oct. 17, 2006). The 2006 M.C.A. established a revised system of military commissions, which limited jurisdiction to alien unlawful enemy combatants.

On February 26, 2008, the convening authority referred appellant's charges and specifications to trial by military commission. Trial began on May 7, 2008. Following trial on the merits, during which appellant mounted no substantive defense, the military commission returned findings of guilty on each charge and specification and on November 3, 2008, sentenced ap-

---

**5.** Military Order of Nov. 13, 2001, "Detention, Treatment, and Trial of Certain Non–Citizens in the War Against Terrorism," 66 F.R. 57833 (Nov. 16, 2001). On March 21, 2002, the Secretary of Defense issued Military Commission Order No. 1, "Procedures for Trials by Military Commissions of Certain Non–United States Citizens in the War Against Terrorism."

**6.** *Geneva Convention* (GCI) *for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field* (Aug. 12, 1949), entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3114, T.I.A.S. 3362, 75 U.N.T.S. 31 (No. 970); *Geneva Convention* (GCII) *for the Amelioration of the Con-*dition of Wounded, Sick and Shipwrecked Members of the Armed Forces at Sea (Aug. 12, 1949), entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3217, T.I.A.S. 3363, 75 U.N.T.S. 85 (No. 971); *Geneva Convention* (GCIII) *Relative to the Treatment of Prisoners of War* (Aug. 12, 1949), entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3316, T.I.A.S. 3364, 75 U.N.T.S. 135 (No. 972); *Geneva Convention* (GCIV) *Relative to the Protection of Civilian Persons in Time of War* (Aug. 12, 1949), entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3516, T.I.A.S. 3365, 75 U.N.T.S. 287 (No. 973). The four *Geneva Conventions* have 194 state parties.

pellant to confinement for life. On June 3, 2009, the convening authority approved the findings and sentence and ordered the sentence executed.

Congress subsequently passed the Military Commissions Act of 2009 (2009 M.C.A.), which President Obama signed into law. Presidential Remarks on Signing the National Defense Authorization Act for Fiscal Year 2010, (Oct. 28, 2009) Govt. Printing Office DCPD Number: DCPD200900858. The 2009 M.C.A. revised portions of the 2006 M.C.A., including expansion of this Court's scope of review.

We recently decided the first direct appeal of a conviction by military commission convened under the 2006 M.C.A. *United States v. Hamdan,* 801 F.Supp.2d 1247, 2011 WL 2923945 (USCMCR June 24, 2011). In *Hamdan,* we concluded that the charged conduct of providing military support for terrorism was punishable under the law of armed conflict from at least February 1996, when Hamdan joined al Qaeda, that a rational basis existed for disparate treatment of aliens in the 2006

and 2009 M.C.A., and that such disparate treatment did not violate the Equal Protection Clause of the Constitution.[7]

## III. JURISDICTIONAL BASIS FOR REVIEW

The Court of Military Commission Review was authorized by Congress in the 2006 M.C.A. and established by the Secretary of Defense. The 2006 M.C.A. provides for "automatic referral" for review by this Court[8] "each case in which the final decision of a military commission (as approved by the Convening Authority) includes a finding of 'guilty.' "[9] The 2006 M.C.A. limited our jurisdiction to act "to matters of law" and "[a] finding or sentence of a military commission under this chapter may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." 2006 M.C.A. §§ 950f(d) and 950a(a).[10]

In section 950f(a) of the 2009 M.C.A., Congress designated our Court as the United States Court of Military Commission Review, and significantly expanded

---

7. These three issues were substantially addressed in our Court's decision in *Hamdan,* 801 F.Supp.2d 1247, 2011 WL 2923945. For purposes of readability, portions of that decision are quoted in this decision without formatting as quotations and sometimes without citation to that decision. Nothing in this decision should be construed as inconsistent with or limiting the Court's decision in *Hamdan.*

8. Except in a case in which the approved sentence extends to death, an accused may expressly waive appellate review. 2006 M.C.A. § 950c(b); 2009 M.C.A. § 950c(b).

9. 2006 M.C.A. § 950c(a). *See also* 2007 Manual for Military Commissions (2007 M.M.C.), Part II, Rules for Military Commissions (R.M.C.) 1111 and 1201(c).

10. *See also* Article 59(a), Uniform Code of Military Justice (UCMJ) ("A finding or sen-

tence of court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused."); Fed. Rule Crim. Proc. 52 (stating, a "harmless error" is "[a]ny error, defect, irregularity, or variance that does not affect substantial rights." Harmless errors "must be disregarded," and "plain error" is an "error that affects substantial rights." Plain error "may be considered even though it was not brought to the court's attention."); *cf.,* 28 U.S.C. § 2106 (stating, "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.").

the scope of our review authority in cases automatically referred for appellate review. In addition to the authority to act with respect to "matters of law," the 2009 M.C.A. § 950f(d), requires us to review the record for factual sufficiency and sentence appropriateness:

> The Court may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, the Court may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the military commission saw and heard the witnesses.

■ This expanded authority mirrors that exercised by the military service Courts of Criminal Appeals in review of courts-martial in which the approved sentence includes death, a punitive discharge, or confinement for one year or more, an authority characterized as an "awesome, plenary, *de novo* power of review." *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990) (citing 10 U.S.C. § 866). We apply the standards and scope of review in the 2009 M.C.A. §§ 950a(a) and 950f(d), as it is more favorable to appellant. *See Hamdan*, 801 F.Supp.2d at 1264 n. 15, 2011 WL 2923945 at *9 n. 15 (citations omitted).

■ We have jurisdiction over this case because the final decision of the military commission, as approved by the convening authority, includes findings of "guilty." *See supra* n. 9.

## IV. ISSUES ON APPEAL

Appellant raises six assignments of error that merit discussion. First, that his convictions must be reversed as none of his charged offenses constitute war crimes triable by military commission. Second, that his conviction for providing material support for terrorism must be reversed as that charge violated the *Ex Post Facto* Clause of the U.S. Constitution and the term "material support" was erroneously defined by the military commission judge. Third, that he was convicted on the basis of political speech in violation of the First Amendment of the U.S. Constitution. Fourth, that the 2006 M.C.A. is an unconstitutional Bill of Attainder. Fifth, that the 2006 M.C.A. violates the Constitution's Equal Protection Clause by making aliens, but not citizens, subject to trial by military commission. Sixth, that a sentence of life imprisonment is inappropriately severe and disproportionate to the sentences of closely-related defendants. We specified two issues.[11]

### A. Result of Court's Review

We have carefully considered the record, the various pleadings and oral arguments of the parties. We hold that the findings and sentence are correct in law and fact

---

11. The two specified issues are as follows:

I. Assuming that Charges I, II, and III allege underlying conduct (e.g., murder of protected persons) that violates the law of armed conflict and that "joint criminal enterprise" is a theory of individual criminal liability under the law of armed conflict, what, if any, impact does the "joint criminal enterprise" theory of individual criminal liability have on this Court's determinations of whether Charges I through III constitute offenses triable by military commission and whether those charges violate the *Ex Post Facto* clause of the Constitution? *See, e.g., Hamdan v. Rumsfeld*, 548 U.S. 557, 611 n. 40, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006).

II. In numerous Civil War and Philippine Insurrection cases, military commissions convicted persons of aiding or providing support to the enemy. Is the offense of aiding the enemy limited to those who have betrayed an allegiance or duty to a sovereign nation? *See Hamdan v. Rumsfeld*, 548 U.S. 557, 600–01, n. 32, 607, 693–97, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006).

and that no error materially prejudicial to the substantial rights of appellant occurred. 2009 M.C.A. §§ 950a(a) and 950f(d).

## V. STATEMENT OF FACTS

Appellant, a self-described "officer" in al Qaeda, joined that group with knowledge that al Qaeda engaged in terrorism and did so in complete agreement with Usama bin Laden's declarations that all Americans and anyone in the United States were legitimate targets of armed attack. Following completion of al Qaeda's military-like training, appellant met personally with bin Laden, discussed al Qaeda's view of itself as a government in exile for the Muslim world engaged in jihad (or "holy war") with the United States, and pledged his personal fealty, including his willingness to die for bin Laden and al Qaeda.

Bin Laden then assigned appellant to al Qaeda's media office and later as his personal assistant/secretary for public relations. Appellant's conduct in those positions and membership in al Qaeda provide the factual basis for his convictions of: (1) providing material support and resources to al Qaeda; (2) conspiring with bin Laden and others to, *inter alia*, commit murder, attack civilians and civilian objects, commit terrorism, and provide material support for terrorism; and (3) soliciting various persons to commit those same offenses.

A brief review of al Qaeda's history, organization and goals is essential to put appellant's conduct in context.

### A. The Al–Qaeda Plan [12]

In December 1979, the former Soviet Union invaded Afghanistan. The Soviets were soon opposed by the mujahideen (self-proclaimed Muslim "holy warriors"), including native Afghans and volunteers for the proclaimed jihad against the Soviet Union. By 1985 radical Palestinian cleric Dr. Abdullah Azzam emerged as leader of the Arab recruits. "Azzam and his supporters schemed to use the conflict in Afghanistan as a means to create a multinational Muslim army to wipe out secular regimes across the Middle East, Asia and North Africa," and to establish an Islamic Caliphate. "In April 1988, Azzam published [a] manifesto, titled 'Al–Qaida', meaning 'The Base' or 'the Solid Foundation,'" in which he advocated armed struggle:

> Azzam reasoned that every revolutionary ideology needs a rugged, elite cadre to protect it, inspire it, and lead it to ultimate victory .... Azzam issued what he referred to as "the final call": "We shall continue the Jihad no matter how long the way is until the last breath and the last beating of the pulse or we see the Islamic state established."

"[M]illionaire Saudi exile Usama Bin Laden ... provided ... financing and logistical support to Azzam's organization and soon ... became a dominant force among the Arabs fighting in Afghanistan.... On September 10, 1988, Azzam, bin Laden, and mujahideen convened the first meeting of al Qaeda." The leaders of al Qaeda formed a Shura (Advisory Council) and divided operations "amongst various wings, including a military committee, a security committee, a financial committee, a religious legal committee, a political committee, and a media committee."

Following withdrawal of Soviet troops from Afghanistan, the varying mujahideen factions turned on each other and Dr. Azzam died. In 1991, facing collapse of the armed struggle in Afghanistan, bin Laden moved to Sudan, set up business enterprises and sponsored overseas terrorist activi-

---

**12.** Unless otherwise stated, the facts and quotations in this section are from Prosecution Ex. 14A, which is the "Script: 'The Al–Qaida Plan'" by Evan F. Kohlmann, or from Mr. Kohlmann's testimony at trial. Tr. 750–815.

ties. Al Qaeda's leaders were angered by American troop presence in Saudi Arabia following the 1991 Persian Gulf War and "believed that Islamic doctrine prohibits the presence of infidels, or non-Muslims, in the 'Land of the Two Holy Places' ..., the Arabian Peninsula, home to the sacred Muslim cities of Mecca and Medina."

In December 1991, following a "fatwa" (religious edict) issued on behalf of al Qaeda condemning the presence of U.S. military peacekeepers, militants attempted to attack U.S. soldiers in Yemen who were en route to Somalia peacekeeping duties. In 1993, bin Laden announced that "the American army now they came to the Horn of Africa, and we have to stop the head of the snake ... the snake is America and we have to stop them. We have to cut the head and stop them." Later that year, Somali militiamen, some of whom were al Qaeda-trained, shot down two U.S. Blackhawk helicopters over Mogadishu, and 18 U.S. servicemen were killed in the ensuing battle.

In 1996, the Sudanese regime ordered bin Laden and his associates out of Sudan. They relocated to Afghanistan at the invitation of the Taliban. In August 1996, bin Laden published a "declaration of war" in which he wrote:

> It is now clear that those who claim that the blood of the American soldiers (the enemy occupying the land of the Muslims) should be protected are merely repeating what is imposed on them by the regime; fearing the aggression and interested in saving themselves. It is a duty now on every tribe in the Arab Peninsula to fight, Jihad, in the cause of Allah and to cleanse the land from those occupiers. Allah knows that the[ir] blood is permitted (to be spilled) and their wealth is a booty to those who kill them.... Death is better than life in humiliation! ... My Muslim Brothers of The World: Your brothers ... are calling upon your help and asking you to take part in fighting against the enemy—your enemy and their enemy—the Americans and the Israelis. They are asking you to do whatever you can ... to expel the enemy, humiliated and defeated, out of the sanctities of Islam.

In February 1998, bin Laden and like-minded allies founded the World Islamic Front Against Jews and Crusaders and signed a joint fatwa requiring all able Muslims to kill Americans—whether civilian or military—anywhere they can be found and to "plunder their money." On May 29, 1998, bin Laden issued a second declaration entitled "The Nuclear Bomb of Islam," in which he stated that "it is the duty of the Muslims to prepare as much force as possible to terrorize the enemies of God."

On August 7, 1998, U.S. embassies in Kenya and Tanzania were suicide-bombed by al Qaeda operatives, resulting in 257 deaths including 12 Americans. On August 20, 1998, the U.S. responded by striking terrorist training camps and a suspected chemical weapons laboratory. In October 1999, the U.S. Government officially designated al Qaeda a foreign terrorist organization, making it unlawful for anyone in the United States to provide material support to al Qaeda, and froze al Qaeda linked resources held by U.S. financial institutions.

In January 2000, al Qaeda attempted an attack on the USS THE SULLIVANS near Yemen; however, the attack boat was overloaded and sank. That boat was recovered and on October 12, 2000, disguised as a friendly civilian boat welcoming the USS COLE to port, suicide-detonated against the COLE, killing 17 American sailors, wounding 39 others, and extensively damaging the ship.

On September 11, 2001, 19 men recruited by al Qaeda hijacked four commercial

airliners in the United States and intentionally crashed one airliner into the Pentagon in Washington, D.C. and two into the World Trade Center in New York. The fourth aircraft crashed in Pennsylvania after the passengers attempted to retake the plane from the hijackers. Thousands of Americans and others were killed as a result of the September 11, 2001 attacks.

**B. Appellant's Background, Conduct, and Trial**

Born in Yemen on September 11, 1969, appellant is well-educated and speaks some English. In the early 1990s he was inspired by Azzam's speeches and traveled to Afghanistan to fight the Soviet-supported regime. He then returned to Yemen.

In the late 1990s, appellant approached a known al Qaeda member in Yemen about returning to Afghanistan. He used money and a visa provided by al Qaeda operatives and traveled to Afghanistan. After completing military-like training, appellant talked to and pledged bayat to bin Laden and joined al Qaeda. Bin Laden then assigned him to al Qaeda's media office.

Following the October 2000 attack on the USS COLE, bin Laden instructed appellant to prepare a video exploiting that attack for recruiting purposes. This full-length video, entitled "The Destruction of the American Destroyer Cole," is comprised of extensive footage intended to inflame the viewers and incite them to migrate to Afghanistan to train for, and actively participate in, violent jihad against the United States. Appellant was proud of the video, claiming it was al Qaeda's best propaganda video at that time, and that it "was influential" and produced "a good result" for al Qaeda. Tr. 534. Translated into multiple languages and widely distributed outside Afghanistan, the video demonstrated power to incite persons with no prior connection

to al Qaeda to action. The video is organized into three parts: "The Problem," "The Causes," and "The Solution."

"The Problem" is appellant's portrayal of the Muslim nation or "Ummah" and includes emotive footage of purported Muslims, particularly women and children, being mistreated and killed. It also depicts the presence of U.S. diplomats and troops in the Middle East as part of "The Problem." The video identifies "The Causes" as diplomatic relationships between the United States and regional leaders and an alliance between the United States and Israel.

"The Solution" includes incensing images of violence against women and children, interspersed with images of world leaders including American Presidents laughing. The horrific and infuriating images are shown repeatedly with religious chanting and "a cappella" singing, known as "anasheed," audible in the background to increase the emotional impact of the video. The anasheed extol the virtues of martyrdom (suicide bombings), of sacrifice, and of combat, somberly chanting lyrics such as "revolt, revolt ... with blood, with blood." Tr. 809. The anasheed instructs the listener to trade blood for blood and destruction for destruction, while showing images of violence against women and children dying, then images of recruits training in al Qaeda camps and terrorist attacks on Americans, and finally joyful Muslims celebrating in the streets. After highly emotional scenes of Muslims suffering attributed to "Western infidels" and complicit Middle Eastern regimes, the video asserts violent jihad as the solution. It calls on viewers to come to Afghanistan to train for, and actively participate in, violent jihad against the United States.

During training camp scenes, bin Laden says, "the outcome of this training is jihad for the cause of God.... [T]hey are wait-

ing for our youths to annihilate America and Israel." Prosecution Ex. 31 at 15. He continues, "[t]he only way to eradicate the humiliation and disbelief that has overcome the Land of Islam is jihad, bullets, and martyrdom operations." *Id.* at 16. Toward the end of the video, bin Laden declares, "[w]e are terrorists, and terror is an obligation in the Book of God. Let the West and East know that we are terrorists and we strike fear." *Id.* at 18.

Appellant explained the importance he and bin Laden ascribed to appellant's role as a "media man" in supporting al Qaeda's objectives:

> I was bored when I was in Afghanistan and working on computers and papers and cameras and TVs; and I asked bin Laden for a martyrdom operation, suicide operation; but he refused. The reason why he refused was that he—that there are many other people other than you or so—the recruiting people through media gets you more people than suicidal attacks.
>
> Even in America, in every country in the world, media is the master ministry or department; and it has strategic goals, just like the United Nations and Internal Affairs and the Treasury Department; and God bless us, his speech was right.

Tr. 195.

After work on the video was completed, bin Laden appointed appellant as his personal assistant and secretary for public relations. Appellant assisted bin Laden in preparing public statements. He operated and maintained data processing equipment, arranged for Mohammad Atta and Ziad al Jarrah (two 9/11 hijackers/pilots) to pledge fealty to bin Laden, and prepared propaganda declarations styled as "martyr wills" to motivate those individuals to commit the 9/11 attacks and document al Qaeda's role in those attacks.

Before the 9/11 attacks bin Laden ordered al Qaeda's Kandahar site evacuated, and told appellant to ready the media van, which included computer, satellite, television, and radio communications equipment. Appellant evacuated Kandahar and traveled in a vehicle convoy, which included bin Laden and other al Qaeda leaders. On 9/11, appellant was unable to obtain a video signal, so bin Laden and other al Qaeda leaders first heard reports of the 9/11 attacks via a radio operated by appellant. At bin Laden's request, appellant researched the economic impact of the 9/11 attacks and provided the results of his research to bin Laden.

Following his capture, appellant voluntarily spoke with multiple investigators regarding his background and role in al Qaeda, including his membership, status as an officer, role in production of the COLE video, and belief in bin Laden's 1996 "declaration of war." Appellant advised investigators that he was willing to discuss his own actions but unwilling to discuss those of others. Prosecution Ex. 13 at 4. He admitted committing each charged act. He also wrote several letters while detained at Guantanamo Bay to al Qaeda leaders renewing his pledge of bayat, restating his resolve to fight to the end, and reaffirming his belief that war is the only way to secure al Qaeda's objectives. Prosecution Ex. 15–18. In Prosecution Ex. 18, he stated:

> The days go on, the war will wage, the conflict will continue, the blood did not and will never dry, and the fate of their [American] utmost interests of their civilization is tied to and mortgaged by our Islamic region ... They and their strategic allies have opened a big door that will not be closed until we regain our occupied holy places—the war is long and we are still at the beginning ... democracy is on its death bed and it is about to succumb to its demise.

Appellant objected to the legitimacy of the military commission that tried him and indicated his intent to boycott the proceedings. He also objected to representation by counsel detailed by the Chief Defense Counsel of Military Commissions. He expressed a desire to proceed *pro se* and represent himself. Appellant also expressed his aspiration to absent himself from all sessions of the military commission, except he wanted to attend the final session to hear announcement of his sentence. The military commission judge advised appellant that his voluntary absence would constitute "waiver of the right to be present," that his absence "could negatively impact the presentation of [his] case," and that his absence would be inconsistent with representing himself and would provide a basis to terminate his proceeding *pro se*. Appellant conveyed his understanding stating "[t]his is my final decision, and it's voluntary[ ]y and I've chosen that." Tr. 78.

Following this colloquy, appellant absented himself from the next session of court on August 15, 2008. The military commission judge then noted appellant's voluntary absence, particularly with respect to the *pro se* issue. Major Frakt, appellant's detailed defense counsel, represented to the military commission judge that he discussed his willingness to "defend [appellant] in the manner in which [appellant] desired to be defended." Tr. 80. Major Frakt also confirmed he had discussed the *pro se* representation issue with appellant, that appellant understood the impact of his voluntary absence from proceedings on his request to proceed *pro se*, and then Major Frakt related that appellant expressed "his very strong desire to return to the detention facility and to have no further communication with counsel of any kind." Tr. 80. In light of appellant's stated boycott and voluntary absence, the military commission judge ruled that detailed defense counsel, Major

Frakt, would continue to represent appellant. Appellant's defense counsel then commented, "In accordance with Mr. Al Bahlul's wishes, defense demands, under Rule for Military Commission 707, a speedy trial. The defense waives all pretrial motions of any kind and is prepared to go to trial at the soonest possible date." Tr. 85.

Appellant's posturing, equivocation about his exercise of the right to counsel and proceeding *pro se*, and variable attendance have combined to create a significant ambiguity in the record. Detailed defense counsel, whose services were ostensibly rejected by appellant at the preceding session of court, appeared on August 15, 2008, without appellant present, putatively representing appellant's wishes. This ambiguity informs our treatment of the matters of waiver and forfeiture, discussed in Part XIV, *infra* at pp. 1256–58.

Appellant attended the next session of court on September 24, 2008, and expressed his preference to attend the trial if such attendance would not forfeit his boycott. The military commission judge informed appellant that his attendance would not forfeit his stated boycott, and appellant attended all subsequent proceedings. Appellant entered pleas of not guilty to all charges and specifications. With the exception of administrative matters and appellant's unsworn statement and related documents presented during the presentencing hearing, appellant presented no defense, made no closing argument, interposed no objection to prosecution evidence, conducted no cross-examination of prosecution witnesses, and presented no defense evidence.

In an unsworn statement to the members during the presentencing hearing, appellant acknowledged his membership in al Qaeda, asserting "we are the only ones on earth who will stand against you," the

United States was responsible for the deaths of innocent civilians for 50 years and as such "we give you the same cup you have given us[.]" Tr. 968–69. He declared that al Qaeda does not submit to any Arab government or to international law, only to God. He also commented that 9/11 was the consequence of U.S. Government policies, and he expressed his willingness to die in prison and belief that al Qaeda will prevail in its war against the United States. He then cited a poem penned by bin Laden named "The Storm of the Airplanes":

> Then the war is ongoing. It's not going to be stopped and until you become fair and go back to your country and pull your ships from the peninsula ... As long as you occupy the Islam island in a direct way or an indirect way and you are around it from the sea and by land and by air, we will continue the war.... [A]s a media man in al Qaeda, we actually take the words into action; and the members of 9/11, they were all media men before they became military men; and I was number 20, but bin Laden refused. My presence here today, I tell you: Sentence me the way you choose. It's not going to stop us from saying the word of truth. Any power-we consider America as a tiger made out of paper. Yes, there is a weight for its force, but we are not scared of it. We are only scared of his almighty God....

Tr. 978–79. The members sentenced appellant to confinement for life.

## VI. STANDARD OF REVIEW

■ On appeal, appellant challenges the authority of Congress to legislate and the President, or his designee, to implement the 2006 M.C.A., on a number of constitutional grounds. He also alleges that the military commission judge misapplied the law and that the sentence awarded is inappropriately severe. Whether a military commission may exercise jurisdiction over the charged offenses is a question of law we review *de novo*. *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C.Cir.2008); *Hamdan*, 801 F.Supp.2d at 1263–65, 2011 WL 2923945 at \*9; *United States v. Khadr*, 717 F.Supp.2d 1215, 1220 (USCMCR 2007). Challenges to the constitutionality of the 2006 M.C.A. are reviewed *de novo*. *Hamdan*, 801 F.Supp.2d at 1264 n. 14, 2011 WL 2923945 at \*9 n. 14 (citations omitted). We also review sentence appropriateness and factual sufficiency *de novo*.[13]

## VII. MILITARY COMMISSION SUBJECT MATTER JURISDICTION

### A. Introduction

Appellant alleges that his convictions must be reversed because none of the charges constitute war crimes triable by military commission. Brief for Appellant 21–28; Reply Brief for Appellant 11–13. Brief on Specified Issues for Appellant 6–39; Reply Brief on Specified Issues for Appellant 5–31. He argues that the military commission's subject matter jurisdiction is limited to war crimes, that Congress' authority to define and punish offenses triable by military commission is constrained to those offenses internationally recognized as violations of the law of war, and that none of the offenses of which he stands convicted are so recognized. *Id.* Appellant, in essence, asserts that Congress exceeded the scope of its constitutional authority in making the offenses of which he was charged and convicted punishable by military commission. *Id.*

---

**13.** 2009 M.C.A. § 950f(d). *See also United States v. Nerad*, 69 M.J. 138, 141–47 (C.A.A.F. 2010), *pet. for cert. denied*, —— U.S. ——, 131 S.Ct. 669, 178 L.Ed.2d 484 (2010) (describing authority of Courts of Criminal Appeals to review the findings and sentence of courts-martial under 10 U.S.C. § 866(c)).

Appellee replies that the military commission validly exercised jurisdiction over the charged offenses. Brief for Appellee 16–30; Brief on Specified Issues for Appellant 1–31. Specifically, that the constitutional authority to define and punish offenses against the law of nations is vested in Congress, that the authority to determine the jurisdiction of military commissions belongs to the political branches exercising their war powers, and that exercise of that authority is entitled to great deference. *Id.* In addition, appellee asserts that even if a military commission's jurisdiction is limited to common law of war offenses, appellant stands convicted of conduct which violates the common law of war. *Id.* at 19–30.

▉ Appellant's challenge of Congress' constitutional authority to "define" his conduct as an offense raises fundamental and significant questions as to the scope of legislative and executive authority in this area and as to what, if any, deference is due the exercise of that authority by reviewing courts. Our review is guided by two fundamental principles. First, the canon of "constitutional avoidance," that being "when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity."[14] Second, we are also guided by the longstanding principle that "an act of Congress ought never to be construed to violate the

law of nations if any other possible construction remains...." *Murray v. Schooner Charming Betsy,* 6 U.S. 64, 118, 2 Cranch 64, 2 L.Ed. 208 (1804).

The offenses of which appellant stands convicted were explicitly defined, as such, by Congress in coordination with the President following the Supreme Court's decision in *Hamdan,* and explicitly intended to address punishment of those with whom the United States was and remains engaged in armed conflict. In the words of Justice Jackson, when national security relating to foreign affairs is an issue, "[an action] executed by the President pursuant to an Act of Congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring; citations omitted; quoted at *infra* n. 29). *See also Hamdan,* 801 F.Supp.2d at 1267 and n. 27, 2011 WL 2923945 at *12 and n. 27.

In the 2006 M.C.A., Congress endeavored "to enumerate or define by statute" the acts punishable by military commission in a conflict characterized by the Supreme Court as "not of an international character occurring in the territory of one of the High Contracting Parties." *See Hamdan,* 548 U.S. at 629, 126 S.Ct. 2749. This is an area of law where explicit international treaty law is generally characterized as "rudimentary" and customary international law is appropriately described as evolving.[15] The parties' acknowledgement that

14. *Skilling v. United States,* —— U.S. ——, 130 S.Ct. 2896, 2940, 177 L.Ed.2d 619, 659 (2010) (citing *United States ex rel. Attorney General v. Delaware Hudson Co.,* 213 U.S. 366, 407, 29 S.Ct. 527, 53 L.Ed. 836 (1909)); *see also id.* 130 S.Ct. at 2930, 177 L.Ed.2d at 669 (citing *United States v. Harriss,* 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954) ("[I]f the general class of offenses to which

the statute is directed is plainly within its terms, the statute will not be struck down as vague.... And if this general class of offenses can be made constitutionally definite by a reasonable construction of the statute, this Court is under a duty to give the statute that construction.")).

15. Jean–Marie Henckaerts, 1 *Customary International Humanitarian Law* xxxiv-xxxv (Cam-

Congress, with the full support of the President, developed a comprehensive code to define and punish the conduct of widely disparate individuals in a global-battle space also informs our analysis.

Even cursory review of the 2006 M.C.A. reveals that Congress cast a wide net of potential individual criminal liability with respect to the offenses which may be subject of trial by military commission.[16] Of course, we need not, and jurisprudentially speaking, indeed should not, attempt to define the outer edges or margins of this plainly broad net unless required to do so by a specific issue in controversy.[17]

In addition, the hybrid nature of international terrorism presents unique legal and policy challenges as the underlying conduct is often punishable under the law of nations, the domestic law of civilized nations, or both. Consideration of the aforementioned, particularly in this statutorily prescribed, yet nascent military commissions system "requires us to proceed with circumspection."[18]

## B. Issue Presented

Accordingly, we see the jurisdictional issue presented as similar to that addressed in *Ex parte Quirin,* "[w]e are concerned only with the question whether it is within the constitutional power of the National Government to place [appellant] on trial before a military commission for the offenses charged." *Ex parte Quirin,*

bridge U. Press 2009)("While common Article 3 is of fundamental importance, it only provides a rudimentary framework of minimum standards and does not contain much detail. . . . Additional Protocol II contains only a very rudimentary regulation of conduct of hostilities."), *http://www.icrc.org/eng/assets/ files/other/customaryinternational-humanitarian-law-i-icrc-eng.pdf.* APII, *infra* n. 39, at art. 13 (art. 13 is quoted, *infra* at p. 34).

16. *See generally* 2006 M.C.A. § 950v; *see also* Jennifer Elsea, The *Military Commissions Act of 2006: Analysis of Procedural Rules and Comparison with Previous DOD Rules and the Uniform Code of Military Justice* 10–13; Congressional Research Service Report for Congress (CRS Report) Order Code No. RL336388, (Sept. 27, 2007); Jennifer Elsea, *The Military Commissions Act of 2006: Background and Proposed Amendments*, CRS Report Order No. R40752 (Aug. 11, 2009), Jennifer Elsea. *The Military Commissions Act of 2009: Overview and Legal Issues* 9–14 CRS Report Order Code No. RL41163 (Apr. 6, 2010). CRS Reports cited at n. 16, 31, 46, 67, and 138 are available at *http://www.fas.org/ sgp/crs/natsec/.*

17. *United States v. Denedo*, 556 U.S. 904, 129 S.Ct. 2213, 2221, 173 L.Ed.2d 1235 (2009) (In discussing the scope of the All Writs Act, 28 U.S.C. § 1651(a), the Court stated, "a court's power to issue any form of relief-extraordinary or otherwise-is contingent on that court's subject-matter jurisdiction over the

case or controversy. Assuming no constraints or limitations grounded in the Constitution are implicated, it is for Congress to determine the subject-matter jurisdiction of federal courts. *Bowles v. Russell*, 551 U.S. 205, 212, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007) ('Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider'). This rule applies with added force to Article I tribunals, such as the NMCCA and CAAF, which owe their existence to Congress' authority to enact legislation pursuant to Art. I, § 8 of the Constitution. [Clinton v.] *Goldsmith*, 526 U.S. [529], 533–534, 119 S.Ct. 1538, 143 L.Ed.2d 720 [ (1999) ].").

18. *Hamdan*, 801 F.Supp.2d at 1268, 2011 WL 2923945 at *12; *See also United States v. Chisholm*, 59 M.J. 151, 152 (C.A.A.F.2003) ("Courts established under Article I of the Constitution, such as this Court, generally adhere to the prohibition on advisory opinions as a prudential matter.")(citing *United States v. Clay*, 10 M.J. 269 (C.M.A.1981)); *Munaf v. Geren*, 553 U.S. 674, 689, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (quoting *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 383, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959))(The nature of the issues raised "requires us to proceed 'with the circumspection appropriate when . . . adjudicating issues inevitably entangled in the conduct of our international relations.' ").

317 U.S. 1, 29, 63 S.Ct. 2, 87 L.Ed. 3 (1942). More specifically, we will focus on the charged conduct in each specification [19] and "inquire whether any of the acts charged is an offense against the law of war cognizable before a military tribunal, and if so whether the Constitution prohibits the trial." *Id.; see also Ex Parte Milligan,* 71 U.S. 2, 45, 4 Wall. 2, 18 L.Ed. 281 (1866). We will discuss the issues of law common to the offenses of which appellant stands convicted and address whether each individual offense describes conduct punishable by military commission.

## C. The Law

■ "Congress and the President, like the courts, possess no power not derived from the Constitution." *Quirin,* 317 U.S. at 25, 63 S.Ct. 2. The Constitution invests in Congress the authority to:

provide for the common Defence, Art. I, § 8, cl. 1, ... To make Rules for the Government and Regulation of the land and naval Forces, Art. I, § 8, cl. 14, ... To define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations, Art. I, § 8, cl. 10,

... [and] To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof. Art. I, § 8, cl. 18.

*Id.* at 26, 63 S.Ct. 1. In addition, the Constitution authorizes Congress "To constitute Tribunals inferior to the Supreme Court." U.S. Const., art. I, § 8, cl. 9.

"The Constitution confers on the President the 'executive Power,' Art. II, 1, cl. § 1, and imposes on him the duty to 'take

Care that the Laws be faithfully executed' Art. II, § 3. It makes him the Commander in Chief of the Army and Navy, Art. II, § cl. 1." *Quirin,* 317 U.S. at 26, 63 S.Ct. 2. The President, as Commander in Chief has "the power to wage war" which Congress has declared, "and to carry into effect all laws passed by Congress for the conduct of war and for the government and regulation of the Armed Forces, and all laws defining and punishing offenses against the law of nations, including those which pertain to the conduct of war." *Id.*

■ Military commissions derive their authority from these provisions of the Constitution as well as statutes, military usage, and the common law of war. *Quirin,* 317 U.S. at 26–28, 30, 34, 63 S.Ct. 2; Winthrop, *Military Law and Precedents* at 831 (2d ed. 1920) (1920 Winthrop). Military tribunals have existed since the Revolutionary War, and Congress has long recognized the " 'military commission' ... as an appropriate tribunal for the trial and punishment of offenses against the law of war not ordinarily tried by courts-martial." *Quirin,* 317 U.S. at 26–27, 63 S.Ct. 2 (citing Articles of War 12, 15); *id.* at 42 n. 14, 63 S.Ct. 2 (listing revolutionary war military commissions). The Uniform Code of Military Justice, enacted in 1950, which provides rules for the government of the armed forces, also acknowledges the jurisdiction of the "military commission" for trial and punishment of "offenders or offenses" as provided "by statute or by the law of war." *See* 10 U.S.C. §§ 821, 836, UCMJ, Act of May 5, 1950, ch. 169, 64 Stat. 107, 115, 120, 149 (quoted in *Hamdan,* 548 U.S. at 592–93, 126 S.Ct. 2749, cited at 652 (Kennedy, Souter, Ginsburg, and Breyer, JJ., concurring in part)).

---

**19.** Consistent with our statutory mandate to "affirm only such findings of guilty ... as [we] find[ ] correct in law and fact and determine[ ], on the basis of the entire record, should be approved," we will assess each charge and underlying specification. 2009 M.C.A. § 950f(d).

Colonel Winthrop explained the genesis of military commissions stating, "[I]n our military law, the distinctive name of *military commission* has been adopted for the exclusively war-court, which ... is essentially a distinct tribunal from the court-martial of the Articles of war." 1920 Winthrop 831. He continued:

> [I]n general, it is those provisions of the Constitution which empower Congress to "declare war" and "raise armies," and which, in authorizing the initiation of *war* authorize the employment of all necessary and proper agencies for its due prosecution, from which this tribunal derives its original sanction. Its authority is thus the same as the authority for the making and waging of war and for the exercise of military government and martial law. The commission is simply an instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as commander-in-chief in war.

*Id.* (emphasis in original). In *Hamdan,* the Supreme Court agreed that military commissions have historically been used by the United States in three circumstances, and that the situation relevant to the conflict with al Qaeda is "incident to the conduct of war" when there is a need "to seize and subject to disciplinary measures those enemies who ... have violated the law of war ....' " [20]

### 1. Military Commissions Act of 2006

The 2006 M.C.A. was developed and passed in direct response to the Supreme Court's decision in *Hamdan.*[21] The stated "purpose" of the 2006 M.C.A. is to "establish[ ] procedures governing the use of military commissions to try alien unlawful enemy combatants [22] engaged in hostilities against the United States for violations of the law of war and other offenses triable by military commission." 10 U.S.C. § 948b(a). The 2006 M.C.A. proclaims, "[t]he provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission" and acknowledges the effect of codifying pre-existing offenses stating, "[b]ecause the provisions of this subchapter ... are declarative of existing law,

**20.** *Hamdan,* 548 U.S. at 596, 607, 126 S.Ct. 2749 (Stevens, Souter, Ginsburg, and Breyer, JJ., concurring) (quoting *Quirin,* 317 U.S. at 28–29, 63 S.Ct. 2); *id.* at 683, 126 S.Ct. 2749 (Thomas, Scalia, and Alito, JJ., dissenting) (citing *Quirin,* 317 U.S. at 28–29, 63 S.Ct. 2). The other two circumstances are: (1) to "substitute[ ] for civilian courts at times and in places where martial law has been declared" and (2) "as part of a temporary military government over occupied enemy territory or territory regained from an enemy where civilian government cannot and does not function." *Hamdan,* 548 U.S. at 595–96, 126 S.Ct. 2749 (Stevens, Souter, Ginsburg, and Breyer, JJ., concurring) (citations omitted).

**21.** It was intended to establish "a comprehensive statutory structure for military commissions that would allow for the fair and effective prosecution of captured members of al Qaeda and other unlawful enemy combatants," and "provid[ed] definitions rooted in United States law for the standards of conduct prescribed by Common Article 3." Message from the President of the United States, Transmitting the 2006 M.C.A. (H.Doc. No. 109–133), Cong. Record H6273 (Sept. 6, 2006). The draft procedures resulted from extended deliberation between the executive branch and Congress, and the procedures tracked those applicable in courts-martial, except where "impracticable or inappropriate for the trial of unlawful enemy combatants captured in the midst of an ongoing armed conflict." *Id.*

**22.** *See infra* n. 57 (noting the term "unprivileged belligerent" replaced the 2006 M.C.A. term "unlawful enemy combatant" in the 2009 M.C.A. § 948a(7) as a more contemporary international law term).

they do not preclude trial for crimes that occurred before the date of enactment of this chapter." 2006 M.C.A. § 950p.

 The jurisdiction of military commissions convened under the 2006 M.C.A. is limited to: (1) alien [23] unlawful enemy combatants (AUEC),[24] and (2) "any offense made punishable by this chapter or the law of war." 2006 M.C.A. § 948d(a). The significance of these limits on the jurisdiction of a military commission convened under the 2006 M.C.A. to our resolution of the assigned error is difficult to overstate. These limits define both the type of person subject to trial by military commission convened under the 2006 M.C.A., an AUEC, and the offenses for which that person may be tried. In a broad sense, these two provisions define the personal or *in personam* jurisdiction and are fundamental to the definition of subject matter jurisdiction of military commissions convened under the 2006 M.C.A.

## 2. Congressional Authority to Define and Punish Offenses Against the Law of Nations

The parties agree the constitutional authority "To define and punish Offences against the Law of Nations" (the "Define and Punish Clause") provides Congress a basis to establish a statutory framework, such as the 2006 M.C.A., for trying and punishing violations of the law of war. U.S. Const. art. I, § 8, cl. 10. In addition, the Government asserts that when Congress exercises its authority to "define and punish" violations of the law of war, in conjunction with the Executive and "especially in the context of an armed conflict where national security is at stake, its judgment is entitled to the greatest deference." [25] In response, appellant avers that the "Supreme Court has consistently required a *plain and unambiguous showing* that a war crime was established under the laws of war" when the charged conduct occurred.[26]

23. 2006 M.C.A. § 948a(3) ("The term 'alien' means a person who is not a citizen of the United States.").

24. 2006 M.C.A. § 948a(1)("(A) The term 'unlawful enemy combatant' means—(i) a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); or (ii) a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or another competent tribunal established under the authority of the President or the Secretary of Defense.").

25. Brief for Appellee 30 (citations omitted); *see also Ex parte Quirin*, 317 U.S. 1, 26, 63 S.Ct. 2, 87 L.Ed. 3 (1942) (listing U.S. Constitution's provisions at p. 18). *See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–37, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring; citations omitted, quoted *infra* at n. 29).

26. Reply Brief on Specified Issues for Appellant 5 (citing *Hamdan*, 548 U.S. at 602, 126 S.Ct. 2749 (Stevens, Souter, Ginsburg, and Breyer, JJ., concurring); *In re Yamashita*, 327 U.S. 1, 17, 66 S.Ct. 340, 90 L.Ed. 499 (1946); *Quirin*, 317 U.S. at 36, 63 S.Ct. 2; *United States v. Yousef*, 327 F.3d 56, 106 (2d Cir. 2003) (emphasis added)), *but see Hamdan*, 548 U.S. at 690–91, 126 S.Ct. 2749 (Thomas, Scalia, and Alito, JJ., dissenting) ("The plurality holds that where, as here, 'neither the elements of the offense nor the range of permissible punishments is defined by statute or treaty, the precedent [establishing whether an offense is triable by military commission] must be plain and unambiguous.' *Ante*, at 602, 126 S.Ct. 2749.... [T]he actions of military commissions are 'not to be set aside by the courts without the *clear conviction* that they are' unlawful, 317 U.S., at 25, 63 S.Ct. 2 (emphasis added). It is also contrary to *Yamashita*, which recognized the legitimacy of that military commission notwithstanding a substantial disagreement pertaining to whether Yamashita had been charged with a violation of the law of war.").

Judicial review of the scope of Congressional authority to define and punish offenses against the law of nations is infrequent. In an 1887 decision, the Supreme Court upheld a federal statute criminalizing the counterfeiting of foreign government securities explaining that "the obligation of one nation to punish those who within its own jurisdiction counterfeit the money of another nation has long been recognized [under the law of nations]." *United States v. Arjona*, 120 U.S. 479, 484, 7 S.Ct. 628, 30 L.Ed. 728 (1887). The Court went on to reason that "[w]hether the offence as defined is an offence against the law of nations depends on the thing done, not on any declaration to that effect by Congress." *Id.* at 488, 7 S.Ct. 628. In *Arjona*, the Supreme Court did not address the scope of Congress' discretion or what, if any deference, Courts should show a determination that a particular act constitutes an offense under the law of nations.

In 1820, the Supreme Court addressed Congressional authority in Article I, § 8, cl. 10, "[t]o define and punish Piracies and Felonies committed on the high seas," the same clause containing the separate congressional power, "[t]o define and punish ... Offenses against the Law of Nations." *United States v. Furlong*, 18 U.S. 184, 198, 5 Wheat. 184, 5 L.Ed. 64 (1820). The Court found a lack of nexus to the United States where Furlong, his victim, and the ship where the murder occurred were all British, and the Court concluded Congress had exceeded the scope of its constitutional authority by declaring "murder [at sea] to be piracy." *Id.* at 195.

Furlong, a British subject, had engaged in an act of piracy against a British vessel, and while aboard that vessel killed another British subject. *Id.* at 195. He was tried and convicted by a U.S. court under a 1790 law criminalizing piracy to include the offense of murder. *Id.* at 193. The Supreme Court reasoned:

> [t]hese are things so essentially different in their nature, that not even the omnipotence of legislative power can confound or identify them.... If by calling murder piracy, it might assert jurisdiction over that offence committed by a foreigner in a foreign vessel, what offence might not be brought within their power by the same device?

*Id.* at 198. We glean from *Furlong* that the Supreme Court recognized "the province and duty of the judicial department ... to say what the law is" includes review of the Congressional exercise of authority "[t]o define and punish Piracies and Felonies committed on the high seas." *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803); U.S. Const., art. I, § 8, cl. 10.

The outer boundaries of Congress' discretion to "define and punish ... Offences against the Law of Nations" and to make such conduct punishable by military commissions remain an open question.[27] An 1865 Attorney General Opinion suggests Congressional authority to "define" such offenses is limited:

> To *define* is to give the limits or precise meaning of a word or thing [already] in being; to make is to call into being ... Congress has the power to *define*, not to make, the laws of nations.... Hence Congress may define those laws [and] may modify [those laws] on some points of indifference.[28]

On the other hand, there is substantial authority supporting the Government's po-

27. Samuel Morison, *History and Tradition in American Military Justice* (Forthcoming 33 U. of Penn. J. of Intl. Law, 1, 2 (2011)) (quoting U.S. Const., art. I, § 8, cl. 10), *http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1852504*. A copy of this article is available at USCMCR Clerk of Court's Office.

28. James Speed, *Opinion of the Constitutional Power of the Military to Try and Execute the Assassins of the President*, 11 Op. Atty. Gen. 297, 299 (1865) (emphasis in original) (internal quotation marks and citations omitted);

sition that "greatest deference" is due Congress' determination that the offenses of which appellant stands convicted constitute offenses under the law of nations; particularly where that determination directly implicates both national security interests in an ongoing armed conflict and foreign affairs, including interpretation of treaty obligations and customary international law.[29]

■ Nonetheless, we are not persuaded by the Government's suggestion that Congress' power to "define and punish ... Offences against the Law of Nations," U.S. Const., art. I, § 8, cl. 10, even when exercised in collaboration with the President in a time of armed conflict, includes the pow-

er to make conduct punishable by military commission without any reference to international norms.[30] It is emphatically the province and duty of a reviewing Court to "say 'what the law is.'" *Boumediene v. Bush*, 553 U.S. 723, 128 S.Ct. 2229, 2259, 171 L.Ed.2d 41, 77 (2008) (quoting *Marbury*, 5 U.S. at 177); *see also Hamdan*, 801 F.Supp.2d at 1279, 2011 WL 2923945 at *19 (citation omitted). We find this duty particularly compelling in the assessment of the constitutionality of a federal statute that by its plain language casts a wide, potentially global net of individual criminal liability, and we conclude this applies to our determination of whether Congress exceeded its constitutional authority by defining the subject conduct as punishable by military commission.[31]

*see also* Morison, *supra* n. 27, at 2 and n. 4 (citations omitted).

**29.** *Hamdan*, 801 F.Supp.2d at 1263–71, 2011 WL 2923945 at *9–*14. *See also Youngstown Sheet & Tube Co.*, 343 U.S. at 635–37, 72 S.Ct. 863 (Jackson, J., concurring; citations omitted)("[The President's authority] is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth) to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power. [An action] executed by the President pursuant to an Act of Congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it."). Justice Jackson's opinion in *Youngstown* has been frequently quoted in subsequent Supreme Court decisions, including *Hamdan*, 548 U.S. at 638, 680, 126 S.Ct. 2749, as a clear expression of the Government's power to regulate conduct in matters of national security. *See also Holder v. Humanitarian Law Project*, 561 U.S. ——, 130 S.Ct. 2705, 2727–29, 177 L.Ed.2d 355 (2010) (noting the "weighty and sensitive interests"). *See also* Winthrop, *Military Law and Precedents* at 831 (2d ed. 1920) (1920 Winthrop).

**30.** Brief for Appellee 18 ("So long as the political branches were justified in the exercise of their war powers, and the accused is a person properly subject to those powers, Congress and the President were within their authority to determine the jurisdiction of military commissions under the MCA Because the offenses with which appellant w[as] charged are offenses over which the MCA confers jurisdiction, appellant's military commission properly exercised jurisdiction.").

**31.** *See Hamdan*, 548 U.S. at 637, 126 S.Ct. 2749 (Kennedy, Souter, Ginsburg, and Breyer, JJ., concurring); *see generally Sanchez-Llamas v. Oregon*, 548 U.S. 331, 353–54, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006); *see also Furlong*, 18 U.S. at 198. Brief for Appellant 22 n. 6; Brief on Specified Issue for Appellant 24–25 and n. 13 (quoting U.S. Congress, Senate Committee on Armed Services, *Military Commissions*, 111th Cong., 1st sess., July 7, 2009) (Submitted statement of Jeh Johnson, General Counsel, Department of Defense) ("After careful study, the Administration has concluded that appellate courts may find that, 'material support for terrorism' ... is not a traditional violation of the law of war.... We thus believe it would be best for material support to be removed from the list of offenses triable by military commission, which would fit better with the statute's existing declarative statement."); *Id.* (Prepared statement of David Kris, Assistant Attorney Gener-

**1172**

■ In making this determination, we will employ the "substantial showing" standard discussed in the Supreme Court's *Hamdan* decision, aware that a standard more favorable to the Government may, as a matter of law, be applicable.[32] Where Congress' determination that certain acts constitute offenses under the law of nations is consistent with international norms, we also conclude that the specific statutory scheme employed by Congress to include the name of the offense, the elements of that offense, the forum by which that offense is punishable, and the applicable rules/procedures, is due great deference.[33]

al) ("[T]here are serious questions as to whether material support for terrorism or terrorists groups is a traditional violation of the law of war .... our experts believe that there is a significant risk that appellate courts will ultimately conclude that material support for terrorism is not a traditional law of war offense[.]")(quoted in Elsea, CRS Report .No. R40752, *supra* n. 16, at 10 n. 65). However, other witnesses recommended that Congress retain providing material support for terrorism as a law of war offense in the 2009 MCA. Sen. Comm. on Armed Services, *Legal Issues Regarding Military Commissions and the Trial of Detainees for Violations of the Law of War*, 111th Cong., 1st Sess. (S. Hrg. 111-190), 20, 105 (July 7, 2009). H.R. Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the Comm. on Jud., *Proposals for Reform of the Military Commissions System*, 111th Cong., 1st Sess., H.R. Doc 111-26 at 109, 121-23 (July 30, 2009). *See also Hamdan*, 801 F.Supp.2d at 1271 n. 34, 1301 n. 137, 2011 WL 2923945 at *15 n. 34, *34 n. 137 (listing citations to legislative history regarding whether the offense of providing material support to terrorism is part of the existing law of war); Report of Special Rapporteur Martin Scheinin on the Promotion and Protection of Human Rights and Fundamental Freedoms While Countering Terrorism, Human Rights Council, UN Doc. A/HRC/6/17/Add. 3 (Nov. 22, 2007) 12 at ¶ 20 ("[T]he offences listed in [the 2006 M.C.A.] of (terrorism, providing material support for terrorism ... and conspiracy) go beyond offences under the laws of war.").

**32.** *Hamdan* 548 U.S. at 603, 126 S.Ct. 2749 (Stevens, Souter, Ginsburg, and Breyer, JJ, concurring) ("At a minimum, the Government must make a substantial showing that the crime for which it seeks to try a defendant by military commission is acknowledged to be an offense against the law of war."), *id.* at 611, 126 S.Ct. 2749 ("Far from making the requisite substantial showing, [under a regulatory scheme superseding the 2006 M.C.A.] the Government has failed even to offer a 'merely colorable' case for inclusion of conspiracy among those offenses cognizable by law-of-war military commission."), *id.* at 691-92, 126 S.Ct. 2749 (Thomas and Scalia, JJ, dissenting) (urging a "flexible approach to evaluating the adequacy of Hamdan's charge" but indicating Hamdan's conspiracy charge "easily satisfies even the plurality's manufactured rule," *see infra* 692-706, 126 S.Ct. 2749,"), *id.* at 702, 126 S.Ct. 2749 (Thomas, Scalia, and Alito, JJ., dissenting). The "substantial showing test" has been used in the habeas context. For example, Hamdan initially filed petitions for writs of habeas corpus and mandamus to challenge the President's intended means of prosecuting a charge of conspiracy to commit offenses triable by military commission. To receive habeas relief, he was required to "ma[k]e a substantial showing of the denial of a constitutional right" on appeal. 28 U.S.C. § 2253(c)(2). *New v. Cohen*, 129 F.3d 639, 644 (D.C.Cir.1997) (*Schlesinger v. Councilman*, 420 U.S. 738, 759, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975)). *See also* 1920 Winthrop, *supra* n. 29, at 831, 836-42; *United States v. Morrison*, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (citations omitted) ("Due respect for, the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds."); *see also Hamdan*, 548 U.S at 637, 126 S.Ct. 2749 (Kennedy, Souter, Ginsburg, and Breyer, JJ., concurring)("If Congress, after due consideration, deems it appropriate to change the controlling statutes, in conformance with the Constitution and other laws, it has the power and prerogative to do so.").

**33.** *See generally Hamdan* 548 U.S. at 603, 611, 126 S.Ct. 2749 (Stevens, Souter, Ginsburg, and Breyer, JJ, concurring *id.* at 702, 126 S.Ct. 2749) (Thomas, Scalia, and Alito, JJ, dissenting). *See Quirin*, 317 U.S. at 25, 63

■ When incorporating existing offenses against the law of nations into American jurisprudence, it is well within Congress' grant of authority under the Define and Punish Clause to define the specific elements of an offense in the context of the American legal system. *See Hamdan*, 801 F.Supp.2d at 1274 and n. 40, 1318–20, 2011 WL 2923945 at \*17 and n. 40, \*47 (citations omitted). This is particularly so when, as in the present instance, the executive and legislative branches act together and "weighty interests of national security and foreign affairs" are the basis for the legislative act. *See supra* n. 29. We begin our analysis by addressing the law of nations, the law of armed conflict, and their applicability in a non-international armed conflict.

### 3. The Law of Nations

When the U.S. Constitution was adopted, "the law of nations was understood" to be "a branch of natural law, deducible by reason, ... obligatory on all nations," and according to "Blackstone and Lord Mansfield, ... incorporated into the common law of England." [34] "[T]he scope and structure of the law of nations [evolved] in the nineteenth century ... [and] the law of nations came to govern primarily relations among nation-states, reflecting this new orientation the law of nations became known as 'international law.' " [35] "The first general American treatise on the subject, published in 1836, used the term 'international law' rather than the 'law of nations' and covered only the law that governed nation-states." Curtis A. Bradley and Jack L. Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position*, 110 Harv. L. Rev. 815, n. 34 (1997) (citing Henry Wheaton, *Elements of International Law Passim* (Philadelphia, Lea & Blanchard 1836)). "[T]he sovereign equality of states and the related principle of non-intervention have been paramount," while "norms generated within this system have been traditionally understood to have

S.Ct. 2 ("the detention and trial of petitioners—ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of grave public danger—are not to be set aside by the courts without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted"); *Cf. Furlong, supra* p. 22.

**34.** Gerald L. Neuman, *Sense and Nonsense about Customary International Law: A Response to Professors Bradley and Goldsmith*, 66 Fordham L.Rev. 371, 373 (1997) (citing Edwin D. Dickinson), *Changing Concepts and the Doctrine of Incorporation*, 26 Am. J. Intl. L. 239, 253 (1932); Stewart Jay, *The Status of the Law of Nations in Early American Law*, 42 Vand. L.Rev. 819, 822–23 (1989); Harold H. Sprout, *Theories as to the Applicability of International Law in the Federal Courts of the United States*, 26 Am. J. Intl. L. 280, 282–85 (1932).

**35.** During the Roman Empire, scholars assembled "a *jus gentium* (law of nations), [which] they believed were universally derivable through reason." Michael J. Garcia, *International Law and Agreements: Their Effect Upon U.S. Law* 1 n. 1, CRS Report No. RL 32528 (Aug. 16, 2004) (citations omitted). Jeremy Bentham coined the term "international law" in 1789. *Id.* (citation omitted). The Supreme Court addressed the law of nations in 1799, *id.* at n. 3 (citing *Ware v. Hylton*, 3 U.S. 199, 281, 3 Dall. 199, 1 L.Ed. 568 (1796) and employed the term "international law" as early as 1815. Curtis A. Bradley and Jack L. Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position*, 110 Harv. L.Rev. 815, 822 (1997) (citing *The Nereide*, 13 U.S. 388, 433 and nn. 32–34, 9 Cranch 388, 3 L.Ed. 769 (1815); R.Y. Jennings, *The Progress of International Law* 8–30 (1960) (describing "development and change" in nineteenth-century international law); Arthur Nussbaum, *A Concise History of the Law of Nations* 178–237 (1947); Harold Hongju Koh, *Transnational Public Law Litigation*, 100 Yale L.J. 2347, 2353–54, 2356 (1991); other citations omitted)).

as their legal subject the state alone, and their breach gave rise only to the responsibility of the state." War Crimes Research Office, *International Criminal Law: A Discussion Guide for the Extraordinary Chambers in the Courts of Cambodia War Crimes*, Am. U. Wash. College of Law 5 (May 2006).

More recently, the law of nations or international law is defined as "rules and principles of general application dealing with the conduct of States and of international organizations and with their relations *inter se*, as well as some of their relations with persons, natural or juridical." Restatement (Third) of Foreign Relations Law of the United States, § 101 (1987). This modern definition reflects the integration of humanitarian law, or perhaps more succinctly individual human rights, into the evolving body of law previously primarily related to relations among nation states with almost exclusive focus on state sovereignty.

The horrors of World War II produced a host of developments in international law, among the most significant was crystallization of the principle that violation of certain international norms, even on behalf of a nation state, could give rise to individual criminal responsibility. The emergence of this principle was primarily driven by the need for effective means of enforcement. The International Military Tribunal at Nuremberg reasoned, "[c]rimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced." [36]

The sovereignty of states over their territory and nationals, the protection of "succeeding generations from the scourge of war," and the maintenance of "international peace" and security remain fundamental tenets of international law. Preamble and Article 1, United Nations Charter. The generally accepted sources of international law include:

a. international conventions establishing rules expressly recognized by the contesting states;

b. international custom, as evidence of a general practice accepted as law;

c. the general principles of law recognized by civilized nations;

d .... judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.[37]

## 4. The Law of Armed Conflict

International law's traditional function of regulating relations between and among states is at the apex of importance when

---

**36.** 1 *Trials of the Major War Criminals Before the International Military Tribunal* at 223 (1947). The 42–volume record, known as the "The Blue Series," of the Trial of the Major War Criminals before the IMT at Nuremberg, Nov. 14, 1945 to Oct. 1, 1946, is cited here as T.M.W.C. These volumes are available at *http://www.loc.gov/rr/frd/Military_Law/NT_major-war-criminals.html*.

**37.** Statute of the International Court of Justice (ICJ Statute), art. 38 (June 26, 1945), 59 Stat. 1055, 1060. *See also Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254, 267 (2d Cir.2007) (citation omitted); *United States v. Hamdan*, 801 F.Supp.2d at 1265, 2011 WL 2923945 at \*10 (listing six sources of international law) (citing 11 *Trials of War Criminals Before the Nurenberg Military Tribunals Under Control Council Law No. 10* at 1235 (1950)). Restatement (Third) of Foreign Relations Law § 102 (1987) ("(2) Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation ... (4) General principles common to the major legal systems, even if not incorporated or reflected in customary law or international agreement, may be invoked as supplementary rules of international law where appropriate.").

those relations degenerate into armed conflict. Indeed, the regulation of armed conflict has long been recognized as essential to the preservation of civilization. The corpus of international norms that regulate the conduct of hostilities and that provide protection for persons not taking part, or no longer taking part, in hostilities is known as the law of armed conflict,[38] is one of the oldest subject areas of international law. It is the "customary and treaty law applicable to the conduct of warfare . . . and to relationships between belligerents . . ." and "requires that belligerents refrain from employing any kind or degree of violence which is not actually necessary for military purposes and that they conduct hostilities with regard for the principles of humanity and chivalry." Dep't. of the Army, Field Manual 27–10, *The Law of Land Warfare* (1956) (1956 FM 27–10), ¶¶ 1, 3. *See also Quirin*, 317 U.S. at 29, 63 S.Ct. 2 (the law of war was not codified or bound by statute).

In his influential 1886 treatise, Colonel William Winthrop explained the laws or customs of war as:

> [T]he rules and principles, almost wholly unwritten, which regulate the intercourse and acts of individuals during the carrying on of war between hostile nations or peoples. While properly observed by military commanders in the field, they may often also enter into the question of the due administration of justice by military courts in cases of persons charged with offences growing out of the state of war. Such laws and customs would especially be taken into consideration by *military commissions* in passing upon offences in violation of the laws of war.

William Winthrop, *Military Law*, vol. I, 42–43 (Morrison 1886).

Since Colonel Winthrop's 1886 treatise, the number of conventions and treaties applicable in armed conflict has increased significantly. Most conventions addressing the law of armed conflict fall within two broad categories, "Hague Law" or "Geneva Law." [39] Hague law primarily ad-

**38.** Also known as the law of war or international humanitarian law, these phrases will be used synonymously throughout this opinion; *see e.g.,* Manooher Mofidi & Amy E. Eckert, *"Unlawful Combatants" or "Prisoners of War": The Law and Politics of Labels,* 36 Cornell Intl. L.J. 59, 61 (2003)("International humanitarian law" is, broadly, that branch of public international law that seeks to moderate the conduct of armed conflict and mitigate the suffering it causes. It is predicated upon ideas . . . namely, that methods and means of warfare are subject to legal and ethical limitations, and that the victims of armed conflict are entitled to humanitarian care and protection." (citation omitted)).

**39.** *See generally* Hague Convention IV (Hague IV) *Respecting the Laws and Customs of War on Land* (Oct. 18, 1907), 36 Stat. 2277; Hague Convention IX (Hague IX), *Concerning Bombardment by Naval Forces in Time of War,* (Oct. 18, 1907), 36 Stat. 2314; Hague Convention V (Hague V), *Respecting the Rights and Duties of Neutral Powers and Persons in Case of War on Land* (Oct. 18, 1907); GCI to GCIV, *supra* n. 6. International Humanitarian Law includes two additional treaties with widespread adoption. *Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts* (API) (Geneva, June 8, 1977), 1125 U.N.T.S. 3 (No. 17512); *Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non–International Armed Conflicts* (APII) (Geneva, June 8, 1977), 1125 U.N.T.S. 609 (No. 17513), 16 I.L.M. 1442, entered into force for UN July 12, 1978. API has 171 state parties and 4 state signatories. APII has 166 state parties and 3 state signatories. The United States has not ratified either API or APII. *See* Letter of President Ronald Reagan (Jan. 29, 1987) transmitting APII to the Senate at III–IV (recommending ratification of APII, but stating "Protocol I is fundamentally and irreconcilably flawed. It contains provisions that would undermine humanitarian law and endanger civilians in war . . . . [One] provision would grant combatant status to irregular forces even if they do not satisfy the traditional requirements to distinguish themselves from the civilian population and otherwise

dresses restraints on the conduct of hostilities, including the outright prohibition of certain means and methods of warfare. Richard D. Rosen, *Targeting Enemy Forces in the War on Terror: Preserving Civilian Immunity*, 42 Vand. J. Transnatl. L. 683, 692 and n. 41 (2009) (citations omitted). Geneva law primarily focuses on the "treatment of civilians and combatants rendered *hors de combat* who fall into a belligerent's hands." *Id.* at 709 (citations omitted). The United Nations Charter, the "Martens Clause,"[40] and other treaties and conventions also factor into the law of armed conflict including defining who may lawfully engage in armed conflict and when resort to armed force is lawful under international law. Laws or customs of armed conflict are grounded in four key principles: (1) distinction;[41] (2) military

comply with the laws of war. This would endanger civilians among whom terrorists and other irregulars attempt to conceal themselves."); Christopher Petras, *The Law of Air Mobility—The International Legal Principles Behind the U.S. Mobility Air Forces' Mission*, 66 A.F. L.Rev. 1, 24 and n. 132 (2010) ("The U.S. is not a party to Additional Protocol I but views much of it as reflecting customary international law. *See* Michael Matheson, *Session One: The United States Position on the Relation of Customary International Law to the 1977 Protocols Additional to the 1949 Geneva Conventions*, 2 Am. U.J. Intl. L. & Pol'y. 419–31 (1987)"; other citations omitted). *See also* Richard D. Rosen, *Targeting Enemy Forces in the War on Terror: Preserving Civilian Immunity*, 42 Vand. J. Transnatl. L. 683, 688–92 (2009); Daniel Smith, *New Protections for Victims of International Armed Conflicts: The Proposed Ratification of Protocol II by the United States*, 120 Mil. L.Rev. 59, 66–69 and n. 41 (1988)("The proposed reservations and understandings to Protocol II, and the reasons for these recommendations, are set forth in a State Department Report submitted to President Reagan. This Report is printed in S. Treaty Doc. No. 2, 100th Cong., 1st Sess. (1987) [hereinafter State Department Report]."); *Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Adoption of an Additional Distinctive Emblem* (APIII) (Dec. 8, 2005) entered into force for UN Jan. 14, 2007, ratified by U.S. Aug. 3, 2007. APIII has 170 state parties and .5 state signatories.

40. The Martens Clause forms a part of the laws of armed conflict: "Until a more complete code of the laws of war is issued, the High Contracting Parties think it right to declare that in cases not included in the Regulations adopted by them, populations and belligerents remain under the protection and empire of the principles of international law, as they result from the usages established between civilized nations, from the laws of humanity and the requirements of the public conscience." The Martens Clause first appeared in the preamble to the 1899 Hague Convention II (Hague II) *with respect to the laws and customs of war on land*, and is restated in GCI–IV and API and APII, *see supra* nn. 6, 39. *See* Rupert Ticehurst, *The Martens Clause and the Laws of Armed Conflict, International Review of the Red Cross* No. 317, at 125–34 (1997) (citing Preamble, Hague IV, *supra* n. 39; the four *1949 Geneva Conventions* for the protection of war victims, *supra* n. 6 (GCI: art. 63; GCII: art. 62; GCIII: art. 142; GCIV: art. 158), *op. cit.*, pp. 169–337; API, art. 1(2), *op. cit.*, p. 390, and APII, Preamble, *op. cit.*, p. 449; *1980 Weapons Convention*, Preamble, *op. cit.*, p. 473), http://www.loc.gov/rr/frd/Military_Law/pdf/RC_Mar-Apr1997.pdf.

41. *See* Chapter 5.3.2, U.S. Dep't of the Navy, Naval Warfare Publication 1–14M/U.S. Marine Corps MCPW 5–12.1, The Commander's Handbook on the Law of Naval Operations (July 2007) [hereinafter NWP 1–14M] ("The principle of distinction is concerned with distinguishing combatants from civilians and military objects from civilian objects so as to minimize damage to civilians and civilian objects."); *see also* API, art. 48, *see supra* n. 39 ("Parties to the conflict shall at all times distinguish between the civilian population and combatants and between civilian objects and military objectives and accordingly shall direct their operations only against military objectives."); Daphne Richemond, *Reexamining the Law of War: Transnational Terrorist Organizations and the Use of Force*, 56 Cath. U.L.Rev. 1001, 1018 and n. 81 (2007) (citing Francisco de Vitoria, *De Indis et de Ivre Belli Reflectiones*) (Ernest Nys ed., John Pawley Bate trans., 1917) (1532), *reprinted in* 1 The Classics of International Law at 171 (James Brown Scott ed., 1917) ("we may not turn

necessity;[42] (3) proportionality;[43] and (4) humanity.[44] These four principles are the cornerstones for the lawful conduct of armed conflict, and more relevant to our inquiry, the deviation from which may provide the basis for individual criminal responsibility for violation of the laws and customs of war.

### a. Combatants—Lawful and Unlawful

 While the aforementioned principles impose restraints on the conduct of hostilities, the "combatants' privilege" is a fundamental rule of the law of armed conflict. The "privilege of combatant immunity" is limited to "lawful combatants" and "the *quid pro quo* for attaining such immunity must be that combatants distinguish themselves from the civilian population—that is, 'persons entitled to immunity for pre-capture war-like acts must have made themselves legitimate targets while performing those acts.'" Rosen, *supra* n. 39, at 770 (citation omitted). Lawful com-

batants enjoy "combatant immunity" for their pre-capture acts of warfare, including the targeting, wounding, or killing of other human beings, provided those actions were performed in the context of ongoing hostilities against lawful military targets, and were not in violation of the law of war.[45] Article 4, of GCIII, *supra* n. 6, makes it clear that lawful combatants will generally only include the regular armed forces of a party to the conflict, including "members of militias or volunteer corps forming part of such armed forces" and members of other militia, volunteer corps, and organized resistance movements belonging to a State party to the conflict so long as they fulfill the following four conditions that are also included in the 2006 M.C.A. § 948a(2) *infra* at n. 53:

1. They are under the command of an individual who is responsible for their subordinates;

2. They wear a fixed distinctive sign or symbol recognizable at a distance;

our sword against those who do us no harm, the killing of innocent being forbidden by natural law.").

**42.** Article 23(g), Annex to Hague IV ("it is especially forbidden.... To destroy or seize the enemy's property, unless such destruction or seizure be imperatively demanded by the necessities of war"); *See also* Joint Publication 1–02, Department of Defense Dictionary of Military and Associated Terms (May 15, 2011) (military necessity—The principle whereby a belligerent has the right to apply any measures which are required to bring about the successful conclusion of a military operation and which are not forbidden by the laws of war); Dep't of the Army, Field Manual 27–10, *The Law of Land Warfare,* (1956) (1956 FM 27–10) at ¶ 3; NWP 1–14M, *supra* n. 41, at 5.3.1.

**43.** *See* NWP 1–14M, *supra* n. 41, at 5.3.3, ("The principle of proportionality requires the commander to conduct a balancing test to determine if the incidental injury, including death to civilians and damage to civilian objects, is excessive in relation to the concrete and direct military advantage expected to be

gained."); API, art. 51(5)(b), *supra* n. 39 ("An attack which may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, or a combination thereof, which would be excessive in relation to the concrete and direct military advantage anticipated" violates the principle of proportionality.").

**44.** Robin Coupland, *Humanity: What is it and how does it influence international law?,* 83 International Review of the Red Cross No. 844, 969, 969–89 (Dec. 2001), *http://www.icrc. org/eng/assets/files/other/irrc–844–coupland. pdf.*

**45.** *United States v. Khadr,* 717 F.Supp.2d 1215, 1222 (USCMCR 2007) (citing *Johnson v. Eisentrager,* 339 U.S. 763, 793, 70 S.Ct. 936, 94 L.Ed. 1255 (1950)) (Black, J. dissenting)("Legitimate 'acts of warfare,' however murderous, do not justify criminal conviction.... It is no 'crime' to be a soldier ....")(citing *Quirin,* 317 U.S. at 30–31, 63 S.Ct. 2 ("Mere membership in the armed forces could not under any circumstances create criminal liability ...."); other citations omitted).

3. They carry their arms openly; and
4. They conduct their operations in accordance with the laws and customs of war.

 The law of armed conflict regulates the means by which armed force is employed, to include the intentional killing of other human beings. Lawful combatants are immunized from prosecution for the act of killing, so long as the fundamental principles of the law of armed conflict are not violated.

 "Lawful enemy combatants [have] ... combatant immunity and [enjoy] ... the protections of the Geneva Conventions if wounded or sick, and while being held as prisoners of war (POWs)." *United States v. Khadr*, 717 F.Supp.2d 1215, 1221 (USCMCR 2007) (citations omitted). Lawful enemy combatants, who are being tried for offenses that violate the law of war or for their "post-capture offenses committed while they are POWs, are entitled to be tried by the same courts, and in accordance with the same procedures, that the detaining power would utilize to try members of its own armed forces (i.e., by court-martial for lawful enemy combatants held by the United States)." *Id.* (citing GCIII, *supra* n. 6, arts. 84, 87 and 102.).

 "By universal agreement and practice, the law of war draws a distinction between the armed forces and the peaceful populations of belligerent nations and also between those who are lawful and unlawful combatants." *Quirin*, 317 U.S. at 30–31 and n. 7, 63 S.Ct. 2 (citing Hague Convention No. IV (Oct. 18, 1907), 36 Stat. 2295, and Annex I to Hague Convention No. IV; other citations omitted). This determination of "lawful" or "unlawful" combatant status is far more than simply a matter of semantics. Unlawful combatants are not entitled to "combatant immunity" or the privileges generally afforded lawful combatants who become POWs. "Unlawful combatants are likewise subject to capture and detention, but in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful." *Id.* at 31, 63 S.Ct. 2; *see also United States v. Lindh*, 212 F.Supp.2d 541, 554 (E.D.Va.2002).

Prior to implementation of Common Article 3, irregular bands of men carrying on irregular wars not in compliance with the law of armed conflict were under the common law of war upon capture subject to a punishment of death, often without trial.[46] "[S]entences and executions without a proper trial were common practice" in many nations prior to 1949, and they were "nevertheless shocking to the civilized" drafters of GCI–GCIV.[47] Common Article

---

**46.** David Glazier, *The Laws of War: Past, Present, and Future: Precedents Lost: The Neglected History of the Military Commission*, 46 Va. J. Intl. L. 5, 36 (2005) ("[I]t was 'a universal right of war, not to give quarter to an enemy that puts to death all who fall into his hands.' [General Winfield Scott, during the Mexican War in 1847,] could have had the outlaws[, who attacked stragglers from the American Army,] shot on the spot. As a logical result, any procedural due process provided exceeded international requirements." (citations omitted)). *See also* Louis Fisher, Military Tribunals: *Military Tribunals: Historical Patterns and Lessons* at 19, (CRS Report Order Code No. RL32458, July 9, 2004)

(quoting The *War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, ser. II, vol. 1 242–43 (1894)) ("It was a well-established principle, said General Halleck, that 'insurgents and marauding, predatory and guerrilla bands are not entitled' to an exemption from military tribunals. These men are 'by the laws of war regarded as no more nor less than murderers, robbers and thieves.' ").

**47.** *Hamdan*, 548 U.S. at 733–34, 126 S.Ct. 2749 (Alito, Scalia, and Thomas, JJ., dissenting) (quoting Jean S. Pictet, 1 Intl. Comm. of Red Cross, *Commentary: Geneva Convention for the Amelioration of the Condition of the*

3 prohibits "the passing of sentences ... without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." [48]

Although international conventions and treaties primarily address international armed conflict or "conflict between nations," in *Hamdan*, the Supreme Court concluded that "at least" Common Article 3 of the Geneva Conventions (so called because it appeared in all four conventions) applies to the United States' conflict with Al Qaeda. *Hamdan* at 548 U.S. at 629–30, 126 S.Ct. 2749. The Court reasoned:

> in a "conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party [49] to the conflict shall be bound to apply, as a minimum," certain provisions protecting "[p]ersons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by ... detention."

*Id.* (citing GCIII, art. 3, ¶ 1(d), 6 U.S.T. at 3320). In *Hamdan*, noncompliance with the requirement that "judgment [be] pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," *id.* at 630, 632, 126 S.Ct. 2749 (citing GCIII, art. 3, ¶ 1(d), 6 U.S.T.

at 3320), provided one of the two primary bases for the Supreme Court's conclusion that the military commission convened under Military Commission Order No. 1, lacked the authority to try Hamdan. *Id.* at 632–33, 126 S.Ct. 2749.

■ Common Article 3, applicable to the United States' conflict with al Qaeda, reflects elementary considerations of humanity, "provides a rudimentary framework of minimum standards[,] and does not contain much detail." Customary International Humanitarian Law (IHL), International Committee of the Red Cross (ICRC), 2005, vol. I at Intro. XXXV. Common Article 3 was adopted to provide minimum humanitarian standards applicable in internal armed conflict, including prohibition of "sentences and executions without previous trial" or "summary justice." GCI, *supra* n. 6. Less than one typed page in length, Common Article 3 declares in GCI:

> In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:
>
> (1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed 'hors de combat' ... shall in all circumstances be treated hu-

---

*Wounded and Sick in Armed Forces in the Field* 54 (1952)), *http://www.loc.gov/rr/frd/Military_Law/pdf/GC_1949–I.pdf.*

**48.** Common Article 3(1)(d). *See* Pictet, *supra* n. 47, at 54 ("All civilized nations surround the administration of justice with safeguards aimed at eliminating the possibility of errors. The Convention has rightly proclaimed that it is essential to do this even in time of war. We must be very clear about one point: it is only 'summary' justice which it is intended to prohibit. No sort of immunity is given to anyone under this provision. There is noth-

ing in it to prevent a person presumed to be guilty from being arrested and so placed in a position where he can do no further harm; and it leaves intact the right of the State to prosecute, sentence and punish according to the law.").

**49.** The term "Party" here has the broadest possible meaning; a Party need neither be a signatory of the Convention nor "even represent a legal entity capable of undertaking international obligations." GCIII Commentary 37.

manely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria. To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons: (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture; (b) taking of hostages; (c) outrages upon personal dignity, in particular humiliating and degrading treatment; (d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

Common Article 3 is supplemented by APII.[50] APII is comprised of 28 articles, including "fundamental guarantees" prohibiting:

at any time and in any place whatsoever: (a) violence to the life, health and physical or mental well-being of persons, in particular murder as well as cruel treatment such as torture, mutilation or any form of corporal punishment . . . (c) taking of hostages . . . (d) acts of terrorism; [and] (h) threats to commit any or the foregoing acts.

APII, art. 4, ¶¶ 1–2. "Protection of the civilian population" is of fundamental import:

1. The civilian population and individual civilians shall enjoy general protection

against the dangers arising from military operations. *To give effect to this protection, the following rules shall be observed in all circumstances. 2. The civilian population as such, as well as individual civilians, shall not be the object of attack. Acts or threats of violence the primary purpose of which is to spread terror among the civilian population are prohibited. 3. Civilians shall enjoy the protection afforded by this Part, unless and for such time as they take a direct part in hostilities.*

APII, art. 13, *supra* n. 39 (emphasis added).

■ Suffice it to say there is no statute, treaty, or other international agreement which exhaustively details all offenses or conduct violative of the laws or customs of war. However, the "fundamental guarantees" of treaties applicable "at any time and in any place whatsoever" including conflicts not of an international character, explicitly prohibit: murder, the intentional targeting of civilians, "acts of terrorism," and "acts or threats of violence the primary purpose of which is to spread terror among the civilian population" as specifically alleged or directly implicated here. *See* Discussion of Common Article 3 and APII at pp. 33–34, *supra* n. 39. These fundamental guarantees and prohibitions are central to determining whether appellant was lawfully tried and punished by military commission. Although Common Article 3 does not specifically adopt individual criminal liability for its violation,

---

**50.** The White House, Office of the Press Secretary, Fact Sheet: *New Actions on Guantánamo and Detainee Policy*, Mar. 7, 2011("Because of the vital importance of the rule of law to the effectiveness and legitimacy of our national security policy, the Administration is announcing our support for . . . [APII] . . . [This protocol] contains . . . fair trial guarantees that apply in the context of non-international armed conflicts, was originally submitted to the Senate for approval by President

Reagan in 1987. The Administration urges the Senate to act as soon as practicable on this Protocol[.] *An extensive interagency review concluded that United States military practice is already consistent with the Protocol's provisions* ") (emphasis added); *see also* President Reagan, Message to the Senate Transmitting APII, Jan. 29, 1987, *http://www. loc.gov/rr/frd/Military_Law/pdf/protocol–II–100–2.pdf. See also supra* n. 39.

violations of Common Article 3 are considered domestically and internationally as crimes or war crimes.[51]

■ The Appeals Chamber of the International Criminal Tribunal for the former Yugoslavia (ICTY), an *ad hoc* tribunal established by the United Nations in 1993 to address varying atrocities that took place during the conflicts in the Balkans in the 1990s, addressed this very issue. In *Tadić*, the Appeals Chamber found that certain norms of international armed conflict have evolved through customary law and now apply during non-international armed conflict as well. *Prosecutor v. Tadić*, Case No. IT–94–1–AR72, Jurisdiction Appeal, ¶¶ 67–71 (Oct. 2, 1995). Specifically:

> that an armed conflict exists whenever there is a resort to armed force between States or protracted armed violence between governmental authorities and organized armed groups or between such groups within a State. International humanitarian law applies from the initiation of such armed conflicts and extends beyond the cessation of hostilities until a general conclusion of peace is reached; or, in the case of internal conflicts, a peaceful settlement is achieved.

*Tadić*, IT–94–1–AR72 at ¶ 70. Although we are not bound by the ICTY Appeals Chamber's decision in *Tadić*, the principles embodied in *Tadić* reveal that conduct during armed conflict that breaches fundamental principles or values may provide the basis for individual criminal liability for violation of the common law of war.

Fundamental laws applicable in any armed conflict, regardless of type, and relevant here include:

(1) Lawful combatants enjoy combatant immunity for pre-capture acts of warfare performed in the context of ongoing hostilities against lawful military targets. To qualify as a lawful combatant an individual must satisfy the conditions specified in the 2006 M.C.A. § 948a(2) *infra* at n. 53 and listed *infra* p. 1182.

■ (2) The law of armed conflict prohibits the intentional targeting of civilians and "[a]cts or threats of violence the primary purpose of which is to spread terror among the civilian population."[52]

**51.** Derek Jinks, *The Declining Significance of POW Status*, 45 Harv. Intl. L.J. 367, 428–30 nn. 347–51 (2004) ("The U.S. War Crimes Act was amended in 1997 to cover expressly all violations of Common Article 3. *See* Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1998, Pub. L. No. 105–118, 111 Stat. 2386 (1997) (codified at 18 U.S.C. § 2441(c) (2000)) (amended in 1997 to replace the term 'grave breaches' with 'war crime' and to include violations of Common Article 3 within the definition of war crimes). Every U.S. court to consider the issue has classified violations of Common Article 3 as 'serious violations of international law' and 'war crimes.' *See, e.g., Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1995); *Linder v. Portocarrero*, 963 F.2d 332, 336 (11th Cir. 1992) . . . *Doe v. Islamic Salvation Front*, 993 F.Supp. 3 (D.D.C.1998) . . ."). *See also infra* n. 101 (discussing Rome Statute of the ICC) (July 17, 1998), entered into force for the U.N. July 1, 2002, 2187 U.N.T.S. 3, 37 I.L.M. 999, U.N. Doc. A/Conf. 183/9); Statute of the International Criminal Tribunal for Rwanda (ICTR), art. 4, 33 I.L.M. 1598, 1600, S.C. Res. 955, U.N. Doc. S/RES/955 (Nov. 8, 2004)(imposes criminal liability for serious violations of Common Article 3, including for "acts of terrorism"); *Prosecutor v. Tadić*, Jurisdiction Appeal, No. IT–94–1–AR72, ¶¶ 87–91 (Oct. 2, 1995) (*Tadić* Jurisdiction Appeal), 35 I.L.M. 32 (1996)(International Criminal Tribunal for the Former Yugoslavia (ICTY) statute provision concerning "other serious violations of the laws and customs of war" necessarily includes violations of Common Article 3); Tom Graditzky, *Individual Criminal Responsibility for Violations of International Humanitarian Law in Non–International Armed Conflicts*, 322 Intl. Rev. Red Cross 29 (1998) (collecting sources), (*http://www.loc.gov/rr/frd/Military_Law/pdf/RC_Mar–1998.pdf*); *Hamdan*, 801 F.Supp.2d at 1282 n. 60, 2011 WL 2923945 at *20 n. .60.

**52.** Henckaerts, *supra* n. 15, vol. 1 at 3–10 (citing primarily API, art. 51(2); GCIV, art. 33; and APII, arts. 4(2)(d), 13(2)). APII, art.

In stark contrast to these fundamental humanitarian principles and in direct contravention of the explicit prohibitions articulated in Common Article 3 and APII are the words posited by bin Laden, and the actions of al Qaeda, both before and after that edict. In February 1998, bin Laden, ostensibly speaking for "The International Islamic Front for Jihad against the Jews and Crusader," announced a "legal fatwa" to "[o]ur Muslim Nation." Prosecution Ex. 22. In that announcement, he declared that:

> The judgement to kill Americans and their allies, both civilian and military is the individual duty of every Muslim able to do so ... We in the name of God, call on every Muslim who believes in God and desires to be rewarded, to follow God's order to kill Americans and plunder their wealth wherever and whenever they find it.

Prosecution Ex. 22 at 2.

On May 28, 1998, bin Laden was interviewed by ABC News and reiterated that "[w]e do not differentiate between those dressed in military uniforms and civilians, they are all targets in this fatwah." Prosecution Ex. 24 at 2. On May 29, 1998, bin Laden issued a declaration called "The Nuclear Bomb of Islam" which included the statement, "it is the duty of Muslims to prepare as much force as possible to terrorize the enemies of God."

With this foundational framework we turn to the statutory elements of the three offenses of which appellant stands convicted. We will discuss the elements common to all three offenses, and then discuss each offense individually.

### (1) Alien Unlawful Enemy Combatant (AUEC)—Common Element 1

The term AUEC is fundamental to determining both persons subject to trial by military commission, and the subject matter jurisdiction of military commissions convened under the 2006 M.C.A. Each specification states that appellant was an "alien unlawful enemy combatant" and alleges a direct nexus to al Qaeda. *See* Charges, *infra* pp. 48, 86, 97. The statute, as written and as applied at trial, confirms the essential jurisdictional function of the AUEC determination.

The 2006 M.C.A. explicitly limits jurisdiction over persons subject to trial by military commission to AUECs and defines an AUEC as a person who: (1) was not a citizen of the United States, (2) was not a "lawful combatant," [53] and (3) was an "unlawful enemy combatant," *see supra* n. 24 (quoting 2006 M.C.A § 948a(1)).

 At trial, the military commission judge made a threshold determination that appellant was an "unlawful enemy combatant," for the limited purpose of establishing jurisdiction, as that term is defined in the 2006 M.C.A. § 948a(1). Tr. 836–37, 873.[54] The military commission judge's ruling, by a preponderance of the evidence, was consistent with his duty to

---

13 is quoted starting at p. 34. *See also supra* n. 39.

**53.** 2006 M.C.A § 948a(2) ("The term 'lawful enemy combatant' means a person who is— (A) a member of the regular forces of a State party engaged in hostilities against the United States; (B) a member of a militia, volunteer corps, or organized resistance movement belonging to a State party engaged in such hostilities, which are under responsible command, wear a fixed distinctive sign recognizable at a distance, carry their arms openly, and abide by the law of war; or (C) a member of a regular armed force who professes allegiance to a government engaged in such hostilities, but not recognized by the United States.").

**54.** The military commission judge's findings reflect a potential error and a potential omission. First, the military commission judge did not enter a finding that appellant was an "alien" as defined in the 2006 M.C.A. § 948a. Instead, trial defense counsel stipulated that appellant was an alien, and the military commission judge accepted that stipulation through judicial notice. The military commission judge also took judicial notice of a "certificate of nonexistence of records" that

rule on "interlocutory questions and all questions of law"[55] and practice in courts-martial.[56] The military commission judge also required the fact finders to determine, based upon legal and competent evidence, "beyond a reasonable doubt, [whether appellant] was an alien unlawful enemy combatant and [whether] the alleged conduct occurred in the context of and was associated with an armed conflict." Tr. 843–44.

■ Based upon the record before us, making allowances for not having personally observed the witnesses, we agree with the military commission judge and the members that appellant was an AUEC, as defined by the 2006 M.C.A., and conclude that the military commission properly exercised jurisdiction over him. We base this conclusion on our findings, beyond any reasonable doubt that: (1) appellant was a member of al Qaeda during the charged time frame as evidenced by his admissions and other corroborating evidence; (2) appellant was a citizen of Yemen, and that he was neither a citizen nor resident of the United States; and (3) that appellant was not a lawful combatant, as that term is defined in 2006 M.C.A. § 948a(2). *See supra* n. 53.

The specification of each charge explicitly stated that appellant was an AUEC and alleged a direct nexus to al Qaeda. The

2006 M.C.A. defines "unlawful enemy combatant" as "a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces)." 2006 M.C.A. § 948a(1), *supra* n. 24. This definition implicitly reflects that membership in al Qaeda renders an individual an unlawful enemy combatant potentially punishable by military commission if that person is also an "alien" and not otherwise a "lawful combatant." This implication was made explicit in the 2009 M.C.A. where an "unprivileged enemy belligerent," "means an individual (other than a privileged belligerent) who—(C) was a part of al Qaeda at the time of the charged offense under this chapter." 2009 M.C.A. § 948a(7)(C). *See infra* n. 58.

The military commission judge applied the 2006 M.C.A. precisely in that manner. He instructed the members that the AUEC determination was an element "common to all the offenses," and further instructed that "the government must prove to you beyond a reasonable doubt that [appellant]" was an AUEC, defining each key term in accordance with the statute.[57] Accordingly, appellant's status as

appellant "is or has ever been a lawful resident of the United States." Tr. 87–88, 298–99, 837, 873. Likewise, he did not explicitly find that appellant was not a "lawful combatant," as that term is defined in the 2006 M.C.A. § 948a(1). *See supra* n. 24. Though not challenged at trial or on appeal, assuming *arguendo* it was error, we conclude that any such error did not materially prejudice the substantial rights of appellant. 2009 M.C.A. § 950a(a).

**55.** 2007 M.M.C., Part II, R.M.C. 801(a)(4) (the military commission judge "[r]ule[s] on all interlocutory questions and all questions of law raised during the military commissions"); *Id.* at R.M.C. 801(e)(2) ("Questions of fact in

an interlocutory question shall be determined by a preponderance of the evidence, unless otherwise stated in this Manual.").

**56.** *See* MCM (2008), Part II, R.C.M. 801(a)(4) and Discussion, R.C.M. 801(e)(4) and Discussion, App. 21–42 to 21–44.

**57.** The record, including appellant's pretrial admissions, establish beyond any reasonable doubt that he was a citizen of Yemen, and there was no evidence presented supporting a finding that appellant was a lawful combatant. Moreover, the members, based upon the military commission judge's instructions concluded beyond a reasonable doubt that appellant was an alien unlawful enemy combatant (AUEC) and not a lawful combatant as de-

an AUEC was crucial to the military commission's exercise of jurisdiction over appellant and determination of his guilt.

### (a) AUEC and the Law of Armed Conflict

Under the law of armed conflict, an AUEC is effectively synonymous with "unprivileged enemy belligerent," in other words a belligerent who is not entitled to "combatant immunity" or, upon capture, treatment as a prisoner of war. It is based upon the statutory language and findings required by the military commission judge and members. Congress' substitution of the phrase "unprivileged enemy belligerent" for "unlawful enemy combatant" in the 2009 M.C.A. further supports this proposition.[58]

As previously discussed, "unlawful combatants are ... subject to trial and punishment by military tribunals for acts which render their belligerency unlawful." *Quirin*, 317 U.S. at 30–31, 63 S.Ct. 2. The Supreme Court has long recognized that "men and bodies of men, who, without being lawful belligerents nevertheless commit hostile acts of any kind are not entitled to the privileges of prisoners of war if captured, and may be tried by military commission and punished by death or lesser punishment." *Id.* at 34, 63 S.Ct. 2 (citing 1940 Rules of Land Warfare promulgated by the War Department for the guidance of the Army, ¶ 351)(internal quo-

tation marks omitted). Clearly, both the plain language of the 2006 M.C.A., *see supra* n. 24, and *Quirin* use the word "unlawful" in contradistinction to the word "lawful" or "privileged." *See supra* n. 58.

### (b) Irregular Warfare

At the time of the Civil War it was a well-established principle that guerilla-type bands were not exempt from military tribunals, and by the "laws of war" treated as murderers, robbers and thieves. Fisher, *supra* n. 46, at 19 (citation omitted). Early in the American Civil War then General–in–Chief of the U.S. Army, Major General (MG) H.W. Halleck posed several related questions to Dr. Francis Lieber, a noted law of war expert and future author of the Lieber Code, one of the first comprehensive lists of the laws of war.[59] General Halleck noted:

> rebel authorities claim the right to send men, in the garb of peaceful citizens, to waylay and attack [Union] troops, to burn bridges and houses, and to destroy property and persons within [Union] lines. They demand that such persons be treated as ordinary belligerents, and that when captured they [be treated as prisoners of war]; they also threaten that if such persons be punished as marauders and spies, that they will retaliate by executing [Union] prisoners of

---

fined in the 2006 M.C.A. § 948a(2). Tr. 843–44, 846, 859, 869, 916–17. *See also supra* nn. 23, 24, 53.

**58.** *Compare* 2009 M.C.A. § 948a(7) *with* 2006 M.C.A. § 948a(1), *supra* n. 24. *See also Hamdan*, 801 F.Supp.2d at 1277 n. 48, 2011 WL 2923945 at *18 n. 48 (citations omitted) (explaining why Congress changed the term from "unlawful combatant" to "unprivileged enemy belligerent").

**59.** Lieber was the lead author of Army General Orders 100 (1863) (G.O. 100), which was

subsequently styled the Lieber Code. *See* Francis Lieber, *Instructions for the Government of Armies of the United States in the Field* (*Lieber's Instructions*) 2 (1898). On April 24, 1863, President Abraham Lincoln approved G.O. 100, and directed its publication, "for the information of all concerned." *Id.* The Lieber Code represented one of the first comprehensive lists of the laws of war. Rosen, *supra* n. 39, at 695 ("The Lieber Code established the basis for later international conventions on the laws of war at Brussels in 1874 and at The Hague in 1899 and 1907.") (citation omitted).

war in their possession. I particularly request your views on these questions. Francis Lieber, *Guerrilla Parties Considered with Reference to the Laws and Usages of War* (Lieber, *Guerrilla Parties*) Forward (1862). *See also* James G. Garner, *General Order 100 Revisited,* 27 Mil. L.Rev. 1, 17 (1965) (citing letter of MG H.W. Halleck to Francis Lieber of Aug. 6, 1863). In response, Doctor Lieber explained:

> [t]he position of armed parties loosely attached to the main body of the army, or altogether unconnected with it has rarely been taken up by writers on the law of war.... We find that self-constituted bands in the South, who destroy the cotton stored by their own neighbors, are styled in the journals of the North as well as those in the South, Guerillas: while in truth they are, according to the common law—not of war only, but that of every society—simply armed robbers, against whom every person is permitted, or is in duty bound, to use all means of defense at his disposal[.]

Lieber, *Guerrilla Parties* at 5–6.

> [I]t is universally understood in this country ... that a guerrilla party means an irregular band of armed men, carrying on an irregular war, not being able according to their character as a guerrilla party, to carry on what the law terms a *regular* war. The irregularity of the guerrilla party consists in its origin, for it is either self-constituted or constituted by the call of a single individual, not according to the general law of levy, conscription, or volunteering ... and it is irregular as to the permanency of the band, which may be dismissed and called again together at any time.... Guerrilla parties ... do not enjoy the full benefit of the laws of war.... The reasons for this are, that they are annoying and insidious,

> .... [guerrilla parties] carry on petty war (guerrilla) chiefly by raids, extortion, destruction, and massacre, and ... generally give [prisoners] no quarter[.]

*Id.* at 7–8, 18–19.

> Nor can it be maintained in good faith ... that ... an armed prowler—(now frequently called a bushwhacker) shall be entitled to the protection of the law of war, simply because he says he has taken up his gun in defence of his country, or because ... his chief has issued a proclamation by which he calls upon the people to ... commit homicides which every civilized nation will consider murders.... The most disciplined soldiers will execute on the spot an armed and murderous prowler found where he could have no business as a peaceful citizen .... the so-called bushwhacker, is a simple assassin, and will thus always be considered by soldier and citizen ... They unite the fourfold character of the spy, the brigand, the assassin and the rebel, and cannot ... expect to be treated as a fair enemy of a regular war. They know what a hazardous career they enter upon when they take up arms, and that, were the case reversed, they would surely not grant the privilege of regular warfare to persons who should thus rise in their rear.

*Id.* at 17, 20–21.

> How far rules which have formed themselves in the course of time between belligerents might be relaxed, with safety, ... So much is certain, that no army, no society, engaged in war, any more than a society at peace, can allow unpunished assassination, robbery, and devastation, without the deepest injury to itself and disastrous consequences[.]

*Id.* at 21–22.

This reasoning was repeated in Attorney General Speed's opinion regarding trial by military commission of those charged with

conspiring to assassinate President Lincoln. He concluded that the act of:

> unit[ing] with banditti, jayhawkers, guerillas, or any other unauthorized marauders is a high offence against the laws of war; the offence is complete when the band is organized or joined. The atrocities committed by such a band do not constitute the offence, but make the reasons ... why such banditti are denounced by the laws of war.

James Speed, *Opinion of the Constitutional Power of the Military to Try and Execute the Assassins of the President,* 11 Op. Atty. Gen. 297, 312 (1865).

Post World War II, before the International Military Tribunal at Nuremburg, both the Chief French Prosecutor and Deputy Chief French Prosecutor acknowledged that unlawful belligerents or *"francs-tireurs* could be condemned to death[.]"[60] Similarly, the occupying powers conducted trials in Germany under the authority of Control Council No. 10, known as the Nuremberg Military Tribunals (NMT) and considered international tribunals administering international law. In "The *United States of America v. Wilhelm List, et al.*" a U.S. Tribunal agreed with the contention of the defendant List, a former German Armed Forces Commander Southeast:

> that the guerrilla fighters with which he contended were not lawful belligerents

entitling them to prisoner of war status upon capture. [The Court is therefore] obliged to hold that such guerrillas were *francs-tireurs* who, upon capture, could be subjected to the death penalty. Consequently, no criminal responsibility attaches to the defendant List because of the execution of captured partisans in Yugoslavia and Greece.

11 T.W.C., *supra* n. 60, at 1269, *see also id.* at 529–30, 1244 (discussing necessity for compliance with the four requirements in the Annex to the Hague Convention, art. 1, at p. 31); 2006 M.C.A. § 948a(2), *supra* n. 53 (requirements for lawful combatant). The Tribunal also held that List's deputy, Walter Kuntze, had "no criminal responsibility ... because of the killing of captured members of the resistance forces, they being *francs-tireurs* subject to such punishment." *Id.* at 1276.

### (c) U.S. Army 1914 and 1956 Manuals

In 1914, the United States War Department "replaced General Orders No. 100 with an Army Field Manual entitled *'The [Rules ] of Land Warfare'* which, updated, is still in force."[61] The purpose of the 1914 Manual was to provide authoritative guidance to military personnel on customary and treaty law applicable to the conduct of warfare on land. 1914 Manual at 3, 11–13. The 1914 Manual ¶¶ 369, 371, and 373 permit prosecution as war crimi-

---

**60.** 5 T.M.W.C., *supra* n. 36, at 405 (Chief Prosecutor M. Francois de Menthon, French Republic, stated to the IMT, "To be sure, the members of the Resistance rarely complied with the conditions laid down by the Hague Conventions, which would qualify them to be considered as regular combat forces; they could be sentenced to death as *francs-tireurs* and executed. But they were assassinated without trial in most cases, often after having been terribly tortured.); 11 *Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10,* at 388 (1951). An abbreviated official edition of *Trials of War Criminals Before the Nuernberg*

*Military Tribunals under Control Council Law No. 10* was published as 15 volumes, are abbreviated as T.W.C., and are known as "The Green Series." The case number, name of lead defendant, popular name, and volume are listed at *infra* n. 85, *http://www.loc.gov/rr/ frd/Military_Law/NTs_war-criminals.html.*

**61.** Gregory P. Noone, *The History and Evolution of the Law of War Prior to World War II,* 47 Naval L.Rev. 176, 200 (2000) (citing Telford Taylor, *The Anatomy of the Nuremburg Trials: A Personal Memoir* 10 (1992); 1956 FM 27–10, *supra* n. 42).

nals of individuals who engage in hostilities without qualifying as lawful combatants or privileged belligerents stating:

**369. Hostilities committed by individuals not of armed forces.**—Persons who take up arms and commit hostilities without having complied with the conditions prescribed for securing the privileges of belligerents, are, when captured by the enemy, liable to punishment for such hostile acts as war criminals.

**371. Highway robbers and pirates of war.**—Men, or squads of men, who commit hostilities, whether by fighting, or by inroads for destruction or plunder, or by raids of any kind, without commission, without being part and portion of the organized hostile army, and without sharing continuously in the war, but who do so with intermitting returns to their homes and avocations, or with the occasional assumption of the semblance of peaceful pursuits, divesting themselves of the character or appearance of soldiers—such men, or squads of men, are not [lawful combatants or privileged belligerents], and, therefore, if captured, are not entitled to the privileges of prisoners of war, but shall be treated summarily as highway robbers and pirates. [citing] G.O. 100, 1863, art. 82[, *supra* n. 59.]

**373. Armed prowlers.**—Armed prowlers, by whatever names they may be called, or persons of the enemy's territory, who steal within the lines of the hostile army for the purpose of robbing, killing, or of destroying bridges, roads, or canals, or of robbing or destroying the mail, or of cutting the telegraph wires, are not entitled to the privileges of the prisoner of war. [citing] G.O. 100, 1863, art. 84[, *supra* n. 59.]

In 1942, the Supreme Court cited the 1914 and 1940 Rules of Land Warfare as the War Department's guidance to the Army on war crimes. *See Quirin*, 317 U.S. at 33–34, 63 S.Ct. 2. In 1956, the U.S. Army updated the 1940 version of the Rules of Land warfare with Dep't of the Army, Field Manual 27–10, *The Law of Land Warfare* (1956 FM 27–10). The 1956 FM 27–10 ¶¶ 502–504 listed grave breaches of the Geneva Conventions and a representative list of other war crimes. At ¶ 499 it defines "the term 'war crime' " to be "the technical expression for a violation of the law of war by any person or persons, military or civilian. Every violation of the law of war is a war crime." Like the 1914 Manual, the 1956 FM 27–10 permits prosecution of unlawful combatants or unprivileged belligerents as war criminals stating:

**80. Individuals Not of Armed Forces Who Engage in Hostilities** Persons, such as gue[ ]rillas and partisans, who take up arms and commit hostile acts without having complied with the conditions prescribed by the laws of war for recognition as belligerents (see [GCIII], art. 4; par. 61 herein), are, when captured by the injured party, not entitled to be treated as prisoners of war and may be tried and sentenced to execution or imprisonment.

**81. Individuals Not of Armed Forces Who Commit Hostile Acts** Persons who, without having complied with the conditions prescribed by the laws of war for recognition as belligerents (see [GCIII], art. 4; par. 61 herein), commit hostile acts about or behind the lines of the enemy are not to be treated as prisoners of war and may be tried and sentenced to execution or imprisonment. Such acts include, but are not limited to, sabotage, destruction of communications facilities, intentional misleading of troops by guides, liberation of prisoners of war, and other acts not falling within Articles 104 and 106 of the Uniform Code of Military Justice and Article 29 of the Hague Regulations.

The 1956 Field Manual provides for punishment of those who assist in illegal hostilities stating in ¶ 82 that persons culpable under ¶¶ 80 and 81 "who have attempted, committed, or conspired to commit hostile or belligerent acts are subject to the extreme penalty of death because of the danger inherent in their conduct. Lesser penalties may, however, be imposed."

**(d) Terrorists**

A former Legal Adviser, U.S. State Department, eloquently addressed the status of terrorists *vis-à-vis* privileged or lawful belligerency in the following statement:

> Terrorists are belligerents who lack the entitlements of those legitimately engaged in combat. No colorable argument has been put forward that terrorists are entitled to any special status under the law of armed conflict—and certainly not to the status of prisoners of war under [GCIII]. As a group, terrorists willingly define and conduct themselves outside the coverage of Article 4 of the [GCIII]: They are neither members of the armed forces of a State Party nor members of a "regular" armed force. Even if generously considered, in the broadest sense, "irregulars" of some sort, they willfully and maliciously fail to distinguish themselves from the civilian population, as impliedly required by the four conditions laid down in the 1907 Hague Regulations and repeated in Article 4(A)(2) of the [GCIII]. In fact, the core aspect of terrorism is that its perpetrators fail on a systematic and willful basis to conduct "their operations in accordance with the laws and customs of war," as required by Article 4(A)(2)(d) . . . .
>
> [A]rticle 4 . . . imposes a distinction between the legitimate and the illegitimate combatant—and while Article 4 express-

ly entitles the legitimate soldier to the [GCIII]'s protections, its real beneficiaries are the civilians who make up the mass of our societies . . . .

\* \* \*

> Terrorism is, above all, the negation of law. More specifically, it is the negation of the fundamental humanitarian principles of the law of armed conflict. Whereas humanitarian law proscribes directing attacks against civilians as such, terrorism promotes it; and whereas a fundamental purpose of *jus in bello* is the facilitation of order after a conflict, the aim of terrorism is the opposite—chaos clad in violence. . . . Application of the law of armed conflict, and in particular its bedrock principles of distinction and fundamental protections, serves humanitarian ends and ultimately reinforces the rules governing international behavior at all times, even in war.[62]

**(e) Conclusion**

The 2006 M.C.A. definition of an AUEC is consistent with the meaning of an unprivileged belligerent under the common law of armed conflict. *See supra* n. 58. In the absence of any meaningful support for the proposition that appellant or other members of an armed group like al Qaeda qualify as lawful or privileged belligerents under the law of armed conflict, and upon consideration of the charged conduct and the entire record, we also conclude, beyond any reasonable doubt, that appellant was an AUEC as defined in the 2006 M.C.A.

**(2) Conduct in the Context of and Associated with an Armed Conflict— Common Element 2**

The 2006 M.C.A., as implemented in the 2007 M.M.C., requires a nexus between the charged conduct and an armed conflict

---

**62.** William H. Taft, IV; Current Pressures on International Humanitarian Law: The Law of Armed Conflict After 9/11: Some Salient Features, 28 Yale J. Intl. L. 319, 321, 323 (2003).

to be punishable. This nexus performs an important narrowing function in determining which charged acts of terrorism constitute conduct punishable by such a law of war military commission, while effectively excluding from their jurisdiction isolated and sporadic acts of violence not within the context of an armed conflict. The 2007 M.M.C. includes this nexus as an element, requiring proof beyond a reasonable doubt that the offense occurred in the context of an armed conflict.[63]

This element, sometimes referred to as the "contextual element"[64] or "chapeaux,"[65] is central to determining whether conduct is punishable by a law of war tribunal. Consistent with treaty law, custom, and practice, the determination whether the hostilities in issue satisfy this element is objective in nature and generally relate to the intensity and duration of those hostilities.[66]

In this case, each specification states that all conduct occurred in "various loca-

**63.** *See also* Charge sheet. The 2006 M.C.A. limits jurisdiction over persons subject to trial by military commission to AUECs *"engaged in hostilities* or who has *purposefully and materially supported hostilities."* § 948a(1)(i) and § 948b(a)(emphasis added). *See* nn. 23, 24, 53. *See also* M.M.C., Part IV ¶ 6(a)(25). The scope of the conspiracy and solicitation offenses are limited to certain object offenses listed in the 2006 M.C.A. The seven objects of the conspiracy, in the Specification of Charge I, and solicitation, in the Specification of Charge II, are defined as an offense punishable by military commission in the 2006 M.C.A. §§ 950v(b)(1), 950v(b)(2), 950v(b)(3), 950v(b)(15), 950v(b)(16), 950v(b)(24), and 950v(b)(25). *See infra* pp. 89, 98.

**64.** Volker Nerlich, ·*Core Crimes and Transnational Business Corporations,* 8 J. Intl. L. Crim. Justice 895, 904 (2010)(citing G. Werle, *Principles of International Criminal Law* (2d ed., The Hague: Asser Press, 2009), marginal no. 1001 et seq., with further references) ("The decisive factor is not the status of the perpetrator, but whether the act in question was committed in the context of an armed conflict. If, however, the contextual element is not present, the conduct in question will not amount to a war crime" and noting "the penultimate element of each of the war crimes in the ICC's Elements of Crimes, which provides that '[t]he conduct took place in the context of and was associated with an international armed conflict/an armed conflict not of an international character.' ").

**65.** Leila Nadya Sadat and S. Richard Carden, *The New International Criminal Court: An Uneasy Revolution,* 88 Geo. L.J. 381, 426 (2000) ("Jurisdictional elements of the offenses are generally found in the *chapeaux* of

the articles defining the crimes. The question arises in war crimes, for example, as to whether an offense was committed in an armed conflict, and whether that armed conflict was international or non-international in character.")(emphasis added).

**66.** *See* APII, *supra* n. 39, art. 1.1 ("This Protocol which develops and supplements Article 3 common to the Geneva Conventions of 12 August 1949 without modifying its existing conditions of application, shall apply to all armed conflicts which are not covered by Article 1 of [API] and which take place in the territory of a High Contracting Party between its armed forces and dissident armed forces or other organized armed groups which, under responsible command, exercise such control over a part of its territory as to enable them to *carry out sustained and concerted military operations* and to implement this Protocol.") (emphasis added) and art 1.2. ("This Protocol shall not apply to situations of internal disturbances and tensions, such as riots, isolated and sporadic acts of violence and other acts of a similar nature, as not being armed conflicts."); *see also* Rome Statute of the ICC, *supra* nn. 51, 118, art. 8(2)(f) ("Paragraph 2(e) [lists 12 serious violations of the laws and customs] "within the established framework of international law" that are applicable "to armed conflicts not of an international character and ... not appli[cable] to situations of internal disturbances and tensions, such as riots, isolated and sporadic acts of violence or other acts of a similar nature. It applies to armed conflicts that take place in the territory of a State when there is protracted armed conflict between governmental authorities and organized armed groups or between such groups.").

tions in Afghanistan, Pakistan, and elsewhere." Appellant has not challenged the existence of an armed conflict between the United States and al Qaeda, either at trial or on appeal. In *Hamdan,* the Supreme Court found an armed conflict to exist with al Qaeda, one governed by applicable conventional and customary laws of war. *Hamdan* 548 U.S. at 628–31, 126 S.Ct. 2749. *See supra* n. 48. There is no dispute that hostilities rising to the level of armed conflict existed in Afghanistan, Pakistan and elsewhere including the United States no later than September 11, 2001. After consideration of the record in this case, we conclude that hostilities rising to the level of armed conflict existed on or before February 1999—the beginning of the charged timeframe. Again, the military commission's application of this contextual element proves illustrative. The military commission judge instructed the members that:

> With respect to each of the offenses listed as objects in the Specification of charges, the government must prove beyond a reasonable doubt that the offense took place in the context of and was associated with armed conflict. In determining whether an armed conflict existed between the United States and al Qaeda and when it began, you should consider the length, duration, and intensity of the hostilities between the parties; whether there was protracted armed violence between the governmental authorities and organized armed groups; whether and when the United States decided to employ the combat capabilities of its armed forces to meet the al Qaeda threat; the number of persons killed or wounded on each side; the amount of property damage on each side; statements of the leaders of either side indicating their perceptions regarding the existence of an armed conflict including the presence or absence of a declaration to that effect; and any other

facts and circumstances you consider relevant to the existence of armed conflict ... [Y]ou should consider whether [the charged offense] occurred during the period of an armed conflict as defined above; was intended or performed while the accused acted on behalf of or under the authority of a party to the armed conflict; and whether it constituted or was closely and substantially related to hostilities occurring during the armed conflict.... Conduct of the accused that occurs at a distance from the area of conflict or prior to the start of the conflict can still be in the context of and associated with armed conflict as long as it was closely and substantially related to the hostilities that comprised conflict.

Tr. 844–45.

 In conclusion, the requirement that the charged conduct occur "in the context of and associated with an armed conflict," as defined in the M.M.C. and by the military commission judge at trial are consistent with the law of armed conflict and the 2006 M.C.A. This element is fundamental to the military commission's proper exercise of jurisdiction over any charged offense. Moreover, after weighing all the evidence in the record and recognizing that we did not see or hear the witnesses, we are also convinced, beyond a reasonable doubt, that the United States was engaged in an armed conflict with al Qaeda during the charged timeframe in "various locations in Afghanistan, Pakistan, and elsewhere."

## VIII. PROVIDING MATERIAL SUPPORT FOR TERRORISM, *EX POST FACTO,* AND INSTRUCTIONAL ERROR

We begin our analysis by combining appellant's three challenges to the charge of providing material support for terrorism:

(1) that providing material support for terrorism is not an offense punishable by military commission; (2) that this offense violated the *Ex Post Facto* Clause of the U.S. Constitution; and (3) that the military commission judge erroneously defined providing material support for terrorism at trial. Brief for Appellant 23–30; Reply Brief for Appellant 11–14.

## A. Providing Material Support for Terrorism—an Offense under the Law of Armed Conflict

Appellant alleges that "Providing Material Support for Terrorism" is a "novel domestic crime" neither recognized nor charged as a war crime before passage of the 2006 M.C.A. Brief for Appellant 24; Reply Brief for Appellant 11–13.[67] He also argues that, as an inchoate offense, providing material support for terrorism was not punishable by military commission. Brief for Appellant at 23–29; Reply Brief for Appellant 11–13. Finally, he avers that even assuming the offense was punishable by military commission the military commission judge erroneously defined that offense. Brief for Appellant at 29–30; Reply Brief for Appellant 13–14.

In *Hamdan,* we recently concluded that a military commission properly exercised jurisdiction under the 2006 M.C.A. over the charged conduct in five specifications of "providing material support for terrorism" when committed by an AUEC in the context of an armed conflict with the requisite knowledge and intent. *See Hamdan,* 801 F.Supp.2d at 1276–79, 2011 WL 2923945 at *18 (citations omitted). The conduct detailed in those five specifications was charged under two distinct formulations of the offense of providing material support for terrorism.

We disagree with appellant's primary assertion that the charged conduct was not punishable by military commission when he committed the offenses. *See Hamdan,* 801 F.Supp.2d at 1312–15, 1322–23, 2011 WL 2923945 at *43–*44, *50 (citations omitted). The charged conduct, including appellant's pledge of fealty to bin Laden, membership in al Qaeda, and intentional provision of material support or resources to al Qaeda, an international terrorist organization, then engaged in armed conflict with the United States, with knowledge that al Qaeda had engaged in or engages in terrorism, was punishable by military commission when committed.

## 1. The Charge

Appellant was charged in the Specification of Charge III with and convicted of:

[as an AUEC and in the context of an armed conflict from in or about February 1999 through in or about December 2001] at various locations in Afghanistan and elsewhere, intentionally provid[ing] material support and resources to al Qaeda, an international terrorist organization then engaged in hostilities against the United States, including violent attacks on the United States' embassies [in] Nairobi, Kenya and Dar es Salaam, Tanzania [on] August 7, 1998; on the U.S.S. COLE [near] Aden, Yemen [on] October 12, 2000, and; at various locations in the United States [on] September 11, 2001, knowing that al Qaeda engaged in or engages in terrorism, by: a. traveling to Afghanistan with the purpose and intent of joining al Qaeda; b. meeting with Saif al' Adl, the head of the al Qaeda Security Committee, as a step toward joining the al Qaeda organization;

---

67. *See also* Elsea, CRS Report No. R40752, *supra* n. 16, at 10 ("Similarly, defining as a war crime the 'material support for terrorism' does not appear to be supported by historical precedent.").

c. undergoing military-type training at an al Qaeda sponsored training camp then located in Afghanistan near Mes Aynak;

d. pledging fealty, or "bayat" to the leader of al Qaeda, Usama bin Laden, joining al Qaeda, and providing personal services in support of al Qaeda;

e. preparing and assisting in the preparation of various propaganda products, including the video "The Destruction of the American Destroyer *U.S.S. COLE*," to solicit material support for al Qaeda, to recruit and indoctrinate personnel to the organization and objectives of al Qaeda, and to solicit, incite, and advise persons to commit terrorism;

f. acting as personal secretary and media secretary of Usama bin Laden in support of al Qaeda;

g. arranging for Muhammed Atta, also known as Abu Abdul Rahman al Masri, and Ziad al Jarrah, also known as Abu al Qa'qa al Lubnani, to pledge fealty or "bayat" to Usama bin Laden;

h. preparing the propaganda declarations styled as martyr wills of Muhammed Atta and Ziad al Jarrah in preparation for the acts of terrorism perpetrated by the said Muhammed Atta, Ziad al Jarrah and others at various locations in the United States on September 11, 2001;

i. at the direction of Usama bin Laden, researching the economic effect of the September 11, 2001 attacks on the United States, and providing the result of that research to Usama bin Laden; [and]

j. operating and maintaining data processing equipment and media communications equipment for the benefit of Usama bin Laden and other members of the al Qaeda leadership.

The charged conduct shares some commonality with Hamdan's conviction for that same offense, as both Hamdan and al Bahlul received military-type training at an al Qaeda-sponsored training camp, both pledged fealty to bin Laden, both were al Qaeda members, and both provided personal services to bin Laden in support of al Qaeda's goals and objectives. However, unlike Hamdan's more traditional soldier-like support (e.g. armed physical security and transportation of persons and weapons), appellant provided staffing and strategic support, and was acquitted of providing physical security.

### 2. The 2006 M.C.A. and 2007 M.M.C.

The 2006 M.C.A.'s definition of "Providing Material Support for Terrorism" includes two principal formulations of conduct comprising that offense.[68] The first, not alleged here, includes "provid[ing] material support . . . for, or in carrying out an act of terrorism." 2006 M.C.A. § 950v(b)(25)(A). While the second, charged here, is that the accused "intentionally provide[d] material support or resources to an international organization engaged in hostilities against the United States . . . ." *Id.* These two formulations are legally distinct. Accordingly, our analysis and holding pertain only to the second.

---

68. 2006 M.C.A. § 950v(b)(25)(A) ("Offense.— Any person subject to this chapter who [1] provides material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, an act of terrorism (as set forth in paragraph (24)), *or* [2] who intentionally provides material support or resources to an international terrorist organization engaged in hostilities against the United States, knowing that such organization has engaged or engages in terrorism (as so set forth), shall be punished as a military commission under this chapter may direct.")(emphasis added). *See also* 2007 M.M.C., Part IV, ¶ 6(25)b; *Hamdan,* 801 F.Supp.2d at 1257–59, 2011 WL 2923945 at *4–*5 (Hamdan was convicted of both types of providing material support for terrorism).

The 2007 M.M.C. in Part IV, ¶ 6(25)bB, lists the particular elements for providing material support for an international terrorist organization as follows:

B. (1) The accused provided material support or resources to an international terrorist organization engaged in hostilities against the United States;

(2) The accused intended to provide such material support or resources to such an international terrorist organization;

(3) The accused knew that such organization has engaged or engages in terrorism; and

(4) The conduct took place in the context of and was associated with an armed conflict.

**a. Material Support or Resources**

The statute defines "material support or resources" as "any, property, tangible or intangible, or [any] service[.]"[69] This definition includes a nonexclusive list of property and services constituting material support or resources including "expert advice or assistance, . . . communications equipment, . . . [and] personnel (1 or more individuals who may be or include oneself) [.]"[70]

By defining "material support or resources" as "any, property . . . or [any]

service" Congress cast a wide net with respect to the scope of support and resources subject of the statute. The Supreme Court acknowledged the broad "scope" of this definition, in ruling on a recent challenge to the domestic law source of this definition. "Of course, the scope of the material-support statute may not be clear in every application." *Holder v. Humanitarian Law Project*, 561 U.S. ——, 130 S.Ct. 2705, 2720, 177 L.Ed.2d 355 (2010).

In this case, the Specification of Charge III states appellant provided both material support and resources. The primary resource charged was that he provided himself to al Qaeda as a member; consistent with the statute's explicit recognition of "personnel [including] oneself" as material support or resources. *See* 2006 M.C.A. § 950v(b)25(A) (quoted *supra* at nn. 68–69,). The specification states he traveled to Afghanistan to join al Qaeda, met with an al Qaeda leader, underwent military-type training at an al Qaeda sponsored camp, met with and pledged personal loyalty to bin Laden, and then joined al Qaeda. The Specification of Charge III ¶¶ a-d.

Appellant was also charged with providing services in direct support of bin Laden and al Qaeda including: preparation of

**69.** *See* 2006 M.C.A. § 950v(b)(25)(B) ("[T]he term 'material support or resources' has the meaning given that term in section 2339A(b) of title 18."). Title 18 U.S.C. § 2339A(b) reads:

(1) the term "material support or resources" means any property, tangible any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious ma-

terials; (2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and (3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.). We interpret the language "any property, tangible or intangible, or service," to mean "any, property . . . or [any] service."

**70.** We interpret the word "including" to mean "includ[ing] but not limited to[.]" *See* 10 U.S.C. § 101(f)(4) ("Rules of Construction" "In this title . . . 'includes' means 'includes but is not limited to' "). *See also* 2008 MCM, R.C.M. 103 Discussion.

propaganda products intended for al Qaeda recruiting and indoctrination training, and inciting persons to commit terrorism; acting as personal and media secretary for bin Laden, facilitating the pledges of loyalty to bin Laden and preparing the propaganda declarations styled as Martyr Wills for two suspected September 11, 2001 hijackers/pilots, researching the economic effect of those attacks on the United States and providing the results to bin Laden, and operating and maintaining data processing equipment and media communications equipment for the benefit of bin Laden and other al Qaeda leaders. The Specification of Charge III ¶¶ e-j.

Although the services he provided are not explicitly identified in the statute, the statutorily enumerated examples are a non-exhaustive list. The charged services fall within the scope of the statutorily defined services to include expert advice or assistance.

 After review of the record, including the Specification of Charge III, and pleadings of the parties, we conclude that appellant's provision of himself as a member of al Qaeda and his provision to al Qaeda of various services constitute "material support or resources," as those terms are defined in the 2006 M.C.A.

**b. Terrorism—defined**

The offense of "terrorism" warrants particularized discussion as it is invoked in each charged offense. The 2006 M.C.A. § 950v(b)(24) prohibits AUECs from committing terrorism stating:

TERRORISM.—Any person subject to this chapter who intentionally kills or inflicts great bodily harm on one or more protected persons, or intentionally engages in an act that evinces a wanton disregard for human life, in a manner calculated to influence or affect the conduct of government or civilian population by intimidation or coercion, or to retaliate against government conduct, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

This definition of "terrorism," is incorporated into "providing material support for terrorism," see n. 68 (quoting 2006 M.C.A. 950v(b)(25)(A)), and may be appropriately characterized as the underlying offense. In addition, the specifications of the conspiracy and solicitation charges cite "terrorism" as an object offense. Accordingly, we will discuss "terrorism" as that offense is defined in the 2006 M.C.A. and international law.

The 2006 M.C.A. definition is more comprehensive than Common Article 3 of the Geneva Conventions, API, and APII. All prohibit the "intentional targeting and killing of protected persons" and "acts or threats of violence the primary purpose of which is to spread terror among the civilian population." See supra n. 39. In addition, the 2006 M.C.A. requires the Government prove that "[t]he accused did so in a manner calculated to influence or affect the conduct of government or civilian population by intimidation or coercion, or to retaliate against government conduct." 2007 M.M.C. Part IV, ¶ 6(24)b(2). The 2006 M.C.A.'s inclusion of an additional element actually narrows the conduct subject to individual criminal liability, and places an additional burden of proof on the Government.

The 2006 M.C.A. definition is also consistent with the most comprehensive definition of "terrorism" by international treaty extant on September 11, 2001. Specifically, the *1999 Financing Terrorism Convention* included in its prohibition

of conduct meeting the definition of terrorism:

> Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and willfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out: (a) An act which constitutes an offence within the scope of and as defined in one of the treaties listed in the annex; [71] or (b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, *or to compel a government or an international organization to do or to abstain from doing any act.*

Article 2.1, *International Convention for the Suppression of the Financing of Terrorism* (Dec. 9, 1999) (*1999 Financing Terrorism Convention* ), 2178 U.N.T.S. 197, 39 I.L.M. 270, G.A. Res. 54/109 (emphasis added).

The similarity in these definitions does not suggest that a universally accepted definition of terrorism existed at the time of appellant's charged conduct, or that such a definition currently exists in international law. A more accurate description of the treaty law addressing international terrorism would be *ad hoc.* Long-standing efforts to define "terrorism" have been the subject of persistent political dispute, primarily associated with national liberation movements, concerns inapplicable to al Qaeda's attacks on the United States. *See* Alex Schmid, *Terrorism on Trial: Terrorism—The Definitional Problem,* 36 Case W. Res. J. Intl. L. 375 (2004).

At least 12 antiterrorism treaties or conventions predate appellant's offenses.[72]

---

**71.** The annex lists the nine treaties *infra* at n. 72, except *Convention on the Marking of Plastic Explosives for the Purpose of Detection* (Mar. 1, 1991), 30 I.L.M. 726; *Tokyo Convention on Offenses and Certain Other Acts Committed on Board Aircraft,* Sept. 14, 1963, 20 U.S.T. 2941, 704 U.N.T.S. 219.

**72.** Those 12 antiterrorism treaties include: (1) *International Convention for the Suppression of the Financing of Terrorism* (Dec. 9, 1999) (*1999 Financing Terrorism Convention* ), 2178 U.N.T.S. 197, 39 I.L.M. 270, G.A. Res. 54/109; (2) *International Convention for the Suppression of Terrorist Bombings* (Dec. 15, 1997) (*1997 Bombing Convention* ), 37 I.L.M. 249; (3) *Convention on the Marking of Plastic Explosives for the Purpose of Detection* (Mar. 1, 1991), 30 I.L.M. 726; (4) *Protocol for the Suppression of Unlawful Acts Against the Safety of Fixed Platforms Located on the Continental Shelf* (Mar. 10, 1988), 27 I.L.M. 684, 1678 U.N.T.S. 304; (5) *Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation* (Mar. 10, 1988), 27 I.L.M. 668, 1678 U.N.T.S. 221; (6) *Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation* (Feb. 24, 1988), 27 I.L.M. 627, 1589 U.N.T.S. 474; (7) *Convention on the Physical Protection of Nuclear Material* (Oct. 26, 1979), 18 I.L.M. 1419, 1456 U.N.T.S. 1987; (8) *International Convention Against the taking of Hostages* (Dec. 17, 1979), G.A. Res. 34/146, U.N. Doc. A/34/46, 1316 U.N.T.S. 205; (9) *Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents* (Dec. 14, 1973), 28 U.S.T. 1975, 1035 U.N.T.S. 167; (10) *Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation* (Sept. 23, 1971), 24 U.S.T. 565, 974 U.N.T.S. 177; (11) *Convention for the Suppression of Unlawful Seizure of Aircraft* (Dec. 16, 1970), 22 U.S.T. 1641, 860 U.N.T.S. 105; (12) *Convention on Offenses and Certain Other Acts Committed on Board Aircraft* (Sept. 14, 1963), 20 U.S.T. 2941, 704 U.N.T.S. 219. *See Hamdan,* 801 F.Supp.2d at 1282 n. 59, 2011 WL 2923945 at *20 n. 59 (listing dates entered into force for the UN, ratified or accessed by the U.S., entered into force for the U.S., and number of signatories and parties). *See also* Karin G. Tackaberry, *Time to Stand Up and Be Counted: The Need for the United Nations to Control International Terrorism,* The Army Lawyer (July 2007) 1, 7–14 (discussing the relevance and limitations of additional terror-

Describing terrorism as a crime of international significance, each of the treaties oblige the parties to criminalize various facets of terrorism in their domestic criminal codes and to cooperate in the prevention and punishment of acts of terrorism. The Organization of American States *Convention to Prevent and Punish the Acts of Terrorism Taking the Form of Crimes Against Persons and Related Extortion that are of International Significance,* 27 U.S.T. 3949; T.I.A.S. 8413 (Feb. 2, 1971), ratified by the United States Oct. 8, 1976, Article 1, for example, provides:

> [U]ndertake to cooperate among themselves by taking all the measures that they may consider effective, under their own laws, and especially those established in this convention, to prevent and punish acts of terrorism, especially kidnapping, murder, and other assaults against the life or physical integrity of those persons to whom the state has the duty according to international law to give special protection[.]

These conventions occurred in the context of numerous debates in the United Nations about the causes of international terrorism and ways to suppress and eliminate terrorism. A 1994 General Assembly Resolution on measures to eliminate international terrorism declared that:

> 1. The States Members of the United Nations solemnly reaffirm their unequivocal condemnation of all acts, methods and practices of terrorism, as criminal and unjustifiable, wherever and by whomever committed . . .;
> 2. Acts, methods and practices of terrorism constitute a grave violation of the

purposes and principles of the United Nations, which may pose a threat to international peace and security, jeopardize friendly relations among States, hinder international cooperation and aim at the destruction of human rights, fundamental freedoms and the democratic bases of society;
> 3. Criminal acts intended or calculated to provoke a state of terror in the general public, a group of persons or particular persons for political purposes are in any circumstance unjustifiable, whatever the considerations of a political, philosophical, ideological, racial, ethnic, religious or any other nature that may be invoked to justify them[.] [73]

In 1998, the Security Council adopted a resolution in response to the attacks on the United States' embassies in Kenya and Tanzania, which are named in the specification of the charge, by "[s]trongly condemn[ing] the terrorist bomb attacks in Nairobi, Kenya and Dar–es–Salaam, Tanzania on 7 August 1998 which claimed hundreds of innocent lives, injured thousands of people and caused massive destruction to property." S.C. Res. 1189, U.N. Doc. S/RES/1189 (Aug. 13, 1998) at ¶ 1. In the same year, the Security Council expressed its concern about "the continuing use of Afghan territory, especially areas controlled by the Taliban, for the sheltering and training of terrorists and the planning of terrorist acts, and *reiterating* that the suppression of international terrorism is essential for the maintenance of international peace and security," and demanded "that the Taliban stop providing sanctuary and training for international terrorists

ism-related treaties, conventions and agreements).

**73.** *Declaration on Measures to Eliminate International Terrorism of 1994* (*Elimination Declaration*), G.A. Res. 49/60, U.N. Doc. A/RES/49/60 (Dec. 9, 1994) at Pt. I, ¶¶ 1–3. "The *Elimination Declaration* was endorsed

annually in subsequent UN resolutions." Reuven Young, *Defining Terrorism: The Evolution of Terrorism as a Legal Concept in International Law and Its Influence on Definitions in Domestic Legislation,* 29 B.C. Intl. Comp. L.Rev. 23, 40 and n. 93 (2006) (citations omitted).

and their organizations." S.C. Res. 1214, U.N. Doc. S/RES/1214 (Dec. 8, 1998) at preamble and ¶ 13 (emphasis in original).

The Organization of the Islamic Conference (OIC) was established on September 25, 1969, and currently has 57 member countries with a total population of 1.5 billion people. *See* OIC webpage on UN website, *http://www.oicun.org/2/23/*. The OIC *Convention on Combating International Terrorism* defines "Terrorism" as:

any act of violence or threat thereof notwithstanding its motives or intentions perpetrated to carry out an individual or collective criminal plan with the aim of terrorizing people or threatening to harm them or imperiling their lives, honor, freedoms, security or rights or exposing the environment or any facility or public or private property to hazards or occupying or seizing them, or endangering a national resource, or international facilities, or threatening the stability, territorial integrity, political unity or sovereignty of independent States.[74]

█ There is ample evidence that an "intent" or "manner calculated to influence or affect the conduct of government . . . by intimidation or coercion," *supra* p. 52, now constitutes "international custom, as evidence of a general practice accepted as law" or at minimum "the general principles of law recognized by civilized nations." Statute of the International Court of Justice art. 38(1). This conclusion is based upon the implicit acceptance of the *1999 Financing Terrorism Convention's* definition of "terrorism" as it was signed by at least 39 nations before September 11, 2001, entered into force in April 10, 2002, and now has 132 signatories and 174 parties. *See Hamdan*, 801 F.Supp.2d at 1282 n. 59, 2011 WL 2923945 at *20 n. 59 (listing number of signatories and parties). In addition, this requirement has routinely appeared in draft definitions emanating from the United Nations since the original working group report in November 2001, and in varying forms in domestic counter-terrorism laws.[75] From 2001 to 2006, the

---

**74.** OIC *Convention on Combating International Terrorism* (Ouagadougou, Burkina Faso, July 1, 1999) at pt. I, art. 1.2, *http://www.oicun.org/7/38/. See also* The League of Arab States, *Arab Convention for the Suppression of Terrorism*, (Cairo, Apr. 22, 1998), pt. 1, art. 1.2 (using the same definition for terrorism); *Hamdan*, 801 F.Supp.2d at 1284 and n. 65, 2011 WL 2923945 at *21 and n. 65 (citing Hans Corell, United Nations Under Secretary General for Legal Affairs, *The International Instruments Against Terrorism: The Record So Far and Strengthening the Existing Regime* 5–6 (June 3, 2002) (listing six significant regional counter-terrorism conventions)) *www.un.org/law/counsel/english/remarks.pdf*.

**75.** *See, e.g.*, Measures to Eliminate International Terrorism: Reports of the Working Group of the Sixth Comm., U.N. Docs. A/C.6/65/L.10 (Nov. 3, 2010); A/C.6/60/L.6 (Oct. 14, 2005); A/C.6/59/L.10 (Oct. 8, 2004); A/C.6/58/L.10 (Oct. 10, 2003); A/C.6/57/L.9 (Oct. 16, 2002); A/C.6/56/L.9 (Oct. 29, 2001); A/C.6/55/L.2 (Oct. 19, 2000); A/C.6/54/L.2 (Oct. 26, 1999); A/C.6/53/L.4 (Oct. 22, 1998), A/C.6/52/L.3 (Oct. 10, 1997), *http://www.un.*

*org/terrorism/workgroupsix.shtml. See also* Security Council Res. 1566, U.N. Doc. S/RES/1566 (Oct. 8, 2004) at ¶ 3 ("criminal acts, including against civilians, committed with the intent to cause death or serious bodily injury . . . with the purpose to provoke a state of terror in the general public or in a group of persons or particular persons, intimidate a population or compel a Government or an international organization to do or abstain from doing any act, which constitute offences within the scope of and as defined in the international conventions and protocols relating to terrorism, are under no circumstances justifiable by considerations of a political, philosophical, racial, ethnic, religious or other similar nature"); *Secretary–General Kofi Annan Offers Global Strategy for Fighting Terrorism, in Address to Madrid Summit*, Press Release, U.N. Doc. SG/SM/9757 (Mar. 10, 2005) (based on the High-level Panel's definition)("[A]ny action constitutes terrorism if it is intended to cause death or serious bodily harm to civilians or non-combatants, with the purpose of intimidating a population or compelling a Government or an international organization to do or abstain from doing any

United States sent five reports to the UN Security Council Committee on Counter–Terrorism describing efforts to suppress terrorism. *See* SCOR S/2006/397 (June 16, 2006); SCOR S/2006/69 (Feb. 3, 2006); SCOR S/2004/296 (Apr. 15, 2004); SCOR S/2002/674 (June 17, 2002); SCOR S/2001/1220 (Dec. 21, 2001).[76]

### 3. Non–U.S. Domestic Providing Material Support for Terrorism–Type Laws

The domestic laws of many nations prohibit conduct that is similar to providing material support for terrorism. Under Afghan law, for example, membership in a terrorist organization, recruiting another to commit a terrorist act, or helping in any form or way in order to complete the commission of a terrorist act is a crime. Law on Combat Against Terrorist Offenses, Art. 19 (July 2008). Article 3(1) of this law defines "Terrorist Offenses" and Article 3(2) defines "Terrorist and Terrorist Organizations" as a "real or legal person which has committed one of the offences mentioned in this Law or designated as a terrorist or terrorist organization by Resolution of the Security Council of the United Nations, provided that the Resolution is certified by the National Assembly."

Brazilian law punishes whoever:

destroys, sacks, extorts, robs, kidnaps, imprisons, burns, plunders, causes to explode, makes a personal attack, or performs acts of terrorism, due to political nonconformity or to obtain funds to be used to support organizations of a political or subversive nature . . . [whoever works to] establish, join, or maintain an illegal military organization of any type or nature, armed or not, with or without uniforms, whose purpose is to engage in combat.[77]

Egypt promulgated Law No. 97 in 1992, and amended it to address terrorist acts and terrorism "committed anywhere in the world." SCOR Report S/2001/1237 at 3 (Dec. 21, 2001) (citing Law No. 97 of 1992). " '[T]errorism' means any use of force or violence or any threat or intimidation to which the perpetrator resorts in order to carry out an individual or collective criminal plan aimed at disturbing the peace or jeopardizing the safety and security of society and which" harms or creates fear or "imperil[s person's] lives, freedoms or security; harm[s] the environment; dam-

---

act," and he "urge[d] world leaders to unite behind" opposing terrorism), *http://www.un.org/News/Press/docs/2005/sgsm9757.doc.htm.*

The UN General Assembly has issued numerous Resolutions addressing measures to prevent international terrorism. *UN Action to Counter Terrorism* Webpage (listing more than 60 UN General Assembly Resolutions to suppress or eliminate terrorism, *http://www.un.org/terrorism/resolutions/.shtml. See, e.g.,* A/RES/65/34 (Jan. 10, 2011) at p. 3, ¶ 1) ("[s]trongly condemning all acts, methods and practices of terrorism in all its forms and manifestations as criminal and unjustifiable, wherever and by whomsoever committed;" and listing eight prior counter-terrorism resolutions from 2002 to 2009).

**76.** Unless stated otherwise, the UN Office on Drugs and Crime is the source of the non-U.S. domestic laws relating to providing material support for terrorism, conspiracy, and solicitation-type offenses cited at pp. 57–61, 93–96, 103–107. *https://www.unodc.org/tldb/browse_countries.html.* The source for the UN Security Council Reports (SCOR), cited at pp. 57–61, 93–96, 103–107, is the UN Security Council Counter–Terrorism Committee website, *http://www.un.org/en/sc/ctc/resources/1373.html.*

**77.** Carlos Japiassu, *Combating Terrorist Financing: The South American Experience,* International Enforcement Law Reporter, 24 Counter-terrorism and International Human Rights, No. 6, pt. 2 (June 2008) (Brazilian National Security Law of Dec. 14, 1983, Law n deg. 7.170, arts. 20, 24).

age[s] or take[s] possession of communications; prevent[s] or impede[s] the public authorities in the performance of their work; or thwart[s] the application of the Constitution or of laws or regulations." *Id.* at 4. The legislator incorporated this definition into criminalizing texts. *Id.*

The "cornerstone" of French counter-terrorism law is the Act of Sept. 9, 1986. SCOR Report S/2001/1274 at 3 (Dec. 27, 2001). "Terrorist acts are generally defined by combining the existence of an offence under ordinary criminal law which appears on a restrictive list with an 'individual or collective undertaking, the aim or which is to cause a serious disturbance to public order by means of intimidation or terror.'" *Id.* Some offenses such as "membership of terrorist groups" have separate legal definitions. *Id.*

The Terrorist and Disruptive Activities (Prevention) Act (1987) (1987 TADA) of India prohibits terrorists acts stating, "Whoever with the intent to overawe the Government ... or to strike terror ... in any section of the people ... or to adversely affect the harmony amongst different sections of the people does any act or thing." 1987 TADA, Ch I, Pt. II, ¶ 3(1). It broadly describes the prohibited means and objectives for commission of a terrorist act:

> by using ... weapons ... or by other substances ... of a hazardous nature ... to cause, or as is likely to cause, death of, or injuries to, any person or persons .... [causing the] loss of, or damage to, or destruction of, property or disruption of any supplies or services essential to the life of the community, [and threatening] to kill or injure such person in order to compel the Government or any other person to do [or refrain] from doing any act.

*Id.* *See also Hamdan*, 801 F.Supp.2d at 1290–92, 2011 WL 2923945 at *26 (citations omitted) (describing in more detail the development of counter-terrorism law in India).

Indonesian law punishes "[a]ny person who with deliberate intent sets fire, causes explosion or causes a flood." SCOR Report S/2001/1245 at 7 (Dec. 26, 2001) (citing Penal Code of Indonesia, Book II on Crimes, Ch. VII on Crimes whereby the General Security of Persons or Property is Endangered, art. 187). Whoever "produces, receives, tries to procure, ..., conceals, transports or imports into Indonesia ... objects ... of which he knows or reasonably must suspect that they are intended ... to cause an explosion, whereby danger of life or general danger to property is feared" commits an offense. *Id.* The Government Regulation in Lieu of Legislation of the Republic of Indonesia No. 1/2002 on Combating Criminal Acts of Terrorism penalizes the intentional use of violence or the "uses violence or the threat of violence to create a widespread atmosphere of terror or fear in the general population or to create mass casualties, by forcibly taking the freedom, life or property of others or causes damage or destruction to ... the environment or public facilities or international facilities." *Id.* at Ch. III, §§ 6, 7 (Oct. 18, 2002).

Italy implemented measures in the 1960s and 1970s to combat domestic terrorism, and adopted additional measures to combat international terrorism after September 11, 2001. Elies van Sliedregt, *European Approaches to Fighting Terror*ism, 20 Duke J. Comp. Intl. L. 413, 420 (2010); SCOR Report S/2002/8 at 4–6 (Jan. 2, 2002). The Cossiga Law, enacted on February 6, 1980, punished "[mere participation in] ... an 'association with the aim of terrorism and of subversion of the democratic order' and 'attack for subversive or terrorist purposes'" without the necessity of actual participation in a violent act.[78]

---

78. Matthew E. Dunham, *Eliminating the Do*mestic Terrorist Threat in the United States: A

Japan's counter-terrorism strategy utilizes the Subversive Activities Prevention Act, which prohibits a variety of terrorism-related activities, including causing, preparing, plotting, and aiding in internal disturbance; as well as actions to induce, aid, plot, preparation or attempt to induce foreign incursion.[79]

Pakistan adopted the Anti–Terrorism Act of 1997 (1997 ATA) to prevent terrorist acts. SCOR Report S/2001/1310 at 6 (Jan. 10, 2002). "In August 2001, the [1997 ATA] was further amended to enlarge its scope. Under the amended Act, terrorism is a punishable offence and abetting terrorism, including membership of terrorist groups and recruitment and support for such groups, is an offence." *Id.* "Sections 11(A) to 11(X) [of the 1997 ATA as amended] prohibit organizations involved in terrorist activities and bars membership and support to such organizations." *Id.* at 8. *See also Hamdan,* 801 F.Supp.2d at 1290–93, 2011 WL 2923945 at *26–*27 (citations omitted) (describing in more detail Pakistan's counter-terrorism laws). The ATA (Second Amendment) Ordnance XIII 1999, § 6 (Gazette of Pakistan, Extraordinary, Pt. I, Aug. 27, 1999), which provides:

> A person . . . commit[s] a terrorist act if he, (a) in order to, or if the effect of his actions will be to, strike terror or create a sense of fear and insecurity in the people, or any section of the people does any act or thing by using bombs, dynamite or other explosive or inflammable

substances, or such fire-arms or other lethal weapons . . . in such a manner as to cause or be likely to cause, the death of or injury to any person or persons or damage to or destruction of, property on a large scale, . . . or threatens with the use of force public servants in order to prevent them from discharging their lawful duties; or (b) commits a scheduled offence, the effect of which will be, or be likely to be, to strike terror, or create a sense of fear and insecurity in . . . any section of the people; . . .

Russian law defines "terrorism" as "violence or the threat of violence against individuals or organizations, and also the destruction (damaging) of or threat to destroy (damage) property and other material objects." Russian Federation Federal Law No. 130–FZ, art. 3 (July 25, 1998). Terrorism includes, for example, to "threaten to cause loss of life, significant damage to property, or other socially dangerous consequences and are implemented with a view to violating public security, intimidating the population, or influencing the adoption of decisions advantageous to terrorists by organs of power, or satisfying their unlawful material and (or) other interests." *Id.* "[T]errorist crimes are crimes envisaged by Articles 205–208, 277, and 360 of the Russian Federation Criminal Code. Other crimes envisaged by the Russian Federation Criminal Code may be categorized as terrorist crimes if they are committed for terrorist purposes."

---

*Case Study on Eradication of the Red Brigades,* 107 Dick. L.Rev. 151, 160–61 (2002) (citations omitted). *See also* SCOR Report, S/2002/8 at 6 (citing Decree Law No. 374 (Oct. 18, 2001), enacted as Law No. 438 (Dec. 15, 2001) which "makes it a crime merely to take part in any preparatory activities in association with others for the commission of acts of terrorism.").

**79.** SCOR Report, S/2001/1306 at 31–39 (Dec. 27, 2001) (citing Subversive Activities Preven-

tion Act, Law No. 240 of 1952), and S/2001/1306 at 23–29) (The Act Regarding the Control of Organizations Which Committed Indiscriminate Mass Murder (Law No. 147, 1999); Matthew H. James, *Keeping the Peace–British, Israeli, and Japanese Legislative Responses to Terrorism,* 15 Dick. J. Intl. L. 405, 439–47 (1997); SCOR Report, S/2006/402 (June 15, 2006) (citing Subversive Activities Prevention Act, Law No. 240 of 1952).

*Id.* *See also* SCOR Report S/2001/1284 (Dec. 27, 2001).

Spanish law indicates that "terrorism" is defined in Spanish Criminal Code, art. 571–79 "of the, 'On crimes of terrorism', and also in the Organic Act on the Reform of the Criminal Code (LO 10/1995 of 23 November 1995)." [80] Under Article 571 of the Spanish Criminal Code terrorists are defined "as those who 'belonging, acting in the service of, or collaborating with armed groups, organizations or bodies whose objective is to subvert the constitutional order or seriously alter public peace', commit the acts described in Article 346." This article includes "attacks on buildings, transportation or communications infrastructure using explosive devices," or under Article 351 "arson causing risk of injury or death.... According to these articles, a crime of terrorism is [one that is] 'intended to subvert the constitutional order or seriously alter public peace.' "

Before September 11, 2001, "Swedish legislation ... contained no reference to specific criminal offences for terrorist acts. Persons committing terrorist acts were punished under the general provisions in the Penal Code." SCOR Report S/2001/1233 at 4 (Dec. 24, 2001). To comply with the European Framework Decision on Combating Terrorism, Sweden enacted the Act on Criminal Responsibility for Terrorist Crimes, which entered into force on July 1, 2003. This act defines a terrorist act as one that is designed to:

1) Inflict serious fear on a population or group of population, 2) Unduly compel a public agency or an international organization to take measures or abstain from measures, or 3) Seriously destroy fundamental political, constitutional, economi-

cal or social structures in a state or intergovernmental organization.

SCOR Report S/2004/476 at 3 (June 10, 2004). "Attempt, preparation or conspiracy to commit terrorist crimes or failure to disclose such crimes is also punishable." *Id.*

The Terrorism Act of 2000 of the United Kingdom states that "terrorism" means "the use or threat of action" if such action "(a) involves serious violence against a person, (b) involves serious damage to property, (c) endangers a person[']s life, other than that of the person committing the action, (d) creates a serious risk to the health or safety of the public or a section of the public ..." Terrorism Act 2000, ch. 11, pt. 1 § 1(1), 1(2) (July 20, 2000). *http:// www.legislation.gov.uk/ukpga/2000/11/ contents/enacted.* Such use or threat must be "for the purpose of advancing a political, religious or ideological cause," or "designed to influence the Government or intimidate a section of the public," and be "made for the purpose of advancing a political, religious or ideological cause." *Id.* at § 1(1). *See also* SCOR Report S/2001/1232 at 10 (Dec. 24, 2001).

█ The 2006 M.C.A. definition of terrorism is narrower in its prohibitions than the language of Common Article 3 and APII, consistent with international norms applicable at the time of the charged conduct, consistent with the general principles of law recognized by civilized nations, and constitutes conduct in violation of the common law of armed conflict. Congress acted within the scope of its constitutional authority in defining terrorism as an offense in the 2006 M.C.A. and in making such conduct punishable by military commission.

---

**80.** Fundación para las Relaciones Internacionales y el Diálogo Exterior, *Case Study: Spain, The Ethical Justness of Conter–Terrorism Measures,* 11 (Oct. 27, 2008), *http://www. transnationalterrorism.eu/tekst/publications/ Spain20case20study20(WP20620Del2012b).pdf* is the source for the facts and quotations in this paragraph.

## B. Discussion

Applying the elements in the M.M.C. Part IV, ¶ 6(25)bB, *supra* p. 50, to the facts in the Specification of Charge III reveals that at trial the Government proved, by legal and competent evidence, beyond a reasonable doubt that appellant:

(1) was an AUEC *see* 2006 M.C.A. § 948(a), *supra* nn. 22–24, 53;

 (2) provided material support or resources to an international terrorist organization engaged in hostilities against the United States," M.M.C. Part IV, ¶ 6(25)bB(1), when he provided himself and various services to bin Laden and al Qaeda by preparation of various propaganda products intended for al Qaeda recruiting and indoctrination training, and incited persons to commit terrorism; facilitated the pledges of loyalty to bin Laden and prepared the propaganda declarations styled as Martyr Wills for two suspected September 11, 2001 hijackers/pilots, researched the economic effect of those attacks on the United States and provided the results to bin Laden, and operated and maintained data processing equipment and media communications equipment for the benefit of bin Laden and other al Qaeda leaders and to al Qaeda an international terrorist organization. Al Qaeda was engaged in hostilities against the United States from at least February 1999. The Specification of Charge III, ¶¶ e, g, h, j;

 (3) intended to provide such material support or resources to such an international terrorist organization," M.C.M. Part IV, ¶ 6(25)bB(2), as demonstrated by his "a. traveling to Afghanistan with the purpose and intent of joining al Qaeda; b. meeting with Saif al 'Adl, the head of the al Qaeda Security Committee, as a step toward joining the al Qaeda organization; c. undergoing military-type training at an al Qaeda sponsored training camp then located in Afghanistan near Mes Aynak; d. pledging fealty, or "bayat" to the leader of al Qaeda, Usama bin Laden, joining al Qaeda." The Specification of Charge III, ¶¶ a-d;

 (4) knew that such organization has engaged or engages in terrorism," M.M.C. Part IV, ¶ 6(25)bB(3), as established by al Qaeda's "violent attacks on the United States' embassies [in] Nairobi, Kenya and Dar es Salaam, Tanzania [on] August 7, 1998; on the U.S.S. COLE [near] Aden, Yemen [on] October 12, 2000, and; at various locations in the United States [on] September 11, 2001"); the Specification of Charge III; and

 (5) That "the conduct took place in the context of and was associated with hostilities." M.M.C. Part IV, ¶ 6(25)bB(4), as shown by a series of violent actions by al Qaeda against the United States and bin Laden's declarations of his plans to attack the United States.

Providing material support for terrorism as codified and charged provided comprehensive notice of both the conduct in issue and the elements of the offense. In fact, the Government was required to prove that the material support provided satisfied both objective and subjective elements.

The objective elements include an *actus reus:* appellant's provision of himself as a member of al Qaeda and various services as material support for al Qaeda; common element 1—"alien unlawful enemy combatant element;" *see supra* pp. 1182–87, common element 2—that the conduct took place "in the context of and was associated with an armed conflict," and that the recipient of the support was "an international terrorist organization engaged in hostilities against the United States." *See supra* pp. 1187–93. As alleged, the Government was required to prove that al Qaeda was "then engaged in hostilities against the

United States" thus further narrowing the scope of punishable conduct.

The subjective elements include both a *mens rea* or intent element, and *scienter* or knowledge element. Specifically, the 2006 M.C.A. requires that the accused "intentionally provides material support and resources" to such an international terrorist organization, with "kn[owledge] that such organization has engaged or engages in terrorism." 2006 M.C.A. § 950v(25).

Review of the elements of "providing material support for terrorism" amply demonstrates that appellant's charged conduct is not an inchoate offense. Instead, the charged offense makes punishable the provision of "material support or resources to an international terrorist organization engaged in hostilities against the United States," with knowledge of that organization's past or ongoing terrorism and with specific intent to "provide material support" to that international terrorist organization. This offense is akin to providing direct support to an ongoing criminal enterprise, in this case one engaged in terrorism, with knowledge of that enterprise's past or ongoing crimes and with specific intent to support that criminal enterprise.

Providing material support for terrorism is essentially co-perpetrator liability, analogous to membership in a criminal organization in that the essence is cooperation for criminal purposes, and akin to aiding and abetting, or complicity. As such, the theory of individual criminal liability has long been recognized as a general principle of law under the law of armed conflict and by civilized nations. This is particularly true where the accused voluntarily joins an organization, with knowledge of that organization's systematic engagement in criminal activity. *See Hamdan,* 801

F.Supp.2d at 1299–1304, 2011 WL 2923945 at \*32–\*35. We recall two related and long-standing legal principles. In 1865, Attorney General James Speed explained that the act of "unit[ing] with banditti, jayhawkers, guerillas, or any other unauthorized marauders is a high offence against the laws of war; the offence is complete when the band is organized or joined." 11 Op. Atty. Gen. at 312, *see supra* p. 1186. Similarly in 1942, the Supreme Court commented, "Unlawful combatants are ... subject to capture and detention, but *in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful." Quirin,* 317 U.S. at 31, 63 S.Ct. 2 (emphasis added; citations omitted). There is also ample support for this conclusion in international jurisprudence.

## 1. Criminal Organizations—International Military Tribunal at Nuremburg

The London Charter established the International Military Tribunal (IMT) at Nuremburg "for the just and prompt trial and punishment of the major war criminals of the European Axis." [81] The IMT was comprised of four members, including representatives from the Governments of the United States, the United· Kingdom of Great Britain and Northern Ireland, the Union of Soviet Socialist Republics, and the Provisional Government of the French Republic. *See Hamdan,* 801 F.Supp.2d at 1305 n. 149, 2011 WL 2923945 at \*37 n. 149 (citing *Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 177 (2d Cir.2009)); 1 T.M.W.C., *supra* n. 36, at arts. 1, 2, p. 10.

Article 9 of the London Charter empowered the IMT to "declare ... that the

---

**81.** Charter of the IMT, art. 1, 1 T.M.W.C., *supra* n. 36, at 10. Annexed to the London Agreement was the London Charter, which served as the IMT's constitution. *See* London

Agreement, art. 2, with Charter of the IMT, art. 2, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279; 4 T.W.C., *supra* n. 60, at X–XIV.

group or organization of which the individual was a member was a criminal organization." 1 T.M.W.C., *supra* n. 36, at 10, 255. Article 10 of the charter empowered the competent national authorities to try individuals for membership *alone* in any organization declared criminal by the IMT before national, military or occupation courts. *Id.* "In any such case the criminal nature of the group or organization is considered proved and shall not be questioned." *Id.*

Six organizations, with about 2,000,000 members in Germany and about 500,000 in the U.S. zone, were indicted as criminal organizations before the IMT.[82] Following vigorous debate on the scope of membership liability, particularly concerns regarding the individual criminal liability of persons with widely disparate levels of knowledge, responsibility, and authority within their respective organizations, the IMT determined that:

> In effect, therefore, a member of an organisation which the Tribunal has declared to be criminal may be subsequently convicted of the crime of membership and be punished for that crime by death. This is not to assume that international or military courts which will try these individuals will not exercise appropriate standards of justice. *This is a far-reaching and novel procedure. Its application, unless properly safeguarded, may produce great injustice . . . .*
>
> A *criminal organisation is analogous to a criminal conspiracy* in that the essence of both is cooperation for criminal purposes. There must be a group bound together and organised for a com-

mon purpose. The group must be formed or used in connection with the commission of crimes denounced by the Charter. Since the declaration with respect to the organisations and groups will, as has been pointed out, fix the criminality of its members, *that definition should exclude persons who had no knowledge of the criminal purposes or acts of the organisation and those who were drafted by the State for membership, unless they were personally implicated in the commission of acts declared criminal by Article 6 of the Charter as members of the organisation. Membership alone is not enough to come within the scope of these declarations.*[83]

The IMT determined that the SA, Reich Cabinet, and General Staff and High Command (GSHC) were not criminal organizations and declared three other charged organizations criminal: the Leadership Corps of the Nazi (National Socialist German Workers') Party, the SS, the Secret State Police (Gestapo) and the SD (the Gestapo and SD were considered as one group because of their close working relationship). 22 T.M.W.C., *supra* n. 36, at 501–23. With respect to the three organizations declared criminal, "the court suggested, despite its inability to bind zonal governments, that future trials for criminal membership ought to include stiff due process guarantees." Jonathan Bush, *The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said*, 109 Colum. L.Rev. 1094, 1161 (2009) (citing 22 T.M.W.C., *supra* n. 36, at 499). Although members of the convicted organizations

---

**82.** Telford Taylor, *Final Report to the Secretary of the Army on the Nuernberg War Crimes Trials under Control Council No. 10* (Taylor Report) 16 (Aug. 15, 1949).

**83.** 1 T.M.W.C., *supra* n. 36, at 256 (Judgment of the IMT–The Accused Organizations) (em-

phasis added); *see also* Quincy Wright, *The Law of the Nuremberg Trial*, 41 Am. J. Intl. L. 38, 70 (1947); Antonio Cassese, *International Criminal Law*, at 136–139 (Oxford U. Press, 2003).

"could be tried for criminal membership in addition to or instead of predicate acts ... the implication was that membership charges would not be a shortcut to conviction and would certainly not be available against average complicitous Germans[.]" *Id.*

### 2. Control Council 10—Nuremburg Military Tribunals

In accordance with Article 10 of the charter the competent national authorities (e.g. Nuremberg Military Tribunals (NMT)) tried individuals for membership in the organizations declared criminal by the IMT before national, military and occupation courts. In some cases, the indictments before the NMT included four counts "corresponding to the categories of crime defined" in Control Council No. 10. Telford Taylor, *Final Report to the Secretary of the Army on the Nuernberg War Crimes Trials under Control Council No. 10* (Taylor Report) 64–72, 79 (Aug. 15, 1949) (citing the "Medical," "Justice," and "Pohl" cases). Count One—Common Design or Conspiracy; Count Two—War Crimes; Count Three—Crimes Against Humanity; and Count Four—Membership in Criminal Organizations.[84]

There were 12 trials conducted by the NMT administered by the United States with American judges. *Id.* at 35–36. Each trial included a group of defendants and the cases are generally referred to by the name of one lead defendant, type of case, common organization, or other trait of the accused.[85] Under Control Council No. 10, 185 persons were indicted, of those 177 stood trial, and 142 individuals were convicted by the NMT. Taylor Report, *supra* n. 82, 91. The last judgment of these tribunals was delivered on April 14, 1949. Taylor Report, *supra* n. 82, 94.

Eighty-seven defendants were tried for membership offenses, 74 were convicted of a membership charge among other charges, and 10 were convicted solely of a membership charge. Taylor Report, *supra* n. 82, at 93. The level of culpability of those convicted solely of membership in a criminal organization varied widely. "The great bulk of SS officers and Nazi Party officials were tried, if they were tried at all, before local German 'denazification' boards (*Spruchkammern*)."[86]

84. *See, e.g.,* 1 T.W.C., *supra* n. 81, at 17 (The standard Indictment for Count Four read: "The defendants Karl Brandt, Genzken, Gebhardt, Rudolf Brandt, Mrugowsky, Poppendick, Sievers, Brack, Hoven, and Fischer are guilty of membership in an organization declared to be criminal by the International Military Tribunal in Case No. 1, in that each of the said defendants was a member of the [SS] ... after 1 September 1939. Such membership is in violation of paragraph I(d), Article II of Control Council Law No. 10."). *See also* Taylor Report, *supra* n. 82, at 72.

85. 1 T.W.C., *supra* n. 60, at VII (The case number, name of lead defendant, popular name, and volume are as follows: 1. Karl Brandt known as the "Medical Case" in vols. I and II; 2. Erhard Milch known as the "Milch Case" in vol. II; 3. Josef Altstoetter known as the "Justice Case" in vol. III; 4. Oswald Pohl known as the "Pohl Case" in vol. V; 5. Friedrich Flick known as the "Flick Case" in vol. VI; 6. Carl Krauch known as the "I. G. Farben Case" in vols. VII and VIII; 7. Wilhelm List known as the "Hostage Case" in vol. XI; 8. Ulrich Greifelt known as the "RuSHA Case" in vols. IV and V; 9. Otto Ohlendorf known as the *"Einsatzgruppen* Case" in vol. IV; 10. Alfred Krupp known as the "Krupp Case" in vol. IX; 11. Ernst von Weizsaecker known as the "Ministries Case" in vols. XII–XIV; and 12. Wilhelm von Leeb known as the "High Command Case" in vols. X, XI, and XV).

86. Taylor Report, *supra* n. 82, at 159, *see also id.* at 16 ("Defendants selected for trial on other charges who happened to be members of an organization declared criminal by the IMT were additionally charged with the crime of membership therein, but no one was ever charged at Nuernberg with the crime of membership alone.").

By way of example, German Master Sergeant Mathias Graf was found guilty of membership in the SD.[87] His service was deemed "voluntary" and he was found to have knowledge but not to have participated in any meaningful manner. After leaving the SD, he was drafted into the SS. As a draftee, he was found not guilty of SS membership. His sentence for membership in the SD was time served.

Doctor Helmut Poppendick, tried during the medical cases, was Chief Physician of the Main Race and Settlement Office, Chief of the Personnel Office in Grawitz, an active duty army surgeon, a lieutenant colonel in the SS, and a colonel in the Waffen SS. 2 T.W.C., *supra* n. 60, at 186, 248–50. The tribunal found the evidence "insufficient to sustain guilt under counts two and three of the indictment," (war crimes and crimes against humanity), although the tribunal noted that Poppendick "at least had notice of [the experiments] and of their consequences." *Id.* at 252. The tribunal found Poppendick guilty of membership in an organization declared criminal, and sentenced him to ten years imprisonment. *Id.* at 253, 299.

"Konrad Meyer–Hetling was the chief of the planning office within the Staff Main Office." 5 T.W.C., *supra* n. 60, at 156. He was a professor and scientist of agriculture who worked part time developing the "General Plan East" that was a "proposed plan for the 'reconstruction of the East.'" *Id.* The Tribunal found him guilty of only membership in a criminal organization, namely that he was a member of the SS, *id.* at 157, 165, and sentenced him to time served. *Id.* at 165.

In the Flick Case, defendants Flick and Steinbrinck were charged with committing "war crimes and crimes against humanity ... in that they were accessories to, abet-

ted, took a consenting part in, were connected with plans and enterprises involving, and were members of organizations or groups connected with: murders, brutalities, cruelties, tortures, atrocities and other inhumane acts committed by ... principally the ... SS." 6 T.W.C., *supra* n. 60, at 23. The indictment charged the defendants, as members of the group "Friends of Himmler ...., which, ... worked closely with the SS, met frequently and regularly with its leaders, and furnished aid, advice, and support to the SS, financial and otherwise." *Id.* The Tribunal found that the "gist of [the charge] is that as members of the Himmler Circle of Friends, Flick and Steinbrinck with knowledge of the criminal activities of the SS contributed funds and influence to its support." *Id.* at 1216.

The Tribunal reasoned that where clear crimes against humanity and war crimes were committed, an "organization which on a large scale is responsible for [crimes such as "mass murders"] can be nothing else than criminal. One who knowingly by his influence and money contributes to the support thereof must, under settled legal principles, be deemed to be, ... certainly an accessory to such crimes." *Id.* at 1217. The Tribunal noted that the monetary contributions commenced before the criminal activities of the SS were widely known, that the prosecution did not prove that the money contributed was directly used for criminal activities, that defendants "played but a small part in the criminal program of the SS," and that some of the money was likely used for cultural purposes. *Id.* at 1219, 1222. Still, the Tribunal found that the criminal character of the SS "must have been known," and that how the money was spent was immaterial. *Id.* 1220–21. The Tribunal found Flick and Steinbrinck

---

**87.** 4 T.W.C., *supra* n. 81, at 584–87 is the source for the information in paragraph. Our Court's decision in *Hamdan* provides more details concerning the cases of Graf, Meyer–Hetling, Flick, and Steinbrinck. *Id.* at 1305–10, 2011 WL 2923945 at *37–*40.

guilty of committing war crimes and crimes against humanity by supporting the criminal organization responsible for such acts. *Id.* at 1222–23.

With respect to Steinbrinck the Tribunal noted that: "[h]e did not seek admission into the SS"; "[h]is membership was honorary"; he only had two official tasks, neither of which were criminal in nature; he had "no duties, no pay, and only casual connection with SS leaders;" and that his activities did not "connect him with the criminal program of the SS." *Id.* at 1221–22. Yet the Tribunal found Steinbrinck guilty of "membership, subsequent to 1 September 1939, in the ... [SS], declared to be criminal by the International Military Tribunal, and paragraph 1(d) of Article II of Control Council Law No. 10." *Id.* at 25, 1223. Both were sentenced to confinement, Flick to seven years and Steinbrinck to five years. *Id.* at 1223.

Although the concept of organizational guilt was not used for the hundreds of thousands of people potentially liable under the London Charter and the decisions of the IMT, many businessmen, doctors, and jurists were tried by military tribunals in the American Occupied zone for their membership in these four criminal organizations.[88] As Justice Thomas indicated:

> For example, in Military Tribunal Case No. 1, *United States v. Brandt,* [The Medical Case, which included medial experiments on prisoners of war] Karl Brandt, Karl Gebhardt, Rudolf Brandt, Joachim Mrugowsky, Wolfram Sievers, Viktor Brack, and Waldemar Hoven were convicted and sentenced to death for the crime of, *inter alia,* membership in an organization declared criminal by the IMT; Karl Genzken and Fritz Fischer were sentenced to life imprisonment for the same; and Helmut Poppen-

dick was convicted of no other offense than membership in a criminal organization and sentenced to a 10–year term of imprisonment. 2 [T.W.C.] 180–300. [The U.S. Supreme] Court denied habeas relief, 333 U.S. 836, 68 S.Ct. 603, 92 L.Ed. 1119 (1948), and the executions were carried out at Landsberg prison on June 2, 1948. 2 [T.W.C.] 330.

*Hamdan,* 548 U.S. at 696, 126 S.Ct. 2749 (Thomas & Scalia, JJ., dissenting); *see also* 2 T.W.C., *supra* n. 60, at 298–300 (sentences in The Medical Case); Taylor Report, *supra* n. 82, at 91.

Similarly, in *Einsatzgruppen,* a U.S. Tribunal sitting at Nuremberg tried members of *Einsatz* units for a large number of murders, and noted that:

> the elementary principle must be borne in mind that neither under Control Council Law No. 10 nor under any known system of criminal law is guilt for murder confined to the man who pulls the trigger or buries the corpse. In line with recognized principles common to all civilized legal systems ... not only are principals guilty but also accessories, those who take a consenting part in the commission of crime or are connected with plans or enterprises involved in its commission, those who order or abet crime, and those who belong to an organization or group engaged in the commission of crime. These provisions embody no harsh or novel principles of criminal responsibility.... Any member who assisted in enabling these [*Einsatz* units whose express mission, well known to all the members, was to carry out a large scale program of murder] to function, knowing what was afoot, is guilty of the crimes committed by the unit ... The cook in the galley of a pirate ship does not escape the yardarm merely be-

---

88. *See Jonathan A. Bush; The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said;* 109 Colum. L.Rev. 1094, 1140–48 (2009) (citing indictments). *See also* Taylor Report, *supra* n. 82, at 16.

cause he himself does not brandish a cutlass. The man who stands at the door of a bank and scans the environs may appear to be the most peaceable of citizens, but if his purpose is to warn his robber confederates inside the bank of the approach of the police, his guilt is clear enough. And if we assume, for the purposes of argument, that the defendants ... have succeeded in establishing that their role was an auxiliary one, they are still in no better position than the cook or the robbers' watchman.[89]

More recently the *Convention against Transnational Organized Crime* [90] acknowledged participation in an organized criminal group in a manner virtually identical to the charged formulation of providing material support for terrorism constitutes criminal activity. Article 5 "Criminalization of participation in an organized criminal group," mandates each state party to:

> establish as criminal offences, when committed intentionally:
>
> (a) ... (ii) *Conduct by a person who, with knowledge of either the aim and general criminal activity of an organized criminal group or its intention to commit the crimes in question, takes an active part in:*
>
> a. *Criminal activities of the organized criminal group;*
>
> b. *Other activities of the organized criminal group in the knowledge that his or her participation will contribute to the achievement of the above-described criminal aim;*
>
> (b) Organizing, directing, *aiding, abetting, facilitating* or counselling the commission of serious crime involving an organized criminal group.

The 2006 M.C.A. uses language which is akin to the criminal organization provisions of the Nuremburg Charter, as implemented by the IMT. In fact, the crime of conspiracy and criminal organizations were the subject of correspondence from the uniformed services senior military legal advisors and topics of discussion during Congressional hearings.[91] Congressional adoption of this relatively broad scope of

---

89. *Prosecutor v. Tadić* (*Tadi* Judgment), Case No. IT–94–1–A, 38 ILM 1518 ¶200 (ICTY App. Chamber, July 15, 1999)(quoting The *United States of America v. Otto Ohlenforf et al.*, 4 T.W.C., *supra* n. 60, at 372–73).

90. *Convention against Transnational Organized Crime* (Nov. 15, 2000), entry into force for UN on Sept. 29, 2003, signatories: 117, parties: 146, signed by U.S. on Dec. 13, 2000, entered into force for U.S. on Dec. 3.2005, T.I.A.S. 13127, 2237 U.N.T.S. 319 (No. 39574).

91. On August 23, 2006, Senator John McCain sought the views of the senior military lawyers in the Department of Defense concerning the use of military commissions. In regard to the scope of membership offenses, Rear Admiral Bruce MacDonald, then Judge Advocate General of the Navy, responded:

> Conspiracy should be included, but only conspiracies to commit one of the substantive offenses specifically enumerated and there must be a requirement to prove the defendant committed an overt act in furtherance of the conspiracy. This would mean, for example, that conspiracy to commit murder in violation of the laws of war would be a cognizable offense, but affiliation with a terrorist organization, standing alone, would not be cognizable.

Sen. Cong. Record S10411 (Sept. 28, 2006). This same person, as a retired vice admiral, is currently the Convening Authority for Military Commissions. Brigadier General James Walker, Staff Judge Advocate to the Commandant of the Marine Corps, stated in his letter to Senator McCain, "jurisdiction of the military commissions should be broad enough to facilitate the prosecution of all unlawful enemy combatants.... Jurisdiction must extend to other terrorist groups, regardless of their level of organization, and the individual 'freelancers' so common on the current battlefield." Sen. Cong. Record S10412 (Sept. 28, 2006).

potential individual criminal liability with respect to international terrorism based, at least in part, upon membership in a criminal organization is a logical tack and evident in the plain language of the statute.

The 2006 M.C.A. is consistent with the IMT's suggestion "that future trials for criminal membership ... include stiff due process guarantees" to prevent injustice. *Bush; supra* n. 88, at 1161 (citing 22 T.M.W.C., *supra* n. 36, at 499). Providing material support for terrorism includes stringent procedural safeguards and comprehensive factual determinations which must be satisfied before a conviction may be returned or punishment imposed.

The charged conduct readily meets the requirements of membership in a criminal organization. Appellant pledged fealty to bin Laden and joined al Qaeda, an armed non-state international terrorist organization, engaged in armed conflict as a belligerent, not entitled to either combatant immunity or POW protection. From the time he joined al Qaeda until his capture in 2001, al Qaeda was engaged in hostilities and terrorism against the United States. Appellant had knowledge that al Qaeda engaged in terrorism before he joined and intentionally provided material support and resources to al Qaeda from February 1999 through December 2001.

That support included providing himself as a member of al Qaeda and various services including propaganda products intended for al Qaeda recruiting and indoctrination training; inciting others to commit terrorism; facilitating pledges of loyalty to bin Laden and preparing the propaganda declarations styled as Martyr Wills of two suspected September 11, 2001 hijackers/pilots; operating and maintaining data processing equipment and media communications equipment used to obtain the first reports of the September 11 attacks to bin Laden and other al Qaeda leadership; and researching the economic effect of those attacks on the United States and providing the results of his research to bin Laden.

Similar to the IMT's declaration of groups and organizations as "criminal organizations," Congress stated that an unlawful enemy combatant includes a member of al Qaeda, not otherwise a lawful combatant in the 2006 M.C.A.[92] However, unlike the IMT's determination of organizational guilt which was binding upon the NMT, the military commission judge made an initial determination that the military commission had personal jurisdiction, specifically that the evidence established appellant is an AUEC. Tr. 837, 873. And ultimately this determination was made by the members as an element of each offense, applying an evidentiary standard of proof beyond a reasonable doubt. Tr. 843–44, 916–17.

Finally, this proposition is also consistent with the long-held U.S. view expressed through successive U.S. Army Field Manuals that unprivileged belligerents who engage in hostilities are subject to punishment under the law of armed conflict. *See supra* pp. 1186–88 (quoting 1914 Manual ¶¶ 369, 371, and 373; 1956 FM 27–10, ¶¶ 80, 81, and 82).

■ The Government has made a "substantial showing," *see supra* n. 32, that appellant's charged conduct, including his membership in al Qaeda, an international terrorist organization, and intentional provision of material support and resources to al Qaeda, with knowledge that al Qaeda engaged in or engages in terrorism and was engaged in armed conflict with the United States, constituted an offense

---

92. *See* 2006 M.C.A. § 948a(1)-(3), *supra* nn. 23, 24 and 53 (defining the terms "alien," "unlawful enemy combatant," and "lawful combatants"). *See also* 2009 M.C.A. § 948a(7)(C), *supra* n. 58 (defining "unprivileged enemy belligerent").

against the law of armed conflict punishable by military commission when committed.

### 3. Joint Criminal Enterprise

As articulated in our recent decision in *Hamdan,* the relatively recent, yet widely accepted, theory of individual criminal liability known as "joint criminal enterprise" (JCE) provides additional support for the conclusion that the charged formulation of providing material support for terrorism was punishable by military commission when the offense occurred.[93] JCE is rooted in the jurisprudence of Nuremburg and other post-World War II tribunals, and is derivative of direct commission of an offense or a form of co-perpetration.[94]

JCE has been adopted or recognized as a theory of individual criminal liability based upon one's participation in a criminal enterprise under customary international law in various treaties and international tribunal decisions since at least the 1990s.[95] In 1993, the UN Security Council established the first of the modern international tribunals—the International Criminal Tribunal for the former Yugoslavia (ICTY)—as an *ad hoc* court to prosecute crimes committed during the period of armed conflict in the former Yugoslavia. *Statute of the ICTY,* S.C. Res. 827, 32 I.L.M. 1203 (1993). The Security Council's mandate limited ICTY jurisdiction to those areas of "international humanitarian law which [were] 'beyond any doubt' part of customary international law[.]" The Secretary–General, *Report of the Secretary–General Pursuant to Paragraph 2 of Security Council Resolution 808,* ¶ 34 U.N. Doc. S/25704 (May 3, 1993). Since the first hearing in 1994, the Tribunal has indicted more than 160 individuals ranging from common soldiers to generals and Prime Minister Slobodan Milošević.

"Dusko *Tadić* was the first defendant tried before an international tribunal[, the ICTY,] since post-World War II courts ceased operating."[96] He was charged with participating with others in the commission of various crimes—including sexual assault, rape, beatings, killings, and other cruel conduct against Bosnian Muslims.[97] During Appeals Chamber review

**93.** *Hamdan,* 548 U.S. at 611 n. 40, 126 S.Ct. 2749 (Stevens, Souter, Ginsburg, and Breyer, JJ, concurring) (acknowledged the doctrine of joint criminal enterprise (JCE) as applied by the ICTY, and referred to JCE as "a species of liability for a substantive offense (akin to aiding and abetting), not a crime on its own.)" (citing *Tadić* Judgment, *supra* n. 89; *Prosecutor v. Milutinović,* Decision on Dragoljub Ojdanić's Motion Challenging Jurisdiction—JCE, Case No. IT–99–37–AR72, ¶ 26 (ICTY Appeals Chamber, May 21, 2003); Allison Marston Danner & Jenny S. Martinez, *Guilty Associations: Joint Criminal Enterprise, Command Responsibility, and the Development of International Criminal Law,* 93 Cal. L.Rev. 75, 103–04 (2005)).

**94.** *See generally* Ian Ralby, *Joint Criminal Enterprise Liability in the Iraqi High Tribunal,* 28 B.U. Intl. L.J. 281, 283–88, 309–10, and nn. 15, 27 (2010) (citing Jens Meierhenrich, *Conspiracy in International Law,* 2 An. Rev. Law & Soc. Sci. 341, 346 (2006); Elizabeth Rush-

ing et al., *Updates From the International Criminal Courts,* 14 Hum. Rts. Brief 55, 56 (2007) ("[A]iding and abetting is a form of accomplice liability, whereas participation in a [JCE] is a type of direct commission of a crime with other persons."); other citations omitted).

**95.** *See 1997 Bombing Convention,* art. 2(3)(c), quoted *infra* at n. 102; Rome Statute of the ICC, *supra* n. 51, art. 25(3)(d), quoted *infra* at pp. 1213–14. Cases tried by the ICTY, cited and discussed *infra* at pp. 1210–15.

**96.** Ralby, *supra* n. 94, at 294 (citing Jacob A. Ramer, *Hate by Association: Joint Criminal Enterprise Liability for Persecution,* 7 Chi.-Kent J. Intl. & Comp. L. 31, 50 (2007)).

**97.** *Id.* (citing *Prosecutor v. Tadić,* Case No. IT–94–1–T, ¶ 9 (ICTY Trial Chamber Judgment, May 7, 1997)). He was sentenced to 20 years in prison. *Id.* (citing *Prosecutor v. Tadić,* Case

of the *Tadić* case, the doctrine of JCE was first articulated as such by the ICTY.

The Appeals Chamber concluded that it was not limited to the liability theories specified in the ICTY statute reasoning that:

> [Article 7(1) of the ICTY Statute] does not exclude those modes of participating in the commission of crimes which occur where several persons having a common purpose embark on criminal activity that is then carried out either jointly or by some members of this plurality of persons. Whoever contributes to the commission of crimes by the group of persons or some members of the group, in execution of a common criminal purpose, may be held to be criminally liable[.] [98]

Also known as the common plan or purpose doctrine, the Appeals Chamber identified three types of JCE "basic," "concentration camp," and "extended." *Tadić* Judgment, *supra* n. 89, ¶¶ 196, 202, 203.204. We find the "basic" and "extended" categories of JCE particularly relevant here. The general *actus reus* requirements are the same for all three categories, while the *mens rea* elements are substantially different.

The Appeals Chamber summarized the objective elements, or *actus reus*, of JCE provided for in the ICTY statute as:

> i. *A plurality of persons.* They need not be organised in a military, political or administrative structure, as is clearly shown by the *Essen Lynching* and the *Kurt Goebell* cases.
>
> ii. *The existence of a common plan, design or purpose which amounts to or involves the commission of a crime provided for in the Statute.* There is no necessity for this plan, design or purpose to have been previously arranged or formulated. The common plan or purpose may materiali[z]e extemporaneously and be inferred from the fact that a plurality of persons acts in unison to put into effect a joint criminal enterprise.
>
> iii. *Participation of the accused in the common design* involving the perpetration of one of the crimes provided for in the Statute. *This participation need not involve commission of a specific crime* under one of those provisions (for example, murder, extermination, torture, rape, etc.), *but may take the form of assistance in, or contribution to, the execution of the common plan or purpose.*

*Prosecutor v. Tadić,* Case No. IT–94–1–A, 38 ILM 1518 ¶ 227 (ICTY Appeals Chamber Judgment, July 15, 1999) (emphasis added). *Tadić* Judgment, *supra* n. 89, ¶ 227 (emphasis in original).

The Appeals Chamber concluded that the *mens rea* element differs according to the category of common design under consideration summarized as follows:

> [*Basic JCE* ] what is required is *the intent to perpetrate a certain crime* (this being the shared intent on the part of all co-perpetrators).
>
> [*Extended JCE*] what is required is the *intention to participate in and further the criminal activity or the criminal purpose of a group* and *to contribute to the joint criminal enterprise or in any event to the commission of a crime by the group.* In addition, responsibility for a crime other than the one agreed upon in the common plan arises only if, under the circumstances of the case, (i) it was *foreseeable* that such a crime might be perpetrated by one or other members of

No. IT–94–1–T, Sentencing Judgment, ¶ 74 (July 14, 1997)).

98. Ralby, *supra* n. 94, at 296 (quoting Tadić Judgment, *supra* n. 89, Case No. IT–94–1–A, ¶ 190).

the group and (ii) the accused *willingly took that risk*.

*Id.* at ¶ 228 (emphasis added). *See Prosecutor v. Brdanin*, IT–99–36–A, ¶¶ 365, 411, 429 (ICTY Appeal Chamber Judgment Apr. 3, 2007).

The evidence needed to prove participation in, and thus liability for participation in a JCE, is therefore distinct and dependent upon the type of JCE in issue. In *Tadić*, the Trial Chamber found no evidence that the accused had taken an actual part in the killings charged. *Id.* at ¶¶ 178–83. The Appeals Chamber, however, overturned the Trial Chamber and convicted Tadić, relying on the concept of common purpose. *Id.* at ¶¶ 230–37. The Appeals Chamber stated that criminal responsibility under Extended JCE "for a crime other than the one agreed upon in the common plan arises only if, under the circumstances of the case, (i) it was *foreseeable* that such a crime might be perpetrated by one or other members of the group and (ii) the accused *willing took that risk.*" *Id.* at ¶ 228 (emphasis in original). As Tadić actively took part in the attack on the town, and was involved in beating a resident, the Appeals Chamber found him criminally liable because he shared the intent to ethnically cleanse the town of Jaskici of its non-Serb population. *Id.* at ¶¶ 232–33. He was, therefore, held to be responsible for the five deaths since they were perpetrated in the course of and were a foreseeable consequence of the common plan. *Id.* at ¶¶ 233–34.

█ The JCE doctrine, which extends individual criminal liability to each member of an organized criminal group for crimes committed by the group within the common plan or purpose, and requires an overt act in support of the offense, shares many attributes of providing material support for terrorism. For example, following World War II a British military court tried two German servicemen and five civilians for war crimes in the deaths of three British airmen, who were attacked and killed by a mob while under the escort of a German soldier in the *"Essen Lynching"* case.[99] Prior to the attack, a German officer, in a loud voice and in the presence of a crowd, "ordered that the escort should not interfere if German civilians should molest the prisoners, adding that [the prisoners] ought to be shot, or would be shot." *Id.* Although the officer was not present when the crowd attacked the British airmen, he and the escort were convicted of murder even though they had not struck the airmen. *Id.*

In the *Milošević* case, prosecutors argued that the indictments against Milošević were "all part of a common scheme, strategy, or plan on the part of the accused to create a 'Greater Serbia,' a centralized Serbian state encompassing the Serb-populated areas of Croatia and Bosnia and all of Kosovo, and that this plan was to be achieved by forcibly removing non-Serbs from large geographical areas through the commission of the crimes charged in the indictments."[100] Under this theory of liability, members of the JCE were held responsible for all of the crimes committed by the group in furtherance of the "Greater Serbia" plan. *Hamdan*, 801 F.Supp.2d at 1286 and n. 78, 2011 WL 2923945 at *23 and n. 78 (citations omitted).

At least three high-ranking members of the police and government, Nikola Saino-

---

99. *Tadić* Judgment, *supra* n. 89, ¶ 207 (citing *Trial of Erich Heyer and six others*, British Military Court for the Trial of War Criminals, Essen, 1 UNWCC ¶ 88, at p. 91 (1945)).

100. *Prosecutor v. Slobodan Milošević*, Case Nos. IT–99–37–AR73, IT–01–51–AR73, Reasons for Decision on Prosecution Interlocutory Appeal from Refusal to Order Joinder, ¶ 8 (Apr. 18, 2002).

vić, Nebojsa Pavković and Sreten Lukić, were convicted as members of the JCE. *Prosecutor v. Milan Milutinovićć,* Case No. IT–05–87–T (ICTY Trial Chamber Judgment Feb. 26, 2009). To satisfy the JCE element of the participation of the accused in the common purpose, an accused "may contribute to and further the common purpose of the JCE by various acts." *Prosecutor v. Vujadin Popović,* Case No. IT–05–88–T, vol. 1, ¶ 1026 (ICTY Trial Chamber Judgment June 10, 2010). The *Popović* Tribunal observed that "[a]n accused may contribute to and further the common purpose of the JCE by various acts, which need not involve carrying out any part of the *actus reus* of a crime forming part of the common purpose, or indeed any crime at all." *Id.* at vol. 1, ¶ 1026 (citing *Prosecutor v. Kvočeka,* Case No. IT–98–30/1–A, Judgment ¶ 99 (ICTY Appeals Chamber Judgment Feb. 28, 2005); other citations omitted). Indeed, "[a] participant in a [JCE] need not physically participate in any element of any crime" so long as other JCE requirements are met. *Id.* at ¶ 99.

JCE "responsibility does not require any showing of superior responsibility, nor the proof of a substantial or significant contribution." *Id.* ¶ 104. JCE "does not require proof of intent to commit a crime." *Prosecutor v. Brdjanin,* Case No. IT–99–36–A, Decision on Interlocutory Appeal ¶ 7 (ICTY Appeals Chamber Mar. 19, 2004). *See also* Intent necessary to establish "Extended JCE" *supra* at pp. 1211–12. "There is no specific legal requirement that the accused make a significant contribution" to the ·JCE. *Kvočcka* Appeals Chamber Judgment at ¶ 97. "The contribution of the Accused need not have been either substantial or necessary to the achievement of the JCE's objectives." *Id.* at ¶ 98. An accused may be found guilty even if his acts or omissions do not "assist, encourage, or lend moral support" to the commission of the underlying offence. *Milutinović* Trial Chamber Judgment, vol. I at ¶ 103. JCE responsibility "does require participation by the accused, which may take the form of assistance in, or contribution to, the execution of the common purpose." *Brdanin* Appeal Chamber Judgment at ¶ 424.

Although the United States has not ratified the Rome Statute of the International Criminal Court (ICC), as of June 24, 2011, there were 115 state parties, and 139 states have signed the Rome Statute of the ICC,[101] creating a standing tribunal with jurisdiction over individuals alleged to have committed genocide, crimes against humanity, war crimes, and eventually, crimes of aggression. Rome Statute of the ICC, *supra* n. 51, art. 5. *See also* Report of the ICC to the UN General Assembly, A/65/313, pp. 6–7 (Aug. 19, 2010). Article 25 of the Rome Statute includes an expansive list of available theories of individual criminal liability including JCE. Specifically, Article 25(3)(d) provides that a person shall be "criminally responsible and liable for punishment in accordance with this statute" if he:

(d) In any other way contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either: (i) Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commis-

---

101. *Hamdan,* 801 F.Supp.2d at 1287 and n. 82, 2011 WL 2923945 at *24 and n. 82 (citing *Khulumani v. Barclay Nat'l Bank Ltd.,* 504 F.3d 254, 276 n. 9 (2d Cir.2007) (noting that the Rome Statute of the ICC has been signed by most of the mature democracies of the world; however, the United States has not ratified it because of concerns about potential abuse of prosecutorial authority); other citation omitted).

sion of a crime within the jurisdiction of the Court; or (ii) Be made in the knowledge of the intention of the group to commit the crime.

Thus, the ICC statute includes a JCE theory of individual criminal liability based upon the knowing or purposeful contribution to the commission or attempted commission of such crimes by a group acting with a common purpose. The incorporation of JCE in other international conventions including the *1997 Convention for the Suppression of Terrorist Bombings* are reflective of the efficacy of JCE under international law.[102]

## C. Analysis

In response to issues specified by this Court, appellant asserts that for JCE "to be relevant here, the offenses charged would have to [establish his] co-perpetration of a specific and completed war crime," and that such "completed elements were neither alleged nor found." Brief on Specified Issue for Appellant 6. He further argues that the "Material Support charge" is not a completed offense, that it does not require intent "to further a foreign terrorist organization's illegal activities," and that "assuming the provisions of the [2006 M.C.A.] could be construed as requiring the equivalent of [JCE] liability for the underlying crimes" that appellant was not on notice that he was subject to personal liability "as a principal for underlying war crimes." *Id.* at 16–17 (citations omitted). We disagree.

■ Appellant correctly asserts that for JCE to be relevant, the specification must allege a completed offense, but contrary to his assertion, that requirement is

satisfied here. For the reasons discussed *supra*, we conclude that the specification describes at least two theories of culpability: (1) membership in a criminal organization (e.g. intentionally joining or membership in al Qaeda, an international organization that engages in terrorism, with knowledge of that terrorism), and (2) terrorism (e.g. as a co-perpetrator of that offense).

The charged offense of providing material support for terrorism shares attributes with all three types of JCE, but most closely resembles "basic" and "extended" JCE. The charged conduct includes that appellant intentionally provided himself, as a member of al Qaeda, and various material support or resources to al Qaeda with knowledge that al Qaeda engaged in or engages in terrorism (e.g. intentional attacks on protected persons with the intent to terrorize the civilian population) and was then engaged in hostilities with the United States. Although the *mens rea* element of the charged offense is not identical to the *mens rea* requirements of either "basic JCE" or "extended JCE," it is substantially similar to the intent element of both types of JCE. *See supra* pp. 1211–12 and n. 89.

■ In fact, the *mens rea* requirements of the charged offense of providing material support for terrorism may be more onerous than that present in either "basic" or "extended" JCE in that the Government must prove beyond a reasonable doubt that the accused with knowledge that al Qaeda engaged in or engages in terrorism, intentionally provided himself and other services, which requires two separate *mens rea* findings. First, that he

---

**102.** *1997 Bombing Convention, supra* n. 72, art. 2(3)(c) ("3. Any person also commits an offence if that person . . . (c) In any other way contributes to the commission of one or more offences as set forth in paragraph 1 or 2 by a group of persons acting with a common purpose; such contribution shall be intentional and either be made with the aim of furthering the general criminal activity or purpose of the group or be made in the knowledge of the intention of the group to commit the offence or offences concerned.").

intentionally provided himself and other enumerated services or resources to al Qaeda; and second that he did so with knowledge that al Qaeda "engaged in or engages in terrorism," which incorporates an additional *mens rea* requirement attributable to the perpetrators of that terrorism (e.g. "intentionally kill[ing] or inflict[ion of] great bodily harm on one or more protected persons, or intentionally engages in an act....") 2006 M.C.A. § 950v(b)(24), *supra* p. 52. Again the military commission judge's instructions reflect that the military commission applied the law in precisely this manner. Tr. 869–71.[103]

At a minimum, the "extended JCE" *mens rea* requirement (e.g. "intent to participate in, contribute to, and further the criminal activity or criminal purpose of al Qaeda" *see supra* pp. 1211–12.) is implied in the specification, which provides examples of the hostilities al Qaeda engaged in both before appellant joined, and while he was a member of Al Qaeda. Indeed, the most notorious charged conduct was that appellant prepared "propaganda products including the video 'The Destruction of the American Destroyer U.S.S. Cole,' to solicit material support for al Qaeda, to recruit and indoctrinate personnel to the organization and objectives of al Qaeda, and to solicit, incite and advise persons to commit terrorism," a video titled to sensationalize one of the enumerated examples of al Qaeda's violent attacks on the United States, the October 2000 attack on the USS COLE in Aden, Yemen. The Specification of Charge III, ¶ e, *supra* p. 48.

Even assuming *arguendo* that the providing material support for terrorism *mens rea* requirement is less arduous than that required in "Extended JCE," and as such reduces the Government's burden while expanding the scope of conduct punishable, we are convinced that Congress did not exceed its constitutional authority to define and punish offenses against the law of nations in codifying this formulation of providing material support for terrorism.

The charged conduct, of which the members ultimately returned findings of guilty, was that appellant travelled to Afghanistan with the purpose and intent of joining al Qaeda, met with a key al Qaeda figure as a step to joining al Qaeda, underwent "military-type" training at an al Qaeda sponsored training camp, pledged loyalty to al Qaeda's then leader bin Laden, and joined al Qaeda with knowledge of its terroristic activities which continued throughout the entire period charged of February 1999–December 2001.

The Government has made a "substantial showing," *see supra* n. 32, that the JCE theory of individual criminal liability provides additional support for the conclusion that the charged offense of providing material support for terrorism was punishable by military commission at the time committed.

### D. Complicity

"Principle VII of The Nuremberg Tribunal Report" also recognized complicity in the commission of a war crime as an offense under international law.[104] "The three essential elements of complicity are

---

**103.** The military commission judge incorporated by reference the definition of terrorism from 2006 M.C.A. § 950v(b)(24). Tr. 871. *See supra* p. 1194, from his earlier instructions on the conspiracy charge. Tr. 856.

**104.** "Complicity in the commission of a crime against peace, a war crime, or a crime against humanity as set forth in Principle VI is a

crime under international law." *Principles of International Law Recognized in the Charter of the Nürnberg Tribunal and in the Judgment of the Tribunal*, Report of the International Law Commission on the Work of its Second Session, Principle VII, U.N. GAOR, 5th Sess., Supp. No. 12, U.N. Doc. A/1316 (1950), 2 Y.B. Intl. L. Comm'n. 374, 377 (1950), *http://*

(1) the commission of a crime; (2) the accomplice's—one who is complicit—material contribution to the commission of that crime; and (3) the accomplice's intention that the crime be committed, or the accomplice's reckless disregard for the potential of its commission." [105]

In the *Tadić* Judgment, *supra* n. 89, ¶ 191, the ICTY Appeals Chamber commented on the distinction between persons in organizations implicated in war crimes, particularly organizational leaders, who often are accomplices, as opposed to the physical perpetrators of the acts as follows:

> Although only some members of the group may physically perpetrate the criminal act ... the ... contribution of the other members of the group is often vital in facilitating the commission of the offence in question. It follows then that the moral gravity of such participation is often no less—or indeed no different—from that of those actually carrying out the acts in question.

One scholar recently argued in the context of genocide that:

> The crime of complicity ... exists to punish those who contribute in a materi-

al way to the commission of genocide, but who, because they lack the specific intent specific motive nexus, cannot be successfully prosecuted for aiding and abetting the crime of genocide.... Only by extending liability to the political actors, arms brokers, and States that facilitate genocide can the promises of the Genocide Convention be fulfilled.[106]

 Another scholar asserts that proof of complicity requires prosecutors "to show intentional participation in acts that contributed toward a criminal result without defendant's prior agreement toward that end." *Bush, supra* n. 88, at 1208. The offense of complicity further supports the conclusion that appellant's conduct violated the law of armed conflict at the time committed.

## E. Aiding the Enemy

The historical U.S. practice of trying the offense of aiding the enemy by military commission provides additional support, or at a minimum, analogical support, for the conclusion that appellant's charged conduct as providing material support for terrorism was punishable by military commission.[107]

---

*untreaty.un.org/ilc/texts/instruments/english/draft20articles/7_1_1950.pdf.*

**105.** Daniel Greenfield, *The Crime of Complicity in Genocide: How the International Criminal Tribunals for Rwanda and Yugoslavia Got it Wrong, and Why It Matters*, 98 J. of Criminal L. & Criminology 921, 925–26, Nw. U. Sch. of L. (2008) (citing William A. Schabas, *Enforcing International Humanitarian Law: Catching the Accomplices*, 842 Intl. Rev. Red Cross 925–26 (2001)).

**106.** *Id.* at 951–52. *See also* Genocide Convention, *infra* n. 113, at art. III(e) (stating that complicity in genocide "shall be punishable").

**107.** The Supreme Court's decision in *Hamdan* reveals possible disagreement over whether the crime of aiding the enemy under Article 104, UCMJ, requires the accused owe allegiance to the party whose enemy he is alleged

to have aided to be triable by military commission. *Compare Hamdan*, 548 U.S. at 600–602 n. 32, 126 S.Ct. 2749 (Steven, Souter, Ginsburg, and Breyer, JJ., concurring) ("the crime of aiding the enemy may, in circumstances where the accused owes allegiance to the party whose enemy he is alleged to have aided, be triable by military commission pursuant to Article 104 of the UCMJ, 10 U.S.C. § 904. Indeed, the Government has charged detainees under this provision when it has seen fit to do so. *See* Brief for David Hicks as Amicus Curiae 7.") *with Hamdan*, 548 U.S. at 696–97, 126 S.Ct. 2749 (Thomas and Scalia, JJ., dissenting) (not addressing the issue of allegiance under Article 104, UCMJ but stating, "[u]ndoubtedly, the conclusion that such conduct [like Hamdan's conduct] violates the law of war led to the enactment of Article 104 of the UCMJ [aiding the enemy]."). In *Hamdan*, our Court found it unnecessary "to de-

Aiding the enemy has long existed in U.S. military jurisprudence. The Continental Congress enacted the American Articles of War of 1776, including Section XIII, Article 18, which punishes any person who provides relief of "the enemy with money, victuals, or ammunition," or who "knowingly harbor[s] or protect[s] an enemy." Winthrop, *supra* n. 32, at 967. Congress subsequently enacted Article of War 45, continuing the prohibition against aiding the enemy. *Id.* at 102. Winthrop concludes that civilians can be tried for aiding the enemy under this article. *Id.* at 102–104. On August 29, 1916, Congress included aiding the enemy as an offense in Article of War 81, and subsequently in UCMJ art. 104. *United States v. Olson,* 7 U.S.C.M.A. 460, 22 C.M.R. 250, 1957 WL 4621 (1957) (discussing genesis of Article of War 81 and Article 104, UCMJ); *See* MCM, 1920, MCM, 1950, MCM, 2008.

"Enemy" is defined in the 2006 M.C.A. §§ 948a(1) and 948a(2), and it includes persons who have "purposely and materially supported hostilities against the United States." *See* 10 U.S.C. §§ 948a(1) and 948a(2), *supra* nn. 24, 53. *See also Hamdan,* 801 F.Supp.2d at 1298 n. 130, 2011 WL 2923945 at *31 n. 130 (quoting 2008 MCM, Part IV, ¶ 23c(1)(b)). The term, "enemy," clearly includes members of al Qaeda who have engaged in acts of terror-

ism. *Id.* at § 948a(1)(i). The elements of providing material support to terrorism are similar to the elements of Article 104, UCMJ. As Colonel Winthrop noted:

Infractions of [the rule forbidding trade or interchange with the enemy], by selling to, buying from or contracting with enemies, furnishing them with supplies, corresponding, mail carrying, passing the lines without authority, & c., are *violations of the laws of war,* more or less grave in proportion as they *render material aid or information to the enemy or attempt to do so, and, as will hereafter be illustrated, are among the most frequent of the offences triable and punishable by military commission.*

Winthrop, *supra* n. 32, at 777 (emphasis added). In 1916, Article of War 81,[108] expanded the offense of aiding the enemy when "or other thing was added" to prohibit providing intangible aid to the enemy, which could include appellant's conduct. *See Olson,* 7 U.S.C.M.A. at 466–67, 22 C.M.R. 256–57.

 In conclusion, the Government has made a "substantial showing," *see supra* n. 32, that the charged conduct, including appellant's pledge of fealty to bin Laden and membership in al Qaeda, an international terrorist organization, and intentional provision of material support and resources to al Qaeda with knowledge that

termine whether aiding the enemy under Article 104, UCMJ, applies ... because [Hamdan was] not charged with violating Article 104, UCMJ [and the Court looked] to the law of war for the historical underpinnings of providing material support for terrorism." *Hamdan,* 801 F.Supp.2d at 1298 n. 130, 2011 WL 2923945 at *31 n. 130.

**108.** Article of War 81, Relieving, corresponding with, or aiding the enemy, provides, "Whosoever relieves or attempts to relieve the enemy with arms, ammunition, supplies, money, or other thing, or knowingly harbors or protects or holds correspondence with or gives intelligence to the enemy, either directly

or indirectly, shall suffer death or such other punishment as a court-martial or military commission may direct." *United States v. Olson,* 7 U.S.C.M.A. 460, 465, 22 C.M.R. 250, 255, 1957 WL 4621 (1957). In Brig. Gen. Crowder's statement to the Sen. Subcommittee on Military Affairs, Feb. 8, 1916, he explained Article of War 81, was a consolidation of Articles of War 45 and 46 of previous code. *See Revision of the Articles of War,* 1912–1920, vol. I at 79. He noted that "the offenses denounced by the present article may, and usually will be, committed by persons outside of the Army," and commented that "the military commission will in time of war try most of these offenses."

**1218**

al Qaeda engaged in or engages in terrorism and was engaged in armed conflict with the United States, constituted an offense under the law of armed conflict when committed. Congress did not exceed its constitutional authority by defining and making such conduct punishable by military commission as providing material support for terrorism.

Appellant has simply proffered no persuasive argument under treaty or customary international law that membership in a terrorist organization such as al Qaeda, when engaged in armed conflict with a nation state, entitles an individual member to any special status under the law of armed conflict. To the contrary, customary practice has been to treat such persons as outside the protections of the law of armed conflict, punishable for their own criminal acts and, if membership is established, their membership in that criminal organization. The domestic laws of many nations prohibiting conduct similar to providing material support for terrorism also strongly suggest that such prohibitions constitute general principles of law recognized by civilized nations.

The statutory scheme employed by Congress in the 2006 M.C.A., including the common elements (AUEC and in the context of an armed conflict), stringent procedural safeguards and comprehensive factual determinations are consistent with international norms. Congress did not exceed its constitutional authority in choosing a name for the offense—"providing material support for terrorism" or in defining the elements of providing material support for terrorism.

## F. *Ex Post Facto*

Appellant had knowledge that al Qaeda engaged in terrorism before he joined and intentionally provided himself and other material support and resources to al Qaeda, including various propaganda products intended for al Qaeda recruiting and indoctrination training, and inciting others to commit terrorism. He was also convicted of facilitating the pledges of loyalty to bin Laden and preparing the propaganda declarations styled as Martyr Wills of two suspected September 11, 2001 hijackers/pilots, operating and maintaining data processing equipment and media communications equipment used to obtain the first reports of the September 11 attacks to bin Laden and other al Qaeda leadership. In addition, he was convicted of researching the economic effect of those attacks on the United States and providing the results of his research to bin Laden, and acting as media and personal secretary for bin Laden.

In light of our decision in *Hamdan*, 801 F.Supp.2d at 1299, 1305–10, 2011 WL 2923945 at *32, *37–*41, and consistent with our discussion, *supra* pp. 1202–20, appellant's charged conduct has long been punishable as membership in a criminal organization and at a minimum, each additional charged act relates directly to appellant's knowledge, intent, or actions in support of al Qaeda, an international terrorist organization with no colorable claim of legitimacy under the law of armed conflict. The similarity of the charged conduct and statutory requirements in the 2006 M.C.A. of knowledge and intent to membership in criminal organizations, the JCE theories of individual criminal liability, complicity, and aiding the enemy reinforce our holding that appellant's charged conduct violated the law of armed conflict when committed.

## G. Instructional Error

Appellant also asserts the military commission judge erroneously included "propaganda" and "recruiting materials" within the definition of "material support" in his instructions to the mem-

bers. Brief for Appellant 2, 19–21, 29–30; Reply Brief for Appellant 2, 19; Tr. 858. The military commission judge used the same definition for all three charges. Tr. 858, 868, 871. A military commission judge "shall give the members appropriate instructions on findings." 2007 M.M.C., Part II, R.M.C. 920(a). *See United States v. Martinez*, 40 M.J. 426, 431 (C.M.A.1994) (citing *United States v. Groce*, 3 M.J. 369, 371 (C.M.A.1977)). There was no objection to these instructions during trial by either party. Thus, pursuant to R.M.C. 920(f), the matter is waived absent plain error.

We have not previously addressed what constitutes "plain error" in the context of the 2006 M.C.A. and note that neither the statute nor M.M.C. defines "plain error." The statute does limit our authority to act with respect to matters of law in that "[a] finding or sentence of a military commission under this chapter may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." 2009 M.C.A. §§ 950f(d) and 950a(a). This limitation is also present in the UCMJ, and closely resembles that applicable in Article III courts. 10 U.S.C. § 859(a) and Fed. R.Crim.P. 52(b). *See supra* p. 1158.

The Supreme Court recently commented that Federal Rule of Criminal Procedure "Rule 52(b) permits an appellate court to recognize a 'plain error that affects substantial rights,' even if the claim of error was 'not brought' to the district court's 'attention.'" *United States v. Marcus*, —— U.S. ——, 130 S.Ct. 2159, 2164, 176 L.Ed.2d 1012, 1017 (2010). The Court noted:

> the cases that set forth our interpretation hold that an appellate court may, in its discretion, correct an error not raised at trial only where appellant demonstrates that (1) there is an "error"; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected appellant's substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings"; and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.[109]

■ "We 'review *de novo* the jury instructions as a whole and view them in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case.'" *United States v. Prince*, 647 F.3d 1257, 1265 (10th Cir.2011) (quoting *United States v. Bedford*, 536 F.3d 1148, 1152 (10th Cir. 2008)).[110]

Appellant provided a variety of resources and services, including preparing

---

**109.** *Marcus*, 130 S.Ct. at 2164, 176 L.Ed.2d at 1017–18 (quoting *Puckett v. United States*, 556 U.S. 129, 129 S.Ct. 1423, 1429, 173 L.Ed.2d 266, 275 (2009) (internal quotation marks omitted); citing *United States v. Olano*, 507 U.S. 725, 731–37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *United States v. Cotton*, 535 U.S. 625, 631–632, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)); *see also United States v. Pope*, 69 M.J. 328, 333 (C.A.A.F.2011) ("Failure to object to an instruction given or omitted waives the objection absent plain error.")(citing R.C.M. 920(f)).

**110.** *See also Brown v. Greene*, 577 F.3d 107, 111 (2d Cir.2009) (quoting *Gaines v. Kelly*, 202 F.3d 598, 606 (2d Cir.2000)) (citing *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973) ("the challenged instructions must be viewed in context, not only with respect to the overall charge, but also with respect to the entire trial record")); *Bryan v. United States*, 524 U.S. 184, 199, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) ("in the context of the entire instructions, it seems unlikely that the jury was misled")(citing *United States v. Park*, 421 U.S. 658, 674–75, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975)); *United States v. Bayer*, 331 U.S. 532, 536–37, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947) ("the extent of [an instruction's] amplification must rest largely in [the trial judge's] discretion"); *United States v. Castenada*, 555 F.2d 605, 611 (7th

propaganda and recruiting materials to an international terrorist organization. The statutory definition begins, "material support and resources means *any* property, tangible or intangible, or service, including. . . ." 18 U.S.C. § 2339A(b), *supra* n. 69 (emphasis added). Clearly propaganda and recruiting materials are within the terms "any property . . . and services." The military commission judge was simply clarifying and amplifying the definition of "material support" and did not change the meaning of the defined term or expand appellant's potential criminal liability. His instructions assisted the members in determining whether appellant committed the charged conduct. We note that the members' determination of those facts was required to be by legal and competent evidence, beyond a reasonable doubt. Thus, we find no error.

## IX. CONSPIRACY TO VIOLATE THE LAW OF WAR AS AN OFFENSE TRIABLE BY MILITARY COMMISSION

Appellant asserts that the offense of conspiracy is not recognized as a war crime under international law, and thus is not punishable by military commission. Brief for Appellant 21, 23–26. He acknowledges U.S. precedent for conspiracy prosecutions by military commission, but notes that those military commissions "exercised jurisdiction under martial-law as well as the law of war." Reply Brief for Appellant 12. Appellant emphasizes the precedent of the *Hamdan* plurality opinion

that "the government failed to make even a 'merely colorable' case for inclusion of conspiracy among those offenses cognizable by law-of-war military commission." Brief for Appellant 25 (citing *Hamdan,* 548 U.S. at 598–613, 126 S.Ct. 2749); Reply Brief on Specified Issues for Appellant 12–13.

The Government argues that the constitutional authority to establish the jurisdiction of military commissions belongs to the political branches exercising their war powers. The Government asserts that terrorists are akin to "guerrillas" engaged in "irregular war," and that "conspiracy has historically violated the law of war" and been tried by military commission. Brief for Appellee 22–23, 27–29; *see also* 1956 FM 27–10, *supra* pp. 43–44, at ¶¶ 80–82. In support of this argument, the Government cites the widespread acceptance of the JCE theory of individual criminal liability, international consensus on the illegality of conspiratorial type conduct and the long-standing U.S. view that conspiracy is punishable under the law of war. Specified Issues Brief for Appellee 1–18.

These diametrically opposed assertions represent more than adversarial hyperbole. The viability of conspiracy as a war crime has long been the subject of controversy. "Some form of conspiracy has been included as a charge and often as part of a judgment in every major American war crimes trial program, from the Civil War cases to Nuremberg and Tokyo after World War II. . . ."[111] This controversy

---

Cir.1977) ("the necessity, extent, and character of any supplemental instructions to the jury are matters within the discretion of the district court").

**111.** *Bush, supra* n. 88, at 1097 and n. 5 (citations stating *"Ex parte Quirin,* 317 U.S. 1, 23, 63 S.Ct. 2, 87 L.Ed. 3 (1942)) (citing but not discussing charge IV, conspiracy); *Mudd v. White,* 309 F.3d 819, 820 (D.C.Cir.2002) (denying relief to descendant of one of eight

persons convicted by military tribunal in May 1865 as conspirators in assassination of President Lincoln); *United States v. Wirz* (U.S. Mil. Comm'n Wash. D.C., Aug.-Sept. 1865), excerpted in 1 The Law of War: A Documentary History 783 (Leon Friedman ed., 1972) (charging first count as "combining, confederating and conspiring together with [named and unnamed persons] to injure the health and destroy the lives of soldiers in the military service of the United States, then held and

has persisted since the Nuremburg Tribunals with the views of highly qualified publicists ranging from "the IMT's rulings were dispositive on the subject of international conspiracy and that the restrictive interpretation is therefore the rule in modern international law;" *Bush; supra* n. 88, at 1163 and n. 240 (citing Antonio Cassese, *International Criminal Law* 197 (2003)), to the counter observation that such a view "omits the teachings of the complex, underutilized Tokyo judgment, which assessed conspiracy far more permissively . . . as well as of the French war crimes trials that later were held under Control Council Law No. 10." [112] Bush emphasized in his thorough discussion of international conspiracy law:

> Even skeptical international lawyers concede, however grudgingly, that conspiracy liability for at least certain acts

was a cornerstone of Nuremberg and Tokyo, programs almost all nations either joined or later endorsed, and is specifically included in the Genocide Convention, through which it became part of the jurisdiction of the *ad hoc* and permanent international criminal courts.[113]

The IMT at Nuremburg "ruled that its own jurisdiction, under the London Charter, extended only to conspiracy to commit crimes against peace and not conspiracy to commit war crimes or crimes against humanity." *Bush* at 1162, *supra* n. 88, at n. 235 (citing *The Nurnberg Trial*, 22 T.M.W.C., at 469 ("[T]he Charter does not define as a separate crime any conspiracy except the one to commit acts of aggressive war.")). This controversy is also readily apparent in the Supreme Court's decision in *Hamdan*.[114] Resolution of this enduring and complex controversy is not

---

being prisoners of war"). Conspiracy at the Nuremberg and Tokyo tribunals is discussed in greater detail in [Bush at 1135–1140]. The Supreme Court most recently discussed conspiracy as a war crime in *Hamdan v. Rumsfeld*. *See* 548 U.S. 557, 598–612, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (Stevens, J., plurality opinion); *id.* at 655, 126 S.Ct. 2749 (Kennedy, J., concurring in part); *id.* at 692–705, 126 S.Ct. 2749 (Thomas, J., dissenting). Justices Stevens and Thomas provide extended discussions of the American historical practice.")

112. *Id.* at 1163 and nn. 241, 242 (n. 241 stating, "For a summary of the Tokyo judgment's view of conspiracy, *see* Solis Horowitz, *The Tokyo Trial*, 28 Intl. Conciliation 473, 553–54 (1950). The relevant text is contained in the majority opinion, [*reprinted in*] 20 [*The Tokyo War Crimes Trial* (R. John Pritchard & Sonia Magbanua Zaide eds., 1981)], at 48, 439; *id.* at 4–7 (Bernard, J., concurring); *id.* at 1–7 (Jaranilla, J., concurring); *id.* at 475 (Webb, P.J., dissenting); *id.* at 491 (Pal, J., dissenting)."; n. 242 stating, "A summary with both trial and appellate court decisions was published along with the Nuremberg summaries as *France v. Roechling*, 14 T.W.C., *supra* [n. 81], at 1075 (Gen. Trib. of the Mil. Govt. 1948), *aff'd in part and rev'd in part*, 14

T.W.C., *supra* [n. 81], at 1097 (Super. Mil. Govt. Ct. 1949).").

113. *Id.* at 1097 (citing *Convention on the Prevention and Punishment of the Crime of Genocide (Genocide Convention )*, art. III(b) (Dec. 9, 1948), entered into force Jan. 12, 1951, 102 Stat. 3045, 78 U.N.T.S. 277, 280, G.A. Res. 260(III) (declaring "conspiracy to commit genocide" to be punishable act); *see* Statute of the International Tribunal for Rwanda (ICTR Charter), art. 2(3)(b) (Nov. 8, 1994), 33 I.L.M. 1602, 1603 (making "conspiracy to commit genocide" punishable by ICTR); Statute of the International Tribunal (ICTY Charter), art. 4(3)(b) (May 25, 1993), 32 I.L.M. 1192, 1193 (punishing "conspiracy to commit genocide"); *see also* William A. Schabas, *The UN International Criminal Tribunals: The Former Yugoslavia, Rwanda and Sierra Leone*, 179–81 (2006) (viewing international crime of conspiracy to commit genocide as still largely common law based)).

114. Justice Stevens, joined by Justices Souter, Ginsberg and Breyer, concluded that the Government failed to sustain its burden to establish that conspiracy was an offense triable by military commission under the common law of war. *Hamdan*, 548 U.S. at 595–613, 126 S.Ct. 2749. While Justice Thomas and Justice Scalia concluded that by joining a guerilla-type organization (membership alone)

essential to decide appellant's challenge. Consistent with the issue presented, we will focus on whether "any of the acts charged is an offense against the law of war cognizable before a military tribunal, and if so whether the Constitution prohibits the trial."

## A. Conspiracy—The Charge and Specification

Appellant, as an AUEC "in the context of and associated with an armed conflict at various locations in Afghanistan and elsewhere, from in or about February 1999 through in or about December 2001" was convicted of conspiring: "with Usama Bin Laden, Saif al 'Adl, and other members and associates of al Qaeda, known and unknown, to commit one or more substantive offenses triable by military commission, to wit: Murder of Protected Persons; Attacking Civilians; Attacking Civilian Objects; Murder in Violation of the Law of War; Destruction of Property in Violation of the Law of War; Terrorism; and Providing Material Support for Terrorism and with knowledge of the unlawful purposes of the agreement . . . willfully entered the agreement with the intent to further those unlawful purposes and knowingly committed the following overt acts in order to accomplish some objective or purpose of the agreement:

a. traveled to Afghanistan with the purpose and intent of joining al Qaeda;

b. met with Saif al-Adel, the head of the al Qaeda security committee, as a step toward joining the al Qaeda organization;

c. underwent military type training at an al Qaeda sponsored training camp [in Afghanistan];

d. pledged fealty, or "bayat" to the leader of al Qaeda, Usama bin Laden, joined al Qaeda, and provided personal services in support of al Qaeda;

e. prepared and assisted in the preparation of various propaganda products including the video "The Destruction of the American Destroyer *U.S.S. Cole*," to solicit material support for al Qaeda, to recruit and indoctrinate personnel to the organization and objectives of al Qaeda, and to solicit, incite, and advise persons to commit Terrorism;

f. acted as personal secretary and media secretary of Usama bin Laden in support of al Qaeda;

g. arranged for Muhammed Atta . . . and Ziad al Jarrah . . . to pledge fealty or bayat to Usama bin Laden;

h. prepared the propaganda declaration styled as Martyr Wills of Muhammed Atta and Ziad al Jarrah in preparation for the acts of terrorism perpetrated by the said Muhammed Atta, Ziad al Jarrah, and others . . . in the United States on September 11, 2001;

i. at the direction of Usama bin Laden, researched the economic effect of the September 11, 2001 attacks on the United States and provided the result of that research to Usama bin Laden; [and]

j. operated and maintained data processing equipment and media communications equipment for the benefit of Usama bin Laden and other members of the al Qaeda leadership.

The similarity between appellant's conviction of conspiracy in the Specification of Charge I and providing material support

---

Hamdan violated the law of war. *Id.* at 692–97, 126 S.Ct. 2749. Justices Thomas, Scalia, and Alito agreed that conspiracy to commit a war crime, including conspiring to attack civilians and civilian objects, to commit murder by an unprivileged belligerent, and terrorism-type offenses violated the law of war and are punishable by military commission, and that Hamdan's conduct qualified as a law of war violation. *Id.* at 697–704, 126 S.Ct. 2749.

for terrorism in the Specification of Charge III, ¶¶ a-j, *supra* pp. 49–49], including the same ten overt acts, informs our analysis of the assigned error.[115] We next turn to the statutory definition.

## B. Conspiracy under the 2006 M.C.A. and 2007 M.M.C.

The 2006 M.C.A. § 950v(b)(28) defines conspiracy as:

Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this chapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

The 2007 M.M.C., Part IV, ¶ 6(28)b, defines the elements of conspiracy as follows:

(1) The accused entered into an agreement with one or more persons to commit one or more substantive offenses triable by military commission or otherwise joined an enterprise of persons who shared a common criminal purpose that involved, at least in part, the commission or intended commission of one or more substantive offenses triable by military commission;

(2) The accused knew the unlawful purpose of the agreement or the common criminal purpose of the enterprise and joined willfully, that is, with the intent to further the unlawful purpose; and

(3) The accused knowingly committed an overt act in order to accomplish some objective or purpose of the agreement or enterprise.

## C. Analysis

 The 2006 M.C.A. defines conspiracy more narrowly than the UCMJ,[116] Title 18 of the U.S.Code, or common law.[117] In addition to the common elements

---

115. "[B]y definition, many material support cases are also conspiracy cases." Testimony of Jeh Charles Johnson General Counsel, Department of Defense Hearing Before the Senate Armed Services Committee "Military Commissions" (July 8, 2009) at p. 4, *http://armed-services.senate.gov/statemnt/2009/July/Johnson2007-07-09.pdf.*

116. *See United States v. Harman,* 68 M.J. 325, 327 (C.A.A.F.2010) ("Under Article 81, UCMJ, conspiracy requires: (1) That the accused entered into an agreement with one or more persons to commit an offense under the code; and (2) That, while the agreement continued to exist, and while the accused remained a party to the agreement, the accused or at least one of the co-conspirators performed an overt act for the purpose of bringing about the object of the conspiracy. Conspiracy need not be in any particular form or manifested in any formal words, rather it is sufficient if the agreement is merely a mutual understanding among the parties. The existence of a conspiracy may be established by circumstantial evidence, including reasonable inferences de-

rived from the conduct of the parties themselves. Any person subject to the [UCMJ] who conspires with any other person to commit an offense under this chapter shall, if one or more of the conspirators does an act to effect the object of the conspiracy, be punished as a court-martial may direct." (internal quotation marks and citations omitted)); *see also* Commander Syed N. Ahmad, JAGC, USN, *The Unconstitutional Prosecution of the Taliban under the Military Commissions Act,* 55 Naval L.Rev. 1, n. 2 (2008).

117. The United States has a well-developed statutory and judicial system for resolving conspiracy to commit terrorism-type offenses. *See* SCOR S/2006/397 at 3, 6–7 (June 16, 2006); SCOR S/2001/1220 at 13–16, 22 (Dec. 21, 2001). *See e.g., United States v. Moussaoui,* 591 F.3d 263, 296–97 (4th Cir.2010) ("The elements of a conspiracy charge are: (1) an agreement among the defendants to do something which the law prohibits; (2) the defendants' knowing and willing participation in the agreement; and (3) an overt act by one

(AUEC and in the context of an armed conflict), the following distinctions are noteworthy.

■ First, only agreements to "commit ... substantive offenses triable by military commission" under 2006 M.C.A. § 950v(b)(28) are punishable as conspiracies. Consequently, to be punishable as conspiracy under the M.C.A., the offense(s) object of the agreement must be punishable under the statute.

■ Second, the accused must "knowingly commit[ ] an overt act in order to accomplish some objective or purpose of the agreement or enterprise." Individual criminal liability is therefore limited to persons who have themselves (1) "committed an overt act in order to accomplish some objective or purpose of the agreement or enterprise," and (2) "knowingly" done so. Under the UCMJ and the general conspiracy statute, 18 U.S.C. § 371, individual criminal liability attaches if an overt act is committed by any party to the agreement.

Finally, conspiracy as defined in the 2006 M.C.A. § 950v(b)(28) and the 2007 M.M.C. clearly casts a wide net of potential individual criminal liability; however, we are mindful that two Congresses and two Presidents have agreed that conspiracy to commit offenses enumerated in the 2006 and 2009 M.C.A. violate the law of armed conflict and are punishable by military commission.

Each of the seven offenses alleged as objects of the conspiracy in the Specification of Charge I is defined as an offense punishable by military commission in the 2006 M.C.A. *See* 2006 M.C.A. §§ 950v(b)(1), 950v(b)(2), 950v(b)(3), 950v(b)(15), 950v(b)(16), 950v(b)(24), and 950v(b)(25). The first five object offenses: (1) murder of protected persons; (2) attacking civilians; (3) attacking civilian objects; (4) murder in violation of the law of war; and (5) destruction of property in violation of the law of war constitute noncontroversial, long-standing violations of the law of armed conflict punishable by military commission.[118] The remaining

---

of the conspirators in furtherance of the agreement's purpose. *See United States v. Hedgepeth,* 418 F.3d 411, 420 (4th Cir.2005). Because it is the agreement to commit the crime that creates the conspiracy, the defendant need not know the details of the underlying crime or "the entire breadth of the criminal enterprise." *United States v. Burgos,* 94 F.3d 849, 858 (4th Cir.1996) (en banc). "A conspirator need not have had actual knowledge of the co-conspirators," and "a conspiracy conviction must be upheld even if the defendant played only a minor role in the conspiracy." *United States v. Morsley,* 64 F.3d 907, 919 (4th Cir.1995); *see also United States v. Banks,* 10 F.3d 1044, 1054 (4th Cir. 1993) ("It is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence."). The defendant "may be liable for conspiracy even though he was incapable of committing the substantive offense." *Salinas v. United States,* 522 U.S. 52, 64, 118 S.Ct.

469, 139 L.Ed.2d 352 (1997)"). *See also Whitfield v. United States,* 543 U.S. 209, 211–14, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) (discussing the distinction between the absence of an overt act requirement in conspiracy under the Sherman Act, 15 U.S.C. § 1, a drug conspiracy under 21 U.S.C. § 846, and a money laundering conspiracy under 18 U.S.C. § 1956(h), as compared to the general conspiracy statute, 18 U.S.C. § 371, "which supersedes the common law rule by expressly including an overt-act requirement.").

118. *See* Rome Statute of the ICC, *supra* nn. 51, 66, art. 8(2) ("2. For the purpose of this Statute, "war crimes" means: (a) Grave breaches of the Geneva Conventions of 12 August 1949, namely, any of the following acts against persons or property protected under the provisions of the relevant Geneva Convention: (i) Wil[l]ful killing; ... (iii) Willfully causing great suffering, or serious injury to body or health; (iv) Extensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully

two object offenses: (6) terrorism and (7) providing material support for terrorism are the subject of considerable discussion in this opinion. *See supra* pp. 1194–1202.

■ Congress did not exceed its constitutional authority by defining terrorism as an offense in the 2006 M.C.A. and in making such conduct punishable by military commission, when committed by an AUEC in the context of an armed conflict. *See supra* pp. 1182–90; *see also Hamdan,* 801 F.Supp.2d at 1287–93, 2011 WL 2923945 at *24–*27. The 2006 M.C.A. offense of terrorism is consistent with Common Article 3 and APII, *supra* n. 39, firmly established international norms, and general principles of law recognized by civilized nations and was applicable at the time of the conduct alleged.

Similarly, Congress acted within the scope of its constitutional authority by defining "providing material support for terrorism" as an offense in the 2006 M.C.A. and in making the conduct alleged here and in *Hamdan* punishable by military commission, when committed by an AUEC in the context of an armed conflict. *See supra* pp. 1181–91; *see also Hamdan,* 801

F.Supp.2d at 1277–78 and nn. 48–54, 2011 WL 2923945 at *18 and nn. 48–54. In this case, we focused on the specific circumstances of appellant's pledge of fealty to bin Laden, his membership in al Qaeda, an international terrorist organization, and his intentional provision of material support and resources with knowledge that al Qaeda engaged in or engages in terrorism and was then engaged in armed conflict with the United States. *See supra* pp. 1188–91. Our conclusion was grounded in the customary practice of treating such persons as outside the protections of the law of armed conflict, punishable for their own criminal acts and those of the armed group of which they were a member.

Appellant was essentially charged with and convicted of conspiring and agreeing with bin Laden and other al Qaeda members to commit the seven object offenses, and with knowledge of the unlawful purposes of that agreement willfully entering into that agreement with the intent to further those unlawful purposes. He knowingly committed the enumerated overt acts "in order to accomplish some objective or purpose of the agreement"

and wantonly ...." and "2(b) Other serious violations of the laws and customs applicable in international armed conflict, within the established framework of international law, namely, any of the following acts: (i) Intentionally directing attacks against the civilian population as such or against individual civilians not taking direct part in hostilities; (ii) Intentionally directing attacks against civilian objects, that is, objects which are not military objectives; ... (v) Attacking or bombarding, by whatever means, towns, villages, dwellings or buildings which are undefended and which are not military objectives; (vi) Killing or wounding a combatant who, having laid down his arms or having no longer means of defence, has surrendered at discretion; ... (ix) Intentionally directing attacks against buildings dedicated to religion, education, art, science or charitable purposes, historic monuments, hospitals and places where the sick and wounded are collected, provided they are

not military objectives; ... (xi) Killing or wounding treacherously individuals belonging to the hostile nation or army; ... (xiii) Destroying or seizing the enemy's property unless such destruction or seizure be imperatively demanded by the necessities of war; ... 2(c) In the case of an armed conflict not of an international character, serious violations of article 3 common to the four Geneva Conventions of 12 August 1949, namely, any of the following acts committed against persons taking no active part in the hostilities ...: (i) Violence to life and person, in particular murder of all kinds ..." and "2(e) Other serious violations of the laws and customs applicable in armed conflicts not of an international character, within the established framework of international law, namely, any of the following acts: (i) Intentionally directing attacks against the civilian population as such or against individual civilians not taking direct part in hostilities; ...").

including traveling to Afghanistan with the intent of joining al Qaeda, undergoing military-type training at an al Qaeda camp, meeting with and pledging personal loyalty to bin Laden, and then joining al Qaeda. The Specification of Charge I ¶¶ a-d.

After joining al Qaeda, appellant committed numerous additional acts "in order to accomplish some objective or purpose of the agreement" including: "preparation of various propaganda products, including the video 'The Destruction of the American Destroyer U.S.S. Cole,' to solicit material support for al Qaeda, to recruit and indoctrinate personnel to the organization and objectives of al Qaeda, and to solicit, incite and advise persons to commit Terrorism;" acting as a personal secretary and media secretary for bin Laden; facilitating the pledges of loyalty to bin Laden and preparing the propaganda declarations styled as Martyr Wills for two suspected September 11, 2001 hijackers/pilots, researching the economic effect of the acts of terrorism perpetrated on the United States by those two hijackers/pilots on September 11, 2001 and providing the results to bin Laden, and operating and maintaining data processing equipment and media communications equipment for the benefit of bin Laden and other al Qaeda leaders. The Specification of Charge I ¶¶ d-j.

This offense as codified and charged provided comprehensive notice of both the conduct in issue and the elements of the offense. In fact, the Government was required to prove both objective and subjective elements.

The objective elements include an *actus reus*, which is appellant's agreement with bin Laden and others to commit the offenses that are the object of the conspira-

cy, and the charged overt acts included his pledge of fealty to bin Laden and membership in al Qaeda as well as the various support and services he personally provided al Qaeda; his status as an AUEC; and that the conduct took place "in the context of and was associated with an armed conflict." The Specification of Charge I.

Additionally, the subjective elements include both a *scienter* or knowledge element, and *mens rea* or intent element. Specifically, that the accused "knew the unlawful purpose of the agreement" and "joined willfully, that is, with the intent to further its unlawful purpose." 2007 M.M.C., Part IV, ¶¶ 6(28)b(2)-(3), *supra* p. 1223. The military commission judge's instructions to the members articulated these requirements and serve to illustrate the subjective elements of the offense.[119]

Likewise, "[t]he act of uniting with "banditti, jayhawkers, guerillas, or any other unauthorized marauders" has long violated the law of armed conflict and that "offence is complete when the band is organized or joined," 11 Op. Atty. Gen. at 312, *see supra* p. 1186. Recent treaty law acknowledges participation in a transnational organized criminal group in a manner similar to the charged conspiracy as punishable conduct. *See* Convention against Transnational Organized Crime, art. 5, quoted at p. 69 and cited *supra* n. 90. In addition, punishment of such conduct under domestic criminal law reflects widespread agreement on this fundamental principle.

Appellant's charged conspiracy is directly akin to the criminal organization provisions of the Nuremburg Charter in Articles 9 and 10, as implemented by the IMT. *See* discussion *supra* pp. 1203–05. We also find that appellant's conduct readily meets

---

119. The military commission judge's instructions included in the elements of each of the seven offenses that are the object of the conspiracy that appellant knew the unlawful pur-

pose of the agreement and joined or willingly joined the conspiracy with the intent to further its unlawful purpose. Tr. 846, 850, 851, 852, 854, 856, 857.

the requirements of membership in a criminal organization. Appellant's conduct, including his agreement with bin Laden and others to commit the object offenses, with knowledge of and intent to further the unlawful purposes of that agreement, and commission of the enumerated overt acts, including meeting with and pledging personal loyalty to bin Laden, and then joining al Qaeda was punishable by military commission as an offense against the law of armed conflict when committed.

Additionally, and like the conduct charged as providing material support for terrorism, *see* JCE *supra* pp. 1210–15 and complicity *supra* pp. 1215–16, the offense of conspiracy as charged is essentially co-perpetrator or principal liability, akin to aiding and abetting, or complicity, theories of individual criminal liability long recognized under the law of armed conflict, and in the domestic law of civilized nations. This is particularly true where, as here, the accused voluntarily conspires and agrees with al Qaeda's leadership to commit at least seven separate offenses against the law of armed conflict and with knowledge of and intent to further the unlawful purposes of that agreement, knowingly commits various overt acts to accomplish some objective of that agreement including pledging loyalty to bin Laden, joining al Qaeda, and providing various services and resources to both. The *mens rea* element as defined in 2006 M.C.A. § 950v(b)(28), *supra* p. 1223, and the 2007 M.M.C., Part IV, ¶¶ 6(28)b, *supra* p. 1223, and as applied by the military judge at trial also duplicates that required for "Basic JCE" (shared intent to perpetrate a certain crime), and "Extended JCE" (intent to participate in and further the criminal activity or the criminal purpose of a group). *See supra* pp. 1211–12.[120]

### 1. Non–U.S. Conspiracy–Type Laws

The domestic laws of many nations address conspiracy and conspiracy-like conduct and include similar language. *See supra* n. 76, for the locations of documents in this section.

In Afghanistan, before December 2001, "alliance in crime" was defined as "the joining of two or more persons in committing a specific or an unspecified felony or misdemeanor, or joining in equipment, facilities or supplementary works of the said crimes, provided that the alliance is regular and continuous, even if it has taken place at the formation stage of crime or for a short time." Afghanistan Penal Code, arts. 49, 50 (Oct. 7, 1976), Issue No. 13, Ser. No. 347. "Every individual shall be sentenced, . . . even if the felony for which the alliance was made has not been initiated." *Id.* at art. 50(1). Current Afghanistan law criminalizes "unit[ing] with another person in order to participate in the commission of [a terrorist] offence." Law on Combat against Terrorist Offenses, Art. 18 (July 2008). *See also supra* p. 1198

---

**120.** The 2007 M.M.C. incorporates as an element "an enterprise of persons who shared a common criminal purpose," or JCE theory into the elements of the offense. *Id.* at Part IV, ¶¶ 6(28)b, *supra* p. 1223. The definition satisfies the *actus reus* requirements for all three types of JCE (e.g. plurality of persons, existence of a common plan, design or purpose which amounts to or involves the commission of a crime provided for in the Statute, and participation of the accused in the common design involving the perpetration of one of the crimes provided for in the Statute where this participation may take the form of assistance in, or contribution to, the execution of the common plan or purpose). Appellant properly points out that the military commission judge granted the Government's motion to strike the "enterprise language" from the Specification of Charge I upon motion from the trial counsel, and this change was made without explanation or objection from appellant. Tr. 109–113; Charge Sheet.

(discussing helping or aiding in terrorism as an Afghan offense).

Brazilian law prohibits "association of more than three persons for the purpose of undertaking criminal activities." SCOR Report S/2001/1285 at 11 (Dec. 27, 2001) (citing the Penal Code of Brazil, art. 288). *See also* pp. 1198, 1236 (discussing Brazilian terrorism laws).

Egyptian law has criminal penalties for "anyone who invites another to join even a mere agreement aimed at the commission of crime in connection with terrorist activity, even if his invitation is not accepted." SCOR Report S/2001/1237 at 4 (Dec. 21, 2001) (citing Arts. 88(b), 97, 98 of the Egypt Penal Code). It also penalizes "anyone who has knowledge of the existence of a plan to commit such crimes and fails to inform the authorities thereof." *Id.*

Under French Law, "criminal conspiracy of a terrorist nature ... [includes] 'participation in a group or an understanding established for the purpose of preparing, by means of one or more material actions, one of the aforementioned terrorist acts.'" SCOR S/2001/1274 at 18 (Dec. 27, 2001) (citing Act 96–647 of 22 July 1996). "The offense of criminal conspiracy for the purpose of planning terrorist acts is applicable to persons not only within French territory but also outside the country." *Id.* at 18–19 (citing Article 706–16 of the Code of Criminal Procedure).

German law punishes anyone who:

forms a group whose aims or activities are directed towards commission of certain criminal offenses [but not specifically terrorism] ... [or] whoever participates in such a group as a member, [commits an offense and if these offenses are] intended to seriously intimidate the population, to unlawfully coerce a public authority or an international organization through the use of force of the threat of use of force, or to signifi-

cantly impair or destroy the fundamental political, constitutional, economic or social structures of a country or an international organization, and which, given the nature or consequences of such acts, may seriously damage a country or an international organization, is subject to punishment.

SCOR Report S/2006/527 at 3 (July 17, 2006) (citing the German Penal Code § 129a as promulgated on Nov. 13, 1998).

The law in India provides for punishment of anyone who "conspires or attempts to commit, or advocates, abets, advises or incites or knowingly facilitates the commission of, a terrorist act or any act preparatory to a terrorist act" as well as "[a]ny person who is a member of a terrorist gang or a terrorist organization, which is involved in terrorist acts . . . ." Terrorist and Disruptive Activities (Prevention) Act, 1987, Part II §§ 3(3) and 3(5).

In Indonesia, a " 'conspiracy' exists as soon as two or more persons agree to commit a crime." Penal Code of Indonesia, as amended May 19, 1999, art. 88. Whoever "conspire[s to commit various crimes] shall be punished . . ." *Id.* at art. 187. Any person having knowledge of a conspiracy to commit ... [various] crime[s] at a moment when the commission of said crimes may still be prevented, [who] deliberately omits to give timely adequate notice thereof either to the ... police, or to the threatened person, shall, if the crime was committed, be punished. . . ." *Id.* at art. 164. *See also* pp. 105 (discussing Indonesian laws against terrorism).

In Italy, a person " 'organizing or directing an association which propose[s]' " terrorist violence, can be sentenced " 'without any violence being committed.' Further, 'mere participation in such an organization' ... even if they ha[ve] never participated in a violent act" could result in a prison

sentence. Matthew Dunham, *Eliminating the Domestic Terrorist Threat in the United States: A Case Study on Eradication of the Red Brigades,* 107 Dick. L.Rev. 151, 160–61 (2002) (citations omitted). SCOR Report S/2002/8 (Jan. 2, 2002) provides:

> Italy [has] . . . a wide ranging set of rules and regulations to counter . . . terrorism. In addition to existing legislation, Decree Law 374/2001 . . . criminalizes the financing of both international and domestic terrorist activities. Section 1 ("Provisions relating to conspiracy for the purposes of domestic or international terrorism") updates article 270–bis of the Criminal Code and provides that "anyone promoting, instituting, organising, managing or financing organisations whose purpose is to propose acts of violence for the purposes of terrorism or for subverting the democratic order shall be liable for a term of imprisonment, . . . and that "anyone participating in the aforementioned organisations shall be liable for a term of imprisonment . . ., specifying that "the pursuit of terrorism shall also apply when the acts of violence are directed against a foreign state, or an international organisation or institution". The same article 1 also contemplates the crime of "providing assistance to associated persons" in article 270–ter of the Criminal Code . . . .

*Id.* at 5. On December 15, 2001, the Italian Government enacted Law No. 438, and "introduced two new . . . types of [punishable] conduct." SCOR Report S/2006/611 at 3 (Aug. 4, 2006). First, "promoting, setting up, organizing, heading or funding associations whose intent is to commit acts of violence for the purposes of terrorism and international terrorism" became a crime. *Id.* Second, "supporting any one of the persons who participate in terrorist associations by . . . providing them with food, hospitality, and means of transportation or communication" became a new offense under Italian law. *Id.*

Under the Japanese Penal Code, "culpability for acts of conspiracy or instigation where the ultimate criminal act is not completed [is applied] under limited circumstances." Tom Stenson, *Inchoate Crimes and Criminal Responsibility Under International Law,* at 11–12, *http://www.law. upenn.edu/journals/jil/jilp/articles/1–1_ Stenson_Thomas.pdf.* For example, [t]he Subversive Activities Prevention Law allows prosecution for instigation of a homicide for political reasons, even where no homicide actually occurs." Stenson, at 11 (citation omitted). "Insurrection, assisting the enemy, inducing a foreign nation to attack the home country, or waging private war are all crimes for which simple incitement or conspiracy to bring them about is sufficient to incur punishment." *Id.* at 11–12 (citing Japanese Criminal Code, Art. 129, 131, 134, 135, 138, 139, 140, 141 (1978)). "[W]hen a principal offender commences the commission of a crime, the provision or collection of funds is punishable as 'aiding and abetting,' or as 'complicity.'" SCOR Report S/2001/1306 at 7 (Dec. 27, 2001). "[T]he provision or collection of funds alone is not punishable under the Penal Code" when "the principal does not commence the commission of a crime." *Id.*

Pakistani law authorizes prosecution for abetting terrorism and includes membership in specified terrorist groups. *See supra* p. 1200. Whoever abets an offense shall be punished, even if the offence is not committed. Pakistan Penal Code, Part V ¶¶ 115, 116 (Oct. 6, 1860); *see also id.* Abetment by Conspiracy §§ 107, 108. A criminal conspiracy requires an agreement to commit an offense and an act done in pursuance thereof by one or more of the parties to such an agreement. *Id.* at Part VA § 120A, as inserted by Criminal Law (Amendment) Act, VIII of 1913. Conspiracy to take various actions against the State or Government of Pakistan is a criminal offense. *Id.* at Part VI § 121A, as

inserted by Penal Code (Amendment) Act, 1870 (XXVII of 1870).

Russian Federal Act. No. 95528–3 of December 2001 "increased liability for creation of terrorist organizations, management of such organizations, recruitment to terrorist groups, supply of weapons and training of persons to commit crimes of a terrorist nature, as well as financing of terrorist organizations." SCOR Report S/2001/1284 at 4 (Dec. 27, 2001). Terrorist activity includes:

> 1) the organization, planning, preparation, and implementation of terrorist action; 2) incitement to terrorist action, to violence against individuals or organizations, or to the destruction of material objects for terrorist purposes; 3) the organization of an illegal armed formation, criminal association (criminal organization), or organized group in order to perpetrate terrorist action, and also participation in such action; 4) the recruitment, armament, training, and use of terrorists; 5) the funding of a known terrorist organization or terrorist group or other assistance to them[.]

Russian Federation Federal Law No. 130–FZ, art. 3 (July 25, 1998), *replaced by* Federal Law No. 35–FZ of Mar. 6, 2006 (containing similar definition of terrorist activity).

Under Swedish law, "[c]onspiracy is defined as a decision to act in collusion with another person, or an offer to undertake or execute a crime or the attempt to incite another person to do so." SCOR Report S/2001/1233 at 3 (Dec. 24, 2001); Swed. Penal Code, Ch. 23 §§ 2, 4, (through May 1, 1999 amendments). "All acts constituting an offence within the scope of and defined in the international criminal law conventions for the suppression of terrorism are ... criminal offences in Sweden." *Id.* at 9.

The law in the United Kingdom provides that membership in a proscribed terrorist organization is an offense, however, not participating in its activities when it was proscribed is a defense to this crime. U.K. Terrorism Act 2000, Ch. 11 § 11 (July 20, 2000). Under Section 12(1) of this chapter, "[a] person commits an offence if—(a) he invites support for a proscribed organization, and (b) the support is not, or is not restricted to, the provision of money or other property" and under Section 12(2) of this chapter:

> [a] person commits an offense if he arranges, manages or assists in arranging or managing a meeting which he knows is (a) to support a proscribed organization, (b) to further the activities of a proscribed organization, or (c) to be addressed by a person who belongs or professes to belong to a proscribed organization.

U.K. Terrorism Act 2000, Ch. 11 § 12(1) 12(2) (July 20, 2000), *http://www. legislation.gov.uk/ukpga/2000/11/contents/ enacted.* Courts in the United Kingdom have jurisdiction over "offences of conspiracy to commit [a terrorism] offence, ... inciting such an offence, attempting such an offence and aiding, abetting, counselling or procuring such an offence." SCOR Report S/2006/398 at 4 (June 16, 2006) (citing Terrorism Act of 2006, § 17).

### D. Conclusion

 The Government has made a "substantial showing," *see supra* n. 32, that the conduct alleged, including appellant's (an AUEC's) agreement with bin Laden and others to commit the object offenses, with knowledge of and intent to further the unlawful purposes of that agreement, and commission of the enumerated overt acts including meeting with and pledging personal loyalty to bin Laden, and membership in al Qaeda was punishable by military commission as an offense against the law of armed conflict when committed.

The specific statutory scheme employed by Congress in the 2006 M.C.A. including the common elements (AUEC and in the context of an armed conflict), stringent procedural safeguards, and comprehensive factual determinations are consistent with international norms. Congress did not exceed its constitutional authority in labeling appellant's conduct "conspiracy" or in defining the elements of conspiracy. Our holding is necessarily limited to the matter before us—the conduct of an AUEC, as those terms are defined in the 2006 M.C.A., *see supra* nn. 23, 24, 53, who is a member of a non-state, transnational terrorist organization engaged in armed conflict with the United States.

## X. SOLICITATION AS AN OFFENSE TRIABLE BY MILITARY COMMISSION

Appellant asserts that the inchoate offense of solicitation is not recognized as a war crime under international law, and thus is not punishable by military commission. Brief for Appellant 25–26.

The Government again argues that the constitutional authority to establish the jurisdiction of military commissions belongs to the political branches exercising their war powers. The Government cites descriptions of similar conduct as war crimes to include "recruiting for [the enemy] army," and "distributing publications or declarations calculated to excite opposition to the federal government or sympathy with the enemy." Brief for Appellee 28 (quoting Winthrop, *supra* n. 32, at 833, 841).

### A. Solicitation—The Charge and Specification

Appellant, as an AUEC "in the context of and associated with an armed conflict," was charged in the Specification of Charge II with and convicted of:

Solicitation to commit Murder of Protected Persons, ... to Attack Civilians, ... to Attack Civilian Objects, ... to commit Murder in Violation of the Law of War, ... to Destroy Property in Violation of the Law of War, ... to commit acts of Terrorism, ... and to Provide Material Support for Terrorism[.]

Charge Sheet, in violation of 10 U.S.C. §§ 950u, 950v(b)(1), 950v(b)(2), 950v(b)(3), 950v(b)(15), 950v(b)(16), 950v(b)(24), and 950v(b)(25).

The Specification of Charge II states that Appellant:

[who is] an alien unlawful enemy combatant, did, in the context of and associated with an armed conflict, from in or about February 1999 through in or about December 2001, at various locations in Afghanistan, Pakistan and elsewhere, wrongfully solicit, order, induce and advise [five named persons] and other persons, known and unknown, to commit [the aforementioned offenses] by preparing and assisting in the preparation of various propaganda products, including but not limited to the video "The Destruction of the American Destroyer U.S.S. Cole," said propaganda products being intentionally designed, made, distributed and shown in order to recruit and indoctrinate personnel to the organization and objectives of al Qaeda, an international terrorist organization, and to solicit, order, induce, and advise said persons to commit [the aforementioned offenses] with the intent that said offenses actually be committed.

Charge Sheet. We next turn to the statutory definition of the solicitation offense.

### B. Solicitation under the 2006 M.C.A. and 2007 M.M.C.

Solicitation is defined in the 2006 M.C.A. § 950u as follows:

Any person [subject to the 2006 M.C.A.] who solicits or advises another or others to commit one or more substantive offenses triable by military commission under this chapter shall, if the offense solicited or advised is attempted or committed, be punished with the punishment provided for the commission of the offense, but, if the offense solicited or advised is not committed or attempted, he shall be punished as a military commission under this chapter may direct.

The 2007 Manual for Military Commissions defines the elements of solicitation as: "(1) That the accused wrongfully solicited, ordered, induced, or advised a person or persons to commit a substantive offense triable by military commission; and (2) That the accused intended that the offense actually be committed." 2007 M.M.C., Part IV, ¶ 5b.

The charged solicitation, as instructed upon by the military commission judge [121] and argued by appellant, constitutes an inchoate offense. We are mindful that two Congresses and two Presidents have agreed that solicitation to commit offenses enumerated in the 2006 and 2009 M.C.A. violate the law of armed conflict and are punishable by a law of war military commission.

## C. Analysis

The seven object offenses of the solicitation specification are the same as the object offenses of the conspiracy specification. *See supra* pp. 1224–25. Each of these seven object offenses is defined as an offense punishable by military commission in the 2006 M.C.A., when committed by an AUEC in the context of an armed conflict. *See supra* pp. 1188–90; *see also Hamdan,*

801 F.Supp.2d at 1277–78 and nn. 48–54, 2011 WL 2923945 at *18 and nn. 48–54. These object offenses are punishable by military commission as violations of the law of armed conflict, and the Specification of Charge II and Charge II were charged and applied in accordance with the statutory and manual requirements, and provided appellant comprehensive notice of the conduct in issue and the elements of the offense. As charged, the Government was required to and did prove both objective and subjective elements.

The *actus reus* of the offense is the wrongful solicitation, order, inducement or advice through the "preparing and assisting in the preparation of various propaganda products, including but not limited to the video 'The Destruction of the American Destroyer U.S.S. Cole,'" to commit the offenses that are the object of the solicitation. The objective elements include that *actus reus,* common element 1—"alien unlawful enemy combatant element," *see* p. 1182 and *supra* nn. 23, 24, 53, and common element 2—that the conduct took place "in the context of and was associated with an armed conflict." *See supra* p. 1188. While the *mens rea* required is the specific intent that those offenses be committed.

In addition, the Specification of Charge II also stated that the propaganda products were "intentionally designed, made, distributed and shown in order to recruit and indoctrinate personnel to the organization and objectives of al Qaeda, an international terrorist organization" and to solicit, "induce, and advise said persons to commit Murder of Protected Persons" among other offenses that violate the law of war.

---

**121.** The military commission judge's instructions on this offense included, "You are further advised that proof that the [object] offenses listed in the Specification of Charge II actually occurred is not required. However, it must be proven beyond a reasonable doubt that the accused intended that persons known or unknown would commit every element of the offense or offenses listed in the Specification of Charge II." Tr. 860.

### 1. International Law and Inchoate Liability

Since World War II inchoate liability for crimes against peace and genocide have been recognized as offenses under international law. This is appropriate given the seriousness and insidiousness of the object offenses.

The IMT at Nuremburg referred to "Crimes Against Peace" or aggressive war as "the supreme international crime differing only from other war crimes in that it contains within itself the accumulated evil of the whole,"[122] and held that conspiracy to commit aggressive war was an offense under the London Charter. In the Far East, "General MacArthur ... convened an international tribunal of eleven Allied nations to try twenty-eight former Japanese leaders, including four prime ministers and a field marshal.... [T]his was to be the sole international tribunal for the Far East, the counterpart to Nuremberg."[123] The court's subject matter jurisdiction was similar to that at Nuremberg, except that Crimes against Peace charge was even more significant. Bush, *supra* n. 123, at 2375 (citing Horowitz, *supra* n. 123, at 487). None of the accused were acquitted, "seven were hanged, two were given lesser sentences, and all the others received life sentences." *Id.*

"The United Nations [subsequently] endorsed the doctrine [of Crimes against Peace], as part of a more general endorsement of the Nuremberg proceedings and results." Bush, *supra* n. 123, at 2388 (citing UN General Assembly Res. 95, A/Res/95(I) (Dec. 11, 1946); other citations omitted). We note that al Qaeda's ultimate goal, establishment of an Islamic Caliphate spanning the Arabian Peninsula, North Africa and Asia, renders al Qaeda's actions in pursuit of that goal akin to aggressive war.

The IMT's disparate findings in the cases of two Nazi defendants, the publicist Julius Streicher and Head of the Radio Division of the Propaganda Ministry Hans Fritzsche, inform our analysis of punishing incitement through propaganda under the law of armed conflict. 1 T.M.W.C. *supra* n. 36, at 304, 338. When the IMT heard the case of Julius Streicher, the Nazi publisher of the anti-Semitic weekly newspaper, *Der Sturmer,* there was no extant treaty or established custom prohibiting genocide or incitement to commit genocide. However, the IMT concluded "Streicher's incitement to murder and extermination at the time when Jews in the East were being killed under the most horrible conditions clearly constitutes persecution on political and racial grounds in connection with War Crimes as defined by the Charter, and constitutes a Crime against Humanity." *Id.* at 304. The IMT "linked Streicher's propaganda with the war crimes that had been carried out ... to establish a parallel to the specific intent requirement in criminal law."[124] He was

---

**122.** 1 T.M.W.C., *supra* n. 36, at 186; *see also,* Nuremberg Justice Norman Birkett, *International Legal Theories Evolved at Nuremberg,* 23 Intl. Aff. 317, 322 (1947) ("The first international theory of supreme importance, which evolved from the Trial is that the waging, initiation and preparation of aggressive war is declared to be a crime.").

**123.** Jonathan Bush, *"The Supreme ... Crime" and its Origins: The Lost Legislative History of the Crime of Aggressive War,* 102 Colum. L.Rev. 2324, 2375 (2002) (citing Philip R. Piccigallo, *The Japanese on Trial: Allied War Crimes Operations in the East, 1945–1951* (1979); Solis Horowitz, *The Tokyo Trial, 1950 International Conciliation* 474).

**124.** Carol Pauli, *Killing the Microphone: When Broadcast Freedom Should Yield to Genocide Prevention,* 61 Ala. L.Rev. 665, 670 n.27 (2010)(citing Jamie Frederic Metzl, *Rwandan Genocide and the International Law of Radio Jamming,* 91 Am. J. Intl. L. 628, 636–37 (1997)).

sentenced "to death by hanging." 1 T.M.W.C. *supra* n. 36, at 365.

The IMT acquitted Hans Fritzsche, a senior official in Goebbel's Ministry of Popular Enlightenment and Propaganda and host of a weekly radio show. *Id.* at 182, 336, 338. The prosecution argued that Fritzsche "incited and encouraged the commission of War Crimes, by deliberately falsifying news to arouse in the German People those passions which led them to the commission of atrocities[.]" *Id.* at 337–38. However, the IMT reasoned:

> His position and official duties were not sufficiently important ... to infer that he took part in originating or formulating propaganda campaigns .... [and] [i]t appears that Fritzsche sometimes made strong statements of a propagandistic nature in his broadcasts. But the Tribunal is not prepared to hold that they were intended to incite the German People to commit atrocities on conquered peoples, and he cannot be held to have been a participant in the crimes charged. His aim was rather to arouse popular sentiment in support of Hitler and the German war effort.

*Id.* at 338. The judgment suggests that the IMT's "reasons for acquitting Fritzsche lay in the fact that, first, he lacked the necessary intent or such intent had not been proved to the Tribunal's satisfaction and second, his speeches were not sufficiently direct or unequivocal in calling for the murder of the Jewish people." Wibke Timmermann, *Incitement in International Criminal Law*, 88 Intl. Rev. of the Red Cross, No. 864, 823, 829 (Dec. 2006) (citations omitted).

"Thus, the [IMT's] death sentence for Streicher and acquittal of Fritzsche suggested that, to be actionable, incitement [to commit genocide] required specificity and a direct link to the actions for which it called." Jamie Metzl, *Rwandan Genocide and the International Law of Radio Jamming*, 91 Am. J. Intl. L. 628, 637 (1997) (citation omitted). Fritzsche's superior, Otto Dietrich, was "a *Reichsleiter* in the Leadership Corps of the Nazi Party in 1932. He maintained that position until the collapse. He was the Party Press Chief, Hitler's Press Chief, Reich Press Chief, and State Secretary in the Ministry of Propaganda." 14 T.W.C., *supra* n. 60, at 861. Dietrich was tried by the NMT at part of "The Ministries Case." 11–14 T.W.C., *supra* n. 60. He was convicted of two charges, Count Five: "War Crimes and Crimes Against Humanity; Atrocities and Offenses Committed Against Civilian Populations" and Count VIII, "Membership in Criminal Organizations." 14 T.W.C., *supra* n. 60, at 467, 576, 855, 861. The Tribunal found his press and periodical directives, "expressed purpose was to enrage Germans against the Jews, to justify the measures taken and to be taken against them, and to subdue any doubts which might arise as to the justice of measures of racial persecution to which Jews were to be subjected." *Id.* at 576.

Following World War II, the United Nations General Assembly unanimously adopted the *Genocide Convention*. *See supra* n. 113. The *Genocide Convention* defined "genocide" as:

> any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; (d) Imposing measures intended to prevent births within the group; (e) Forcibly transferring children of the group to another group.

*Id.* at art. II(a)-(e). The *Genocide Convention* makes punishable not only geno-

cide, but also inchoate offenses including conspiracy to commit genocide, and direct and public incitement to commit genocide, regardless of whether any acts of genocide were committed or even attempted. *Id.* at art. III(b)-(d). The *Genocide Convention* became part of the jurisdiction of the *ad hoc* and permanent international criminal courts. *See supra* n. 113.

In the Akayesu Trial Judgment, the International Criminal Tribunal for Rwanda (ICTR) emphasized the inchoate nature of the crime by declaring that, "genocide clearly falls within the category of crimes so serious that direct and public incitement to commit such a crime must be punished as such, even where such incitement failed to produce the result expected by the perpetrator." *Prosecutor v. Akeyesu,* Case No. ICTR-96-4-T, (Judgment) ¶ 562 (Trial Chamber, Sept. 2, 1998).

Similarly, "public provocation to commit terrorism" has been acknowledged as punishable under general principles of law recognized by civilized nations, including organizations and individual nations. Article 5(2) of *The Council of Europe Convention on the Prevention of Terrorism (European Terrorism Convention)* (May 16, 2005) mandates each party to criminalize "public provocation to commit a terrorist offence ... when committed unlawfully and intentionally, as a criminal offence under its domestic law." The *European Terrorism Convention* defines "public provocation to commit a terrorist offence" as: "the distribution, or otherwise making available, of a message to the public, with the intent to incite the commission of a terrorist offence, where such conduct, whether or not directly advocating terrorist offences, causes a danger that one or more such offences may be committed." *Id.* The *European Terrorism Convention* also mandates passage of legislation prohibiting "[r]ecruitment for terrorism," defined as "means to solicit another person to commit or participate in the commission of a ter-

rorist offence, or to join an association or group, for the purpose of contributing to the commission of one or more terrorist offences by the association or the group." *Id.* at art. 6(1).

The similarities between the prohibition against solicitation and recruitment in the *European Terrorism Convention* and solicitation as defined in the 2006 M.C.A. § 950u, *supra* pp. 1231–32, and charged here are manifest. The similarities include the *actus reus* ("public provocation to commit a terrorist offence" and public message), and *mens rea* (specific intent).

The *OIC Convention on Combating International Terrorism, see supra* n. 74, recognized the importance of preventing and combating terrorist crimes by cooperation and exchange of information regarding "[m]eans of communications and propaganda utilized by terrorist groups" and "arresting those accused of committing a terrorist crime ... or being implicated in such acts either by assistance, collusion, *instigation,* or financing." *Id.* at Ch. I, Div. II, art. 4.1(b) and 4.4(a)(emphasis added).

The general principles of law recognized by civilized nations also recognize inchoate liability for conduct akin to solicitation, inducement, or advice to another to commit terrorism. Following is a summary of those laws from various nations arranged alphabetically.

### 1. Solicitation—Type Laws

Before December 2001, under Afghan law, it was a crime to organize or encourage another to join an organization whose aim is to disturb or nullify "one of the basic and accepted national values in political, social, economic or cultural spheres of the State or makes propaganda for its extension or attraction to it, by whatever means it may be." Afghanistan Penal Code, arts. 221, 222 (Oct. 7, 1976). Cur-

rent Afghan law criminalizes "recruit[ing] another person in order to participate in or carry out [a terrorist act]," or helping in any way in order to complete the commission of a terrorist act. Law on Combat against Terrorist Offenses, art. 19 (July 2008).

Brazilian law criminalizes the "association of more than three persons for the purpose of undertaking criminal activities," and the "recruitment of new members for terrorist groups would fall under the definition of this crime." SCOR Report S/2001/1285 at 11 (Dec. 27, 2001) (citing the Penal Code of Brazil, art. 288). Brazilian law also punishes "support to an association, party, committee, class entity or group whose goal is to change the current regime or of the Rule of Law, either by violent means or through serious threat." SCOR Report S/2006/680 at 3 (Aug. 21, 2006) (citing the National Security Law of Dec. 14, 1983, art. 16). "[I]ncitement to the commission of any crime in general" violates Brazilian law. *Id.* at 9 (citing the Penal Code of Brazil, art. 286). "[P]ublic apologia (or glorification) of any crime or criminals" is prohibited. *Id.* (citing the Penal Code of Brazil, art. 287).

Egyptian criminal law punishes promoting a terrorist act:

> by speech, writing or any other means, or any person directly or indirectly possessing or acquiring writings, writings, printed materials or recordings of any kind that promote or advocate [terrorism] for dissemination or viewing by others, or anyone who possesses or acquires any means of printing, recording or broadcasting that is used or intended to be used even temporarily to print, record or broadcast any of the aforementioned.

SCOR Report S/2006/351 at 10–11 (May 31, 2006) (citing Egypt Penal Code, art. 86 as amended by Act No. 97 of 1992 on terrorism). Incitement of a terrorist crime is punishable even "if no consequence resulted therefrom." *Id.* at 11 (citing Egypt Penal Code, art. 95 as amended by Act No. 97 of 1992 on terrorism).

French law "criminalizes incitement to and advocacy of terrorism." SCOR Report S/2006/547 at 3 (July 20, 2006) (citing Act of 1881, art. 24). "Article 23 defines the range of means used for such incitement, which can occur orally in a public place, or on any written material accessible to the public." *Id.* "Incitement to terrorism is punishable even if it has not resulted in an offence." *Id.*

Under German law, "Public Incitement to Crime," is an offense that provides, "[w]hoever publicly, in a meeting or through dissemination of writings, [and other media] incites an unlawful act, shall be punished as an inciter." SCOR Report S/2006/527 at 4 (July 17, 2006) (citing German Penal Code § 111 as promulgated on Nov. 13, 1998); *see also id.* at 3 (citing German Penal Code §§ 26, 30(1)). It is "irrelevant in this context whether the incitement is successful or not." *Id.* at 4 (citing German Penal Code § 111). "Whoever publicly, in a meeting or through dissemination of writings, approves of certain enumerated unlawful acts in a manner that is capable of disturbing the peace, is subject to punishment, ... this includes urging or glorifying terrorism as necessary and justified." *Id.* (citing German Penal Code § 140(2)).

The law in India punishes whomever "advocates, abets, advises or incites or knowingly facilitates the commission of, a terrorist act or any act preparatory to a terrorist act." 1987 Terrorist and Disruptive Activities (Prevention) Act (1987 TADAPA), pt. II, ¶ 3(3). The 1987 TADAPA defines "abet" as "i. the communication or association with any person or class of persons who is engaged in assisting in any manner terrorists ...; [and] ii. the pass-

ing on, or publication of, ... or distribution of, any document or matter obtained from terrorists...." *Id.* at pt. I, ¶ 2(1)(a).

The Penal Code of Indonesia contains two sections to stop recruiting of terrorists. First, "[a]ny person who orally or in writing incites in public to commit a punishable act, a violent action against the public authority or any other disobedience, either to a statutory provision or to an official order issued under a statutory provision, shall be punished...." SCOR Report S/2001/1245 at 6 (Dec. 26, 2001) (citing Penal Code of Indonesia, Book II on Crimes, Ch. V on Crimes Against the Public Order, art. 160). Second, "[a]ny person who by one of the means ... attempts to induce others to commit a crime, shall, if it does not result in the crime or a punishable attempt thereto, be punished." *Id.* at 7 (Penal Code of Indonesia, Book 11 on Crimes, Ch. V on Crimes Against the Public Order, art. 163 bis). The Republic of Indonesia, Government Regulation in lieu of Legislation No. 1/2002 on Combating Criminal Acts of Terrorism, criminalizes assisting, facilitating, and inciting terrorist acts. *Id.* at §§ 11–15 (Oct. 18, 2002).

Under Italian law, incitement to commit an act of terrorism is punishable, but must involve a genuine risk of inducing someone to commit the actual crime. SCOR Report S/2006/611 at 3 (Aug. 4, 2006). The incitement itself need not be successful, nor the crime actually committed. *Id.* A second set of measures adopted just after the bomb attacks in London in 2005 added terrorist recruitment and training to the list of terrorism crimes. *Id.* at 4 (citing Italian Criminal Code, art. 270 (July 31, 2005)); Elies van Sliedregt, *European Approaches to Fighting Terrorism*, 20 Duke J. Comp. Intl. L. 413, 420 (2010) (citing Italian Criminal Code of Italy, art. 270); *see also* Italian Criminal Code, arts. 39–40 (heightened penalties for anyone who in-cites or directs others under his authority to commit crimes).

The law in Japan provides:
when an act of terrorism which also constitutes a criminal offence such as homicide is committed, the incitement of such an act can be prosecuted either as an "incitement", ... or as an "accessoryship," ... In addition,
... the incitement of insurrection, instigation of foreign aggression or assistance to an enemy [is prohibited].... [T]he incitement of such offences as arson, homicide, [and] public disturbance ..., with the purpose of promoting, supporting or objecting to a political ideology or measure.... [T]he incitement of the use of explosives with the purpose of disrupting public safety or harming another's body or property [is prohibited].
SCOR Report S/2006/402 at 3 (June 16, 2006) (Penal Code, arts. 61, 62; Penal Code, Subversive Activities Prevention Act, arts. 38–40; Explosives Control Act, art. 4). The Japanese Criminal Code "only assigns culpability for acts of conspiracy or instigation where the ultimate criminal act is not completed under limited circumstances ... [such as] prosecution for instigation of a homicide for political reasons, even where no homicide actually occurs." Stenson, at 11–12 (citing Shigemitsu Dando, *The Criminal Law of Japan; The General Part* 222 (B.J. George, trans., 1997)). Similarly, "[i]nsurrection, assisting the enemy, ... [and] waging private war are all crimes for which simple incitement or conspiracy to bring them about is sufficient to incur punishment." *Id.* (citing Japanese Criminal Code, arts. 129, 131, 134, 135, 138, 139, 140, 141 (1978)).

The criminal law of Pakistan punished abetting terrorism, including membership of terrorist groups. *See supra* p. 1200 (citing SCOR Report S/2001/1310 at 6 (Jan. 10, 2002)). Whoever abets an offense

shall be punished, even if the offence is not committed. Pakistan Penal Code §§ 107–119 (Oct. 6, 1860). Recruitment and support for terrorist groups is an offence. SCOR Report S/2001/1310 at 6 (Jan. 10, 2002) (citing The Anti–Terrorism Act of 1997).

Russian law broadly criminalizes incitement to engage in terrorist activity and recruitment to a terrorist group. *See supra* p. 1230 (quoting Federal Act. No. 95528–3 of Dec. 2001 and Russian Federation Federal Law No. 130–FZ, art. 3 (July 25, 1998), *replaced by* Federal Law No. 35–FX of Mar. 6, 2006).

Under Spanish law, "membership in an armed group or terrorist groups and organizations is defined as a criminal offense, ... [as is] inciting others, conspiring or purposing to commit these offenses of illegal association." José Luis de la Cuesta, *Anti–Terrorist Penal Legislation and the Rule of Law: Spanish Experience* at 4, ¶ 3.2, (2007), (citing Arts. 515.2, 516.2, 519) *http://www.penal.org/IMG/JLDLCTerrorism.pdf*. The Organic Act No. 7/200 modified "exalting terrorism" as an offense in Penal Code, art. 578, and makes punishable "any praise or justification of terrorist offenses or of those involved in committing them through any form of public expression or broadcast. Exalting terrorism also covers acts that serve to discredit, scorn or humiliate the victims of terrorist offenses, their families or relations." *Id.* at 7, ¶ 4.4 (citation omitted).

Chapter 23, section 4, of the Swedish Penal Code provides:

punishment shall be imposed not only on the person who committed the crime but also on anyone who furthered it by advice or deed (e.g., financing). A person not regarded as the perpetrator shall, if he or she induced another person to commit the act, be sentenced for *instigation* of the crime or for *aiding and abetting* the crime. Each accomplice shall be judged according to the intent or the negligence attributable to him or her.

SCOR Report S/2001/1233 at 3 (Dec. 24, 2001) (emphasis in original). In response to the question from the UN Security Council, "what offences in your country prohibit (i) recruitment to terrorist groups?" Sweden responded, "[a] person who publicly urges or otherwise attempts to entice people to commit a criminal act can be sentenced for inciting rebellion. The act can be committed orally, through a publication or in other messages to the public." *Id.* at 5. "A person who recruits people for military or comparable service without authority of the Government can be sentenced for unlawful recruiting." *Id.*

In the United Kingdom, under the common law it is an offense to incite another to commit an offense. SCOR Report S/2006/398 at 3 (June 15, 2006). "There is no need for the offense to be attempted or committed." *Id.* Section 1 of the Terrorism Act of 2006 provides that it is a criminal offense:

to publish a statement which directly or indirectly incites or encourages others to commit acts of terrorism ... if, at the time, the defendant intends to encourage terrorism ..., or is reckless as to whether persons will be so encouraged. Indirect encouragement includes the glorification of terrorism of the specified offences, where it can reasonably be inferred that the conduct that is glorified should be emulated in existing circumstances.

*Id.* at 3.

Under U.S. law, " '[d]irect incitement [to commit] crimes against peace, crimes against humanity and war crimes' has long been recognized as an offense punishable by military commission." 1956 FM 27–10 ¶ 500. Civil War era military commissions

convicted individuals of violations of the law of war by inciting, soliciting, or encouraging others to violate the law of war. Headquarters District of Central Missouri issued General Order No. 17, Section II stated that "all persons who have or shall in future knowing" encourage guerillas "in their nefarious deeds will be arrested and kept in close confinement until by military commission or other court." [125]

The following examples are illustrative of such offenses: (1) falsely assuming "the character of a military officer" and then using such assumed character to "incite others to commit acts of hostility against the United States . . . contrary to the laws and customs of are in like cases," S.O. 28, pp. 406–27 (1862) (J. Owen); (2) aiding, assisting, and inciting others to damage railroad property, see S.O. 160, p. 457–64 (1862) (W. Petty); (3) "[i]nciting unlawful warfare" by "incit[ing], induc[ing] and procur[ing] persons to take up arms and commit acts of hostility against the . . . United States contrary to the laws and customs of war in like cases," see G.O. 15, p. 475 (1862) (E. Wingfield); (4) "[v]iolation of the laws of war" by "incit[ing] certain persons unknown to make an armed attack upon the dwelling-house . . . of a citizen of Missouri" with the intention that the occupants be murdered, see G.O. 19, p. 478 (1862) (J. Barnes); (5) "[v]iolations of the laws of war by the publication" in pamphlets and articles of information designed to "comfort the enemy and incite [the population] to rebellion" or to "incite to acts of insurrection," see S.O. 160, p. 453–57 (1862) (E.Ellis); and (6) "[i]nciting insurrection" by making speeches, circulars, and other communications to "arouse sentiments of hostility" against the United States Government." [126] Similarly, unlawfully recruiting for the enemy army was an offense tried by military commission.[127]

In response to a U.N. Security Council resolution 1624 (2005), the United States listed three U.S. measures to prohibit and prevent incitement to commit terrorism stating:

> (1) criminalization of solicitation to violence, seditious conspiracy, and advocacy of the overthrow of Government and criminalization of certain "inchoate crimes" that permit prosecution of preparatory acts to substantive criminal conduct, including acts of terrorism; (2) designation of terrorist organizations with the resulting legal consequences; and (3) making inadmissible to the U.S. aliens who have either incited terrorist activity with the intention to cause death or serious bodily injury, or endorsed or espoused terrorist activity, or persuaded others to endorse or espouse terrorist activity.

SCOR S/2006/397 at 3 (June 16, 2006). *See also* SCOR S/2006/69 (Feb. 3, 2006); SCOR S/2004/296 (Apr. 15, 2004); SCOR

---

**125.** G.O. 17, p. 281–82 (1862) *found in* H.R. Doc. No. 65, 55th Cong., 3d Sess., *reprinted in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, Ser. II, vol. I (Civil War, Ser. II, vol. 1) is the source for the orders cited in this section, except those in *infra* at nn. 126 and 127.

**126.** G.O. 214, Specification 2, Charge III, pp. 543–549 (1865) (W. Bowles, A. Humphreys, H. Heffren, L. Milligan, and S. Horsey) H.R. Doc. No. 314, 55th Cong., 3d Sess., *reprinted*

*in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, Ser. II, vol. VIII (Civil War, Ser. II, vol. 8). *See also Ex parte Milligan*, 71 U.S. 2, 121, 4 Wall. 2, 18 L.Ed. 281 (1866) (reversing Milligan's military commission conviction for lack of jurisdiction).

**127.** G.O. 114, pp. 1–2 (1863) (W. Corbin); G.O. 114, pp. 2–3 (1863) (T. McGraw); G.O. 155, pp. 1–3 (1864) (J. Scally); G.O. 249, pp. 1–2 (1864) (J. Kirby).

S/2002/674 (June 17, 2002); SCOR S/2001/1220 (Dec. 21, 2001).

The U.S. submission to the UN explains:

First, the federal criminal solicitation statute, 18 U.S.C. § 373, makes it a crime "with intent that another person engage in [the] conduct," to "solicit[ ], command[ ] induce[ ] or otherwise endeavor[ ] to persuade [an]other person to engage in" the use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States. 18 U.S.C. § 373(a). Significantly, this statutory prohibition makes speech punishable when the defendant specifically intends that "another person engage in [the] conduct constituting a felony" and where the surrounding circumstances are "strongly corroborative of that intent." *See* 18 U.S.C. § 373(a). Such additional qualifications are intended to preserve the vitality of the solicitation statute from a First Amendment-based challenge.

However, the offense of solicitation is complete when the defendant attempts to persuade another to commit a crime. It is therefore inconsequential whether the contemplated federal crime of force or violence was actually consummated or whether the defendant even succeeded in inducing his subject to attempt such commission. *United States v. Cardwell*, 433 F.3d 378, 391 (4th Cir. 2005); *see Initiative & Referendum Instit. v. U.S. Postal Service*, 417 F.3d 1299, 1314 (D.C.Cir.2005)("In criminal law, solicitation is regarded as a free-standing offense: requesting the unlawful act is itself a crime, regardless of whether the offense was consummated"). Thus, solicitation does not require that the proponent of the criminal act successfully persuade his listener to use unlawful physical force so long as it is clear that he or she intended to do so. SCOR S/2006/397 at 5 (June 16, 2006).

In 1996, Sheik Omar Amad Ali Abdel Rahman ("Rahman") was convicted of violating 18 U.S.C. § 2384 (conspiracy to advance the forceful overthrow of the U.S. Government), *inter alia* for his involvement in terrorist plots to bomb New York City facilities and to assassinate certain persons. Rahman's codefendants actually heeded the exhortations of his sermons and were incited to commit acts of terrorism. *Id.* at 7 (citing *United States v. Rahman*, 189 F.3d 88, 116–17 (2d Cir. 1999)).

Inchoate liability under international law continues to evolve. Review of the general principles of law recognized by civilized nations reflects this to be particularly true in the case of terrorism. This is consistent with the evolutionary nature of common law of armed conflict, particularly in light of both the hybrid nature of terrorism and the awareness of the threat terrorism presents to both domestic stability and international peace and security.

Much like Julius Streicher, appellant's efforts to incite others to murder and terrorize Americans reflect both his specific intent to arouse others to commit such atrocities and specific intent that such atrocities actually be committed. Unlike the IMT's reasoning in the case of Hans Fritzsche, we find appellant's position and official duties sufficiently important to establish beyond a reasonable doubt, that "he took part in originating or formulating propaganda campaigns .... intended to incite [others, both named and unnamed] to commit atrocities on [Americans and others based solely upon their nationality or physical presence in the United States]." *See* 1 T.M.W.C., *supra* n. 36, at 338 (discussing the IMT's basis for finding Streicher guilty).

Appellant's incitement during an ongoing armed conflict in which al Qaeda used terror as its primary means and method of warfare clearly links his conduct to ongoing violations of the law of armed conflict's most fundamental tenets. His efforts to encourage others to join al Qaeda and to commit such atrocities in furtherance of al Qaeda's strategic goal of establishing control over the Arabian Peninsula, North Africa, and Asia are akin to inciting aggressive war, "the supreme international crime," in a non-international armed conflict. *See supra* n. 122. We also note that the IMT held defendants individually criminally liable for their acts in furtherance of the common plan or conspiracy to engage in aggressive war. 1 T.M.W.C., *supra* n. 36, at 11 (IMT Charter, art. 6). *See also id.* at 186–226 (IMT Judgment, describing Germany's aggressive war), 224–26 (IMT Judgment, discussing "The Law as to the Common Plan or Conspiracy" to engage in aggressive war). The IMT found eight defendants guilty of Count One, conspiracy to engage in aggressive war. *Id.* at 366–67.

Similarly, appellant's incitement and efforts in support of bin Laden and al Qaeda to justify the intentional killing of civilians and destruction of their property based solely upon their nationality or physical presence in the United States, and his actions equate to conduct and intent akin to that punishable as genocide. Terrorism, as advocated by appellant and employed by al Qaeda, constitutes a modern incarnation of the insidious evils present in aggressive war and genocide, and exhibit the specific intent and contextual nexus to the actions to be actionable as an offense. Solicitation, as defined, alleged, and proven in this case, is far removed from an inchoate offense involving mere criminal suggestion or prompting. Rather, in its present guise, it is criminal incitement, recruitment, indoctrination, and motivation to violence, deliberately targeting without distinction persons and interests of a particular nationality. Appellant's charged conduct is an offense against the law of nations. His relevant criminal conduct was prohibited under the laws of Afghanistan, where the conduct was committed; and the United States, the object of the solicited offenses, and the nation attacked by al Qaeda.

■ Upon consideration of the extant treaty law, customary international law, and general principles of law recognized by civilized nations, we conclude that the Government has made a "substantial showing," *see supra* n. 32, that public solicitation, inducement, or advice to commit any of the charged object offenses (e.g. to attack protected persons and property in violation of the laws of armed conflict, to commit terrorism, or to recruit members for or otherwise indoctrinate members in an international terrorist organization) violates international norms. Moreover, Congress did not exceed the scope of its constitutional authority to define and punish offenses under the law of nations, by making such conduct, when committed by an AUEC in the context of or associated with a non-international armed conflict, punishable by military commission.[128]

---

128. *See Generally* The Preamble of the Rome Statute of the ICC, *supra* n. 51 ("... *Mindful* that during this century millions of children, women and men have been victims of unimaginable atrocities that deeply shock the conscience of humanity, *Recognizing* that such grave crimes threaten the peace, security and well-being of the world, *Affirming* that the most serious crimes of concern to the international community as a whole must not go unpunished and that their effective prosecution must be ensured by taking measures at the national level and by enhancing international cooperation, *Determined* to put an end to impunity for the perpetrators of these crimes and thus to contribute to the prevention of such crimes ...") (emphasis in original).

## XI. FIRST AMENDMENT ISSUES

Appellant asserts he was convicted on the basis of political speech in violation of the First Amendment.[129] He argues the First Amendment "bars the prosecution of political argument except in a few narrow circumstances, such as incitement." Brief for Appellant 9. And he avers this case does not rise to the level of incitement. Appellant states he "is not claiming First Amendment rights on the battlefield," but asserts once charges were filed against him, his foreign political speech is protected by the First Amendment. *Id.* Should this Court find he has no First Amendment rights personally, appellant argues that his prosecution for production of "The Destruction of the American Destroyer U.S.S. Cole" [hereinafter The Video] violates the First Amendment because it chills the dissemination of information available to U.S. citizens. Finally, appellant asserts the military commission judge erred in failing to properly instruct the members on the standard for incitement or on the probative value of protected speech as evidence.

Following the Supreme Court's decision in *Holder v. Humanitarian Law Project,* 561 U.S. ——, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010), appellant sought and was granted leave to file a supplemental brief. Appellant acknowledged that the Court's opinion in *Holder* "suggested that 'independent advocacy' can be distinguished from advocacy 'in coordination with or at the direction of'" a terrorist organization. Supplemental Brief on *Holder v. Humanitarian Law Project* for Appellant 2 (citing *Holder,* 130 S.Ct. at 2723). Given the Supreme Court's determination that Congress could lawfully prohibit the latter conduct, appellant "concede[d] that the clear implication of the Court's opinion is that otherwise protected speech can underlie an overt act in support of a charge of [18 U.S.C.] § 2339B, if done in the manner the Court described." *Id.* Nevertheless, appellant maintains that the Government's pervasive exploitation of "[his] thoughts, [ ] beliefs, [ ] ideals" as incriminating evidence warranted special instruction from the military commission judge that his "political beliefs were not on trial." *Id.* (citing *United States v. Salameh,* 152 F.3d 88, 112 (2d Cir.1998)).

For the reasons discussed below, we disagree. We hold the First Amendment does not apply to appellant's conduct, and if it did, the First Amendment was not violated. Further, we hold the military commission judge did not err in his instruction to the members.

### A. Discussion

 The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. Amend. I. It is well established that "the unconditional phrasing of the First Amendment was not intended to protect every utterance." *Roth v. United States,* 354 U.S. 476, 483, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

The Supreme Court has not specifically held a noncitizen speaking abroad is protected by the First Amendment. In fact, in *Boumediene v. Bush,* 553 U.S. 723, 770, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), Justice Kennedy wrote that before that decision, the Court "has never held that noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty have any rights under our Constitution." In *Boumediene,*

---

**129.** Brief for Appellant 9–19, Reply Brief for Appellant 7–10. Although appellant focuses on Charge II for solicitation as grounds for his First Amendment argument, the evidence of The Video was used in Charges I and III, as well. We will address the First Amendment issue as it applies to all three charges.

the Supreme Court concluded the constitutional privilege of habeas corpus pursuant to Article I, Section 9, Clause 2 extends to the detainees held at Guantanamo Bay. *Id.* at 771, 128 S.Ct. 2229. It is important to note, that opinion was limited to Article I, Section 9, Clause 2 and did not address any other provisions of the Constitution. However, in order to determine if First Amendment protections extend to appellant, we will review recent habeas corpus jurisprudence.

In *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), the Court concluded that 21 German citizens, who had been captured in China, tried and convicted of war crimes by an American military commission and incarcerated in a prison in Germany, had no right of habeas corpus. *See Rasul v. Bush,* 542 U.S. 466, 475, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004) (discussing *Eisentrager* ). The *Eisentrager* opinion was based on six factors critical to the question of the prisoners' constitutional entitlements. *Id.* The six factors were that the prisoner is:

> (a) an enemy alien; (b) has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is at all times imprisoned outside the United States.

*Id.* at 475–76, 124 S.Ct. 2686 (citing *Eisentrager,* 339 U.S. at 777, 70 S.Ct. 936). Both Justice Stevens and Justice Kennedy distinguished the six factors when applied to the detainees held at Guantanamo.

In *Rasul,* the Supreme Court held that the federal courts had jurisdiction to hear the detainees' habeas corpus cases noting that nothing in the Court's precedent categorically excludes aliens detained in military custody outside the United States

from the *"privilege of litigation."* *Id.* at 484, 124 S.Ct. 2686 (emphasis added). In *Boumediene,* Justice Kennedy discussed another case involving American citizens invoking the rights of the Fifth and Sixth Amendments to indictment and jury trial, *Reid v. Covert,* 351 U.S. 487, 76 S.Ct. 880, 100 L.Ed. 1352 (1956), that held the Fifth and Sixth amendments apply to U.S. citizen military dependents charged with criminal conduct in a foreign country. *Boumediene,* 553 U.S. at 759–62, 128 S.Ct. 2229. In explaining why there seems to be a difference when the Supreme Court held the Constitution applied and when it held that it did not apply, Justice Kennedy noted *practical considerations* were at play in the decisions of *Reid* (for place of both confinement and trial) and *Eisentrager* (post-WWII reconstruction, security, logistics of transporting convicted Germans to the U.S., among other factors). *Id.* at 761–62, 128 S.Ct. 2229. Justice Kennedy concluded, in *Boumediene,* 553 U.S. at 772, 798, 128 S.Ct. 2229.

> The gravity of the separation-of-powers issues raised by these cases and the fact that these detainees have been denied meaningful access to a judicial forum for a period of years, render these cases exceptional.... We hold that petitioners may invoke the fundamental procedural protections of habeas corpus.

The end result in *Boumediene* and in *Rasul* was access to a judicial forum and the privilege of litigation based upon a fundamental constitutional right, the writ of habeas corpus. There is a distinction to be drawn between habeas corpus rights and First Amendment protections. Both Justice Stevens and Justice Kennedy distinguished *Eisentrager* with respect to rights to habeas corpus, and the *Eisentrager* opinion contains comment on constitutional rights in general which proves insightful in analyzing the issue at hand. In *Eisentrager,* 339 U.S. at 784, 70 S.Ct. 936, the Supreme Court wrote:

If the Fifth Amendment confers its rights on all the world except Americans engaged in defending it, the same must be true of the companion civil-rights Amendments, for none of them is limited by its express terms, territorially or as to persons. Such a construction would mean that during military occupation irreconcilable enemy elements, guerrilla fighters, and "were wolves" could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against "unreasonable" searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments.

 In 1990, the Supreme Court held that the Fourth Amendment does not extend to a search by American authorities of the Mexican residence of a Mexican citizen and resident who had no voluntary attachment to the United States. *United States v. Verdugo–Urquidez*, 494 U.S. 259, 264–75, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). The Fifth Amendment's privilege against self incrimination is a fundamental *trial* right of criminal defendants, whereas the Fourth Amendment prohibits unreasonable searches and seizures occurring when committed, not at trial. *Id.* at 264, 110 S.Ct. 1056. The Court also emphasized that the First, Second, Fourth, Ninth, and Tenth Amendments provide rights or powers reserved to "the people," *id.* at 264–66, 110 S.Ct. 1056. "The people" relates:

> to a class of persons who are part of a national community or who have other-

wise developed sufficient connection with this country to be considered part of that community. *See United States ex rel. Turner v. Williams*, 194 U.S. 279, 292, 24 S.Ct. 719, 48 L.Ed. 979 (1904) (Excludable alien is not entitled to First Amendment rights, because "he does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law"). The language of these Amendments contrasts with the words "person" and "accused" used in the Fifth and Sixth Amendments regulating procedure in criminal cases.

*Id.* at 265–66, 110 S.Ct. 1056. The Court also discussed the *Insular Cases*,[130] which held that not every constitutional provision applies to governmental activity even where the United States has sovereign power. *Id.* at 268–69, 110 S.Ct. 1056 (declining to "endorse the view that every constitutional provision applies wherever the United States Government exercises its power."). The Court clarified how rights attach to "the people" under the Constitution:

> aliens receive constitutional protections when they have come within the territory of the United States and [have] developed substantial connections with the country.... But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders.... [Verdugo–Urquidez] is an alien who has had no previous significant voluntary connection with the United States, so these cases avail him not.[131]

---

**130.** *See United States v. Verdugo–Urquidez*, 494 U.S. 259, 268, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). The *Insular Cases* arose from U.S. territories before they became states. The Supreme Court in *Boumediene* also discusses the *Insular cases*. The cases cited dealt with issues involving Fifth Amend-

ment, Sixth Amendment, and Revenue Clauses of the Constitution.

**131.** *Id.* at 270–71, 110 S.Ct. 1056 (The Court distinguished six cases Verdugo–Urquidez, who was in the United States involuntarily, relied upon where the Court held, "that aliens

■ In this case, appellant, a citizen of Yemen, prepared The Video in Afghanistan following al Qaeda's attack on the USS COLE in 2000. The Video was shown to al Qaeda recruits and trainees in Afghanistan, and it was and is also widely available on the Internet. There is no question that, when he made The Video, appellant had no lawful connection with the United States. His only subsequent connection to the United States was his capture, detention, and trial. Such a connection does not thereby recast speech made years before with First Amendment protections. The First Amendment is not a right dealing with access to a judicial forum, or one regulating procedures during a criminal proceeding, but rather one concerning the freedom of speech. Under these facts, appellant is not entitled and does not have the rights and protections provided by the First Amendment.

## B. The Military Commissions Act and the First Amendment

Assuming *arguendo* appellant is entitled to the protections of the First Amendment, we next address the First Amendment challenge to the M.C.A. Appellant contends his speech was political speech and thus protected by the First Amendment. He cites *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) and *United States v. Aguilar*, 883 F.2d 662, 684 (9th Cir.1989), and states the facts of the case at hand do not rise to the level of inciting or producing imminent lawless action. Brief for Appellant 9–11; Reply Brief 9.

■ First, we must examine the M.C.A. to determine if it is facially overbroad. To review a law challenged on First Amendment grounds, the Supreme Court applies the overbreadth doctrine. *United States v. Williams*, 553 U.S. 285, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008).

> A statute is facially invalid if it prohibits a substantial amount of protected speech. The doctrine seeks to strike a balance between competing social costs. On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, ·inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional— particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects. In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.

*Id.* at 292, 128 S.Ct. 1830 (citations omitted). A law is overbroad, and hence void, if it "does not aim specifically at evils within the allowable area of state control, but on the contrary sweeps within its am-

enjoy certain constitutional rights. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 211–212, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (illegal aliens protected by Equal Protection Clause); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (resident alien is a 'person' within the meaning of the Fifth Amendment); *Bridges v. Wixon*, 326 U.S. 135, 148, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) (resident aliens have First Amendment rights); *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931) (Just Compensation Clause of Fifth Amendment); *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights); *Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (Fourteenth Amendment protects resident aliens). These cases, however, establish only that HN9 aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with the country."; other citations omitted).

bit other activities that ... constitute an exercise of freedom of speech.... " *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

In our review of the M.C.A., we focus on the three offenses of which appellant was charged and convicted: (1) providing material support and resources, including himself, to al Qaeda, an international terrorist organization then engaged in hostilities with the United States; (2) conspiring with Usama bin Laden and other members and associates of al Qaeda to, *inter alia*, commit murder, attack civilians and civilian objects in violation of the law of war, commit terrorism, and provide material support for terrorism; and (3) soliciting various persons to commit these same offenses.

The 2006 M.C.A. specifically addresses offenses fundamental to a Government's first duty to those governed—protection of its citizens. Charges I and II, the conspiracy and solicitation charges, are clearly speech-based offenses. However, as the Second Circuit held in *Rahman*, appellant was "not immunized from prosecution for such speech-based offenses merely because one commits them through the medium of political speech.... [If appellant's] speeches crossed the line into criminal solicitation, procurement of criminal activity or conspiracy to violate the laws, prosecution is permissible." *Rahman*, 189 F.3d at 117.

Next we look to Charge III and the definition used in all three charges for providing material support for terrorism. *See supra* n. 69. The definition of material support includes prohibitions on certain types of speech, i.e., training and expert advice and assistance, but these prohibitions are directly connected to providing material support or resources to an inter-

national terrorist organization engaged in hostilities against the United States, knowing that such organization has engaged or engages in terrorism. 2006 M.C.A. § 950v(b)(25). The creation of propaganda and recruiting materials are within the definition's terms "any product ... or services" and necessarily involve speech. *See supra* p. 1220.

 Upon review of the entire M.C.A., we find the law is specifically aimed at the crime of terrorism, and that it does not intrude into an area of protected speech.[132] The M.C.A., in its absolute sense and also relative to the statute's plainly legitimate sweep, is *not overbroad*. Thus, we find *no* facial First Amendment violation.

Assuming *arguendo* the M.C.A. suppressed appellant's political speech, we will subject the M.C.A. to strict scrutiny to determine if any such restrictions "further[ ] a compelling interest and [are] narrowly tailored to achieve that interest." *See Citizens United v. Federal Election Commission*, —— U.S. ——, 130 S.Ct. 876, 899, 175 L.Ed.2d 753 (2010) (citing *Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 464, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (WRTL)).

The Supreme Court has categorically declared several types of speech to be unprotected under the First Amendment. *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (child pornography depicting actual children); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (fighting words); *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (threats of violence); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (speech that imminent-

---

**132.** Congress expressly exempted religious materials from the statute. 18 U.S.C.

§ 2339A(b)(1).

ly incites illegal activity); *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (obscenity). In each case, there was a compelling government interest related to the well-being of human beings justifying these constitutionally valid statutes. *See United States v. Stevens*, 533 F.3d 218, 227 (3d Cir.2008). In affirming the lower court's decision in *United States v. Stevens*, —— U.S. ——, 130 S.Ct. 1577, 1586, 176 L.Ed.2d 435 (2010) (citations omitted), Chief Justice Roberts wrote:

> When we have identified categories of speech as fully outside the protection of the First Amendment, it has not been on the basis of a simple cost-benefit analysis. In *Ferber*, for example, we classified child pornography as such a category. We noted that the State of New York had a compelling interest in protecting children from abuse, and that the value of using children in these works (as opposed to simulated conduct or adult actors) was *de minimus*. But our decision did not rest on this "balance of competing interests" alone. We made clear that *Ferber* presented a special case: The market for child pornography was "intrinsically related" to the underlying abuse, and was therefore "an integral part of the production of such materials, an activity illegal throughout the Nation." As we noted, "[i]t rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Ferber* thus grounded its analysis in a previously recognized, long-established category of unprotected speech, and our subsequent decisions have shared this understanding.

▬ "[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447, 89 S.Ct. 1827 (footnote omitted). The defendant in *Brandenburg* was convicted based upon a filmed Ku Klux Klan rally which depicted hooded Klansmen brandishing firearms, parading around a burning cross, and shouting despicable racial epithets. The film showed the defendant proclaiming to the armed crowd, "if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance [sic] taken." *Id.* at 446, 89 S.Ct. 1827. Quoting from an earlier decision, the Supreme Court noted that "the mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Id.* at 448, 89 S.Ct. 1827 (quoting *Noto v. United States*, 367 U.S. 290, 297–98, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961)). The Court continued, "A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control." *Id.* In reversing the conviction, the Supreme Court held that the statute in question purports to punish mere advocacy and to forbid, on pain of criminal punishment, assembly with others merely to advocate the described type of action. Moreover, "neither the indictment nor the trial judge's instructions to the jury in any way refined the statute's bald definition of the crime in terms of mere advocacy not to distinguish from incitement to imminent lawless action." *Id.* at 448–49, 89 S.Ct. 1827 (footnote omitted).

■ The Second Circuit, in *Rahman*, examined a host of criminal statutes that provided a crime could be committed by speech alone. 189 F.3d at 116–117. It is well established that the Government may criminalize certain preparatory steps towards criminal action, even when the crime consists of the use of conspiratorial or exhortatory words. *Id.* The Second Circuit held the Government, who possessed evidence of conspiratorial planning, "need not wait until buildings and tunnels have been bombed and people killed before arresting the conspirators." *Id.* at 116. The Rahman Court explained:

Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for such speech-based offenses merely because one commits them through the medium of political speech or religious preaching. Of course, courts must be vigilant to insure that prosecutions are not improperly based on the mere expression of unpopular ideas. But if the evidence shows that the speeches crossed the line into criminal solicitation, procurement of criminal activity, or conspiracy to violate the laws, the prosecution is permissible.

*Id.* at 117. The following language falls outside the protections of the First Amendment: When Rahman was talking about killing President Mubarak: "make up with God ... by turning his rifle's barrel to President Mubarak's chest, and killing him. . . . Depend on God. Carry out this operation. It does not require a fatwa ... you are ready in training, but do it. Go ahead." *Id.* In consultation regarding the bombing of the United Nations Headquarters, Rahman told another, "Yes, it's a must, it's a duty." *Id.* In discussing the bombing of the UN, he advised that it would be "bad for Muslims," but added that they should "find a plan to destroy or to bomb or to ... inflict damage to the American Army." *Id.* Rahman's speeches were not simply the expression of ideas, but in some instances constituted the crime of conspiracy to wage war on the United States, and solicitation of attack on the U.S. military installations, as well as the murder of the Egyptian President. The Second Circuit concluded "words of this nature—ones that instruct, solicit, or persuade others to commit crimes of violence—violate the law" and are not protected by the First Amendment. *Id.*

In *United States v. Sattar*, a federal district court found the defendant guilty despite his claims the test in *Brandenburg* was not met.[133] The defendant in *Sattar* was charged with drafting and disseminating a fatwah to be issued under Rahman's name that was entitled "Fatwah Mandating the Bloodshed of Israelis Everywhere" and that called on "brother scholars everywhere in the Muslim world to do their part and issue unanimous fatwah that urges the

---

**133.** 272 F.Supp.2d 348, 374 (S.D.N.Y.2003), *aff'd, United States v. Stewart*, 590 F.3d 93 (2d Cir.2009), *cert. denied, Sattar v. United States*, — U.S. ——, 130 S.Ct. 1924, 176 L.Ed.2d 404 (2010). The *Sattar* case involved three defendants convicted of various crimes arising from their contacts with and behavior relating to government restrictions on communications and other contacts with Sheikh Omar Ahmad Ali Abdel Rahman. Rahman is serving a life sentence for terrorism-related crimes of seditious conspiracy, solicitation of murder, solicitation of an attack on American military installations, conspiracy to murder, and conspiracy to bomb. The district court issued nine opinions and a variety of wide orders addressing issues presented during the course of the proceedings. *See generally United States v. Sattar*, No. 02 Cr. 395(JGK), 2003 WL 22137012, 2003 U.S. Dist. LEXIS 16164 (S.D.N.Y. Sept. 15, 2003) (*Sattar II* ); *United States v. Sattar*, 314 F.Supp.2d 279 (S.D.N.Y. 2004) (*Sattar III* ); *United States v. Sattar*, 395 F.Supp.2d 66 (S.D.N.Y.2005) (*Sattar IV* ); *United States v. Sattar*, 395 F.Supp.2d 79 (S.D.N.Y.2005) (*Sattar V* ).

Muslim nation to fight the Jews and to kill them where ever they are." *Sattar,* 272 F.Supp.2d at 374; *see also United States v. Stewart,* 590 F.3d 93 (2d Cir.2009) at 99, 114. The court found these specific acts to be sufficient to support the charge that Sattar solicited crimes of violence. And in each case, the courts held that such acts and statements that "instruct, solicit, or persuade others to commit crimes of violence" are not protected by the First Amendment and may be prosecuted." *Stewart,* 590 F.3d at 115 (citing *Rahman,* 189 F.3d at 117); *Sattar,* 272 F.Supp.2d at 374 (citing *Rahman,* 189 F.3d at 117).

Appellant argues that Supreme Court opinions have "clarified that for lawless action to be 'imminent' the speaker must be addressing specific individuals, who are intended and likely to act without further deliberation." Brief for Appellant 17 (citing *Hess v. Indiana,* 414 U.S. 105, 108–109, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973)). *Hess* is distinguishable on its facts. The *Hess* case involved a U.S. citizen defendant who was protesting the war and blocking a street on the campus of Indiana University. When he was required to move by the sheriff, he loudly said, "We'll take the … street later." *Hess,* 414 U.S. at 107, 94 S.Ct. 326. The Court held that Hess's speech "was not directed to any person or group of persons" and found that he was not "advocating, in the normal sense, any action." *Id.* at 108–09, 94 S.Ct. 326. In the case at hand, although specific individuals were not named in The Video, appellant was clearly advocating violent, lawless actions (to kill and destroy) against specific targets (Americans) by an identified group (Muslims). We note the affirmed cases of *Rahman and Sattar* discussed above contained similar threats against a specific large group or category of targets as opposed to merely threats against specifically named individuals.[134]

 Applying strict scrutiny to the M.C.A., we conclude Congress had a compelling interest in prohibiting terrorism even if it impacted certain speech. Congress narrowly tailored the M.C.A. to focus on criminal activities of terrorists. We find appellant's claim he was convicted for making political speech unpersuasive. The Video's purpose was to incite listeners to join al Qaeda and kill Americans and others. Appellant himself described The Video as "one of the best propaganda videos the al Qaeda had to date … influential and produced good results for [al Qaeda]." Tr. 534. A government expert testified The Video may have been the number one al Qaeda propaganda video. The Video was repeatedly shown during training at al Qaeda safehouses and terrorist training camps. The Video was an important training and indoctrination tool for al Qaeda and is commercially available in numerous languages.

The obvious purpose of The Video was to incite others to join al Qaeda and to commit crimes against Americans or other U.S. interests or to support those who do. We find The Video constitutes incitement to imminent lawless action. Unlike *Brandenburg,* this is a case where The Video goes beyond mere advocacy, to that of incitement. The Video was aimed at inciting viewers to join al Qaeda, to kill Americans, and to cause destruction. The target was quite specific: all Americans and American interests. Like *Rahman* and

---

**134.** *Sattar,* 395 F.Supp.2d at 98–99 (the Government is not required to prove specific identity of victims of the conspiracy to kill or in which country or countries the victims would be killed or that that defendant knew the identity of or location of the intended victims to establish intent to support conspiracy); *United States v. Romero,* 897 F.2d 47, 50–51 (2d Cir.1990) (affirming conviction for conspiring to kill a federal officer where defendants conspired to kill "anyone posing a threat to them or [their narcotics] business").

*Sattar*, the target was not limited to a specific, named individual. The Video is an integral part of and intrinsically related to the commission of terrorism. We hold appellant's speech is not protected by the First Amendment as political speech, but is unprotected speech integrally tied to unlawful criminal activity.

## C. Potential Chilling Effect on U.S. Citizens

Appellant argues that prosecution for his creation of The Video has a chilling effect on U.S. citizens in their exercise of the right to dissemination of information. Brief for Appellant 11–14. In *Citizens United*, 130 S.Ct. at 908, the Supreme Court declared:

> When Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves.

Appellant's prosecution does not adversely affect the rights of U.S. citizens to receive such information. The Video is readily available on the Internet and in numerous foreign languages. Possession or viewing of The Video is not criminalized by the M.C.A.—providing material support for terrorism is the conduct that is prohibited. Nothing in the M.C.A. prohibits access to information such as The Video.

## D. Military Commission Judge's Instructions

■■■■■ Appellant asserts the military commission judge failed to instruct the members of a First Amendment defense that appellant could be convicted only if The Video was intended and likely to bring about specific and imminent illegality. This issue is raised for the first time on appeal. Appellant made no objection to the proposed instructions during trial, and raised no issue of the need for a First Amendment defense instruction. Pursuant to the 2007 M.M.C., Part II, R.M.C. 920(f), the issue is waived absent plain error. *See supra* p. 1219 (explaining plain error rule for instructions). As noted above, appellant has no First Amendment right to commit the charged offenses, thus he has no right to have the instruction provided to the members. In review of the entire record, we find no error, let alone plain error, in the military commission judge's failure to *sua sponte* provide a First Amendment defense instruction.

■■■■ Assuming *arguendo*, that it was error since the instruction is of a "constitutional dimension," we will examine the issue. *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). The Supreme Court has stated that "[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). The Ninth Circuit found that "[w]here there is some evidence . . . that the purpose of the speaker or the tendency of his words are directed to ideas or consequences remote from the commission of the criminal act, a defense based on the First Amendment is a legitimate matter for the jury's consideration." *United States v. Freeman*, 761 F.2d 549, 551 (9th Cir.1985). The *Freeman* decision established, as a threshold for a First Amendment jury instruction, that there be "some evidence" that the defendant's purpose or the likely effect of his words was "remote" from the commission of the crime. A First Amendment defense instruction need not be given when the words are more than

mere advocacy but are "so close in time and purpose to a substantive evil as to become part of the crime itself." *Id.* at 552.[135]

## E. Conclusion

The Supreme Court's observation in *Holder* is relevant to the instant case:

> [P]laintiffs simply disagree with the considered judgment of Congress and the Executive that providing material support to a designated foreign terrorist organization ... bolsters the terrorist activities of that organization. That judgment, however, is entitled to significant weight, and we have persuasive evidence before us to sustain it. Given the sensitive interests in national security and foreign affairs at stake, the political branches have adequately substantiated their determination that, to serve the Government's interest in preventing terrorism, it was necessary to prohibit providing material support in the form of training, expert advice, personnel, and services to foreign terrorist groups, even

if the supporters meant to promote only the groups' nonviolent ends.

*Holder,* 130 S.Ct. at 2728.

We find The Video's message to be more than mere advocacy, as discussed above. The message of The Video was an incitement to imminent lawless activity. A First Amendment defense instruction was not required.

## XII. 2006 M.C.A. AND BILL OF AT-TAINDER

Appellant states that the Military Commissions Act is a bill of attainder because Congress has, through the 2006 M.C.A., unconstitutionally identified him as an AUEC and punished him by depriving him of "previously enjoyed rights." Brief for Appellant 30–36.

## A. Bills of Attainder and Legislative Analysis

 A bill of attainder "legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." [136] "The analysis necessarily requires

---

**135.** *See also United States v. Fleschner,* 98 F.3d 155, 158–159 (4th Cir.1996)(The court held there was no evidence supporting a First Amendment instruction noting the defendant's words and acts were not remote from the criminal acts, including meetings held to encourage people to unlawful actions, money collected, advice and instructions given and followed (citing *United States v. Kelley,* 769 F.2d 215, 217 (4th Cir.1985). "The cloak of the First Amendment envelops critical, but abstract, discussions of existing laws, but lend no protection to speech which urges the listener to commit violations of current law.")); *United States v. Mendelsohn,* 896 F.2d 1183, 1186 (9th Cir.1990) (computer program was "too instrumental in and intertwined with the performance of criminal activities to retain First Amendment protection"); *United States v. Aguilar,* 883 F.2d 662, 685 (9th Cir.1989) (appellants failed to establish some evidence their activities were remote from the crime in

that "appellants instructed illegal aliens on how and where to cross the border and supplied them with sanctuary contacts ... speech was inextricably intertwined with actions that facilitated the aliens' illegal entry"); *United States v. Holecek,* 739 F.2d 331, 335 (8th Cir.1984)(*Brandenburg* inapplicable when defendant has done a great deal more than advocate violations of the law through speech, thus the instruction was not proper).

**136.** *Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 846–47, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984) (citing *Nixon v. Administrator of General Services,* 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *see United States v. O'Brien,* 391 U.S. 367, 383 n. 30, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *United States v. Lovett,* 328 U.S. 303, 315, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946)).

an inquiry into whether the three definitional elements—specificity in identification, punishment, and lack of a judicial trial—are contained in the statute." *O'Brien*, 391 U.S. at 384 n. 30, 88 S.Ct. 1673. "The judicial function is 'not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations.'" *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 850, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984) (quoting *CSC v. Letter Carriers*, 413 U.S. 548, 571, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)).

### 1. Legislatively Determines Guilt

Appellant argues that he is being punished merely for being an AUEC.[137] We disagree. His argument misapprehends the legal significance of the AUEC determination. Although the AUEC determination is an element of each charged offense and a jurisdictional prerequisite, his status as an AUEC, standing alone, is not punishable under the M.C.A. *See supra* pp. 1182–88.

The term AUEC, in this context, is used synonymously with "unprivileged enemy belligerent." 2006 M.C.A. §§ 948a(1), (3); 2009 M.C.A. § 948a(7). Far from constituting a determination of guilt, this designation identifies one's status under the law of armed conflict including the Geneva Conventions. 2006 M.C.A. § 948c; 2009 M.C.A. § 948c; *supra* p. 20 and n. 21 (discussing military commission jurisdiction). The argument also ignores the additional procedural and substantive protections provided by the M.C.A., including the presumption of innocence and the Government's burden of proving every element of each offense, to include AUEC status, beyond a reasonable doubt by legal

and competent evidence. The M.C.A., as implemented through the M.M.C., explicitly provides *inter alia* for example, the presumption of innocence, the right to have the AUEC finding and guilt determined beyond a reasonable doubt by impartial members, and the right to appellate review. 2006 and 2009 M.C.A. §§ 949a; 949*l*(c)(1); 950c. *See also infra* n. 138; *see also e.g.*, 2007 M.M.C., Part II, R.C.M. 506, 701, 703, 806, 906, 912, 914, 916, 918, 920, 921, Chapters X–XII (listing numerous rights of the accused to a fair trial and substantial post-trial rights).

### 2. Legislatively Inflicts Punishment

Appellant also asserts that his punishment is the deprivation of rights that he "previously enjoyed." Specifically, he claims that before his status as an AUEC, he somehow enjoyed the rights to confront evidence against him, to petition for writ of habeas corpus and to protection against self-incrimination under the Constitution of the United States of America. Brief for Appellant 32. He also asserts that his status as an AUEC deprived him of his previously enjoyed rights under the Geneva Conventions. *Id.* at 33.

The Supreme Court has recognized three tests when analyzing whether a statute inflicts forbidden punishment: historical, functional, and motivational tests. *Nixon*, 433 U.S. at 472–78, 97 S.Ct. 2777. Therefore, the inquiry requires the court to determine "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a congressional intent

---

**137.** Brief for Appellant 31 states, "AUEC status is therefore nothing other than a reverse-engineered definition, designed to impose the law's burdens upon GTMO detainees uniquely."

to punish." *Selective Service System*, 468 U.S. at 852, 104 S.Ct. 3348 (quotation omitted).

### a. Historical Test

In *Nixon*, the Supreme Court articulated the historical test standard by describing the history of bills of attainder. *Nixon*, 433 U.S. at 473, 97 S.Ct. 2777. In England, bills of attainder "originally connoted a parliamentary Act sentencing named individual or identifiable members of a group to death." *Id.* However, the prohibition against bills of attainder "also proscribes enactments originally characterized as bill of pains and penalties, that is, legislative acts inflicting punishment other than execution." *Id.* at 474, 97 S.Ct. 2777. The Court stated that "[o]ur country's own experience with bills of attainder resulted in the addition of another sanction to the list of impermissible legislative punishments: a legislative enactment barring designated individuals or groups from participation in specified employments or vocations. . . ." *Id.*

Appellant relies on cases which have expanded the notion of punishment to incorporate employment rights but those have little relevance here. In *Lovett*, the Supreme Court struck down a law designed to permanently bar three named, executive employees from government service based on their Congressionally-determined political beliefs. *Lovett*, 328 U.S. at 313–14, 66 S.Ct. 1073. A special subcommittee of the Appropriations Committee, which charged those individuals with "subversive beliefs and associations" adjudicated their cases in secret executive sessions where those charged were not permitted to be present or represented by counsel. *Id.* at 310–11, 66 S.Ct. 1073. The Court found that the law "inflict[ed] punishment without the safeguards of a judicial trial." *Id.* at 316, 66 S.Ct. 1073. The Court listed certain procedural safeguards required to ensure "the people of this country [are not

subjected to] punishment without trial," including the following rights: to be tried by a jury; to confront witnesses; to be represented by counsel; to be informed of the charges; to the right against self-incrimination; to not be subjected to double jeopardy, the *ex post facto* application of laws or cruel and unusual punishment. *Id.* at 317–18, 66 S.Ct. 1073. Despite the fact that appellant is an AUEC, the M.C.A. provides the very procedural safeguards identified by the Supreme Court as required for citizens of this country to have a fair trial. 2006 and 2009 M.C.A. §§ 948–950; *See also infra* n. 138.

■ In each case cited by appellant as support for historically-recognized punishment, the decisions were based on U.S. citizens whose discernable rights were permanently denied without the requisite due process. As such, each case is readily and necessarily distinguishable. Further, the Geneva Conventions do not establish a private right of action, as appellant asserts; however, the United States has obligated itself to abide by those conventions. 2009 M.C.A. § 948b(e). The Supreme Court held in *Hamdan v. Rumsfeld*, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), that Common Article 3 of the Geneva Conventions is applicable in military commissions and noted that the United States must fulfill its obligations. *Id.* at 631–35, 126 S.Ct. 2749. We conclude that the military commission convened here under the 2006 M.C.A. qualified as a "regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *See Hamdan*, 801 F.Supp.2d at 1261 n. 7, 2011 WL 2923945 at *7 n. 8 (quoting Article 3(1)(d) of GCIII, *supra* n. 6.) The military commissions authorized in the M.C.A., afford extensive procedural guarantees, including the right to counsel, rights to present and respond to evidence and to present

and cross-examine witnesses, the presumption of innocence, and the right against self-incrimination.[138] Congress, in the M.C.A., also provided defendants the right to be present during trial proceedings, the right to appeal to this Court (as well as the automatic right to appeal to the United States Court of Appeals for the District of Columbia Circuit, and the right to petition the Supreme Court of the United States), and the right to have a military commission judge preside over the trial. *See supra* n. 138.

Assuming *arguendo* that Common Article 3 grants privately enforceable rights, the M.C.A. affords those rights.[139] The M.C.A. does not summarily impose punishment, but rather provides a system by which to determine personal and subject matter jurisdiction, guilt or innocence, and appropriate punishment. Under the M.C.A., appellant enjoys benefits which exceed those required by Common Article 3, such as the rights to a public trial by members, to have witnesses produced for his trial, to limitations on admissibility of evidence, to raise affirmative defenses, among many other rights. *See Hamdan v. Rumsfeld*, 548 U.S. at 633, 126 S.Ct. 2749; M.C.A. §§ 948–950; *see also supra* n. 138.

Just as the Court stated in *Nixon*, we too find here that "no feature of the challenged Act falls within the historical meaning of legislative punishment." *Nixon*, 433 U.S. at 475, 97 S.Ct. 2777. Appellant argues that "Congress unconstitutionally"

denied him eight previously available rights. However, appellant fails to articulate any viable legal support for his assertion of those rights.

### b. Functional Test

■ The functional test analyzes whether "nonpunitive legislative purposes" are reasonably furthered given the burdens imposed. *Id.* at 475–76, 97 S.Ct. 2777. Considering the facts and circumstances and the purpose of the M.C.A., just as in *Nixon*, "legitimate justifications for the passage of the Act are readily apparent." Appellant argues that the "M.C.A. sought to reverse holdings of the Supreme Court as to the rights enjoyed by a known class of litigants." Brief for Appellant 34. As previously stated, the M.C.A. defines the class of individuals subject to the jurisdiction of military commissions. We hold that by defining AUECs for jurisdictional purposes and limiting jurisdiction thereto, the M.C.A is "an act of nonpunitive legislative policy making." *Nixon*, 433 U.S. at 477, 97 S.Ct. 2777.

### c. Motivational Test

The "third recognized test of punishment is strictly a motivational one: inquiring whether the legislative record evinces a congressional intent to punish." *Id.* at 478, 97 S.Ct. 2777. Appellant cites remarks from congressional floor debates and hearings as support of congressional intent to pass the M.C.A. as a punitive

**138.** *See Hamdan*, 801 F.Supp.2d at 1316 n. 171, 2011 WL 2923945 at *45 n. 171 (listing rights available to accused tried by military commission). *See also* Jennifer Elsea, *Comparison of Rights in Military Commission Trials and Trials in Federal Criminal Courts* 8–24, CRS Report Order Code No. Code R40932, (Jan. 26, 2010), Jennifer Elsea, *Selected Procedural Safeguards in Federal, Military, and International Courts* 11–34, CRS Report for Congress Order Code No. RL31262, (Sept. 18, 2006).

**139.** *But see* 2006 M.C.A. § 948b(g) (stating Geneva Conventions Not Establishing Source of Rights.—No alien unlawful enemy combatant subject to trial by military commission under this chapter may invoke the Geneva Conventions as a source of rights.); 2009 M.C.A. § 948b(e) (stating "Geneva Conventions Not Establishing Private Right of Action—No alien unprivileged enemy belligerent subject to trial by military commission under this chapter may invoke the Geneva Conventions as a basis for a private right of action.").

measure. Brief for Appellant 34–35. Even the broadest reading of these congressional records "cast no aspersions on appellant's personal conduct and contain no condemnation of his behavior as meriting the infliction of punishment." *Nixon,* 433 U.S. at 479, 97 S.Ct. 2777. Rather, they focus on the desire to protect Americans and America's national security while also protecting human dignity. Brief for Appellant 35 (citing statement of Sen. Grassley, 152 Cong. Rec. S10401).

## (1) Specificity of Identification

Appellant contends that "[w]hat distinguishes bills of attainder from Congress' legitimate authority to make distinctions between classes of offenders is whether Congress is legislating 'by rules of general applicability.'" Brief for Appellant 30–31 (citing *United States v. Brown,* 381 U.S. 437, 461, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965)).

Arguing the specificity requirement, appellant states that Congress may legislate "by rules of general applicability" and that "[i]t cannot specify the people upon whom the sanction it prescribes to be levied." *Brown,* 381 U.S. at 461, 85 S.Ct. 1707. Nor can Congress designate persons "described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Selective Service System,* 468 U.S. at 847, 104 S.Ct. 3348 (citations omitted). However, the *Nixon* Court cautioned against extending the already "broad and generous ... protection against bills of attainder" by presuming that "the Constitution is offended whenever a law imposes undesired consequences on an individual or on a class that is not defined at a proper level of generality." *Nixon,* 433 U.S. at 469–470, 97 S.Ct. 2777. The Supreme Court continued to articulate the standard, stating:

> By arguing that an individual or defined group is attained whenever he or it is compelled to bear burdens which the individual or group dislikes, appellant removes the anchor that ties the bill of attainder guarantee to realistic conceptions of classification and punishment. His view would cripple the very process of legislating, for any individual or group that is made the subject of adverse legislation can complain that the lawmakers could and should have defined the relevant affected class at a greater level of generality. Furthermore, every person or group made subject to legislation which he or it finds burdensome may subjectively feel, and can complain, that he or it is being subjected to unwarranted punishment. However expansive the prohibition against bills of attainder, it surely was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals. In short, while the Bill of Attainder Clause serves as an important "bulwark against tyranny," it does not do so by limiting Congress to the choice of legislating for the universe, or legislating only benefits, or not legislating at all.

*Id.* at 470–71, 97 S.Ct. 2777 (footnote and citations omitted).

Additionally, appellant argues that because there is nothing he can do to avoid the label of AUEC, the law is an unconstitutional bill of attainder. Brief for Appellant 31. However, appellant fails to articulate how his status determination as an AUEC, which initially serves as a jurisdictional predicate, constitutes punishment. The Supreme Court has expressly recognized that "[e]ven if the specificity element were deemed satisfied ... the statute would not necessarily implicate the Bill of Attainder Clause." *Selective Service System,* 468 U.S. at 851, 104 S.Ct. 3348. Appellant correctly states that AUEC is a status. Brief for Appellant 31. Status as

an AUEC is not punishment. Rather, by defining the class of individuals subject to the jurisdiction of the M.C.A., Congress is exercising its inherent power under constitutional authority to "define and punish . . . Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. The definitions of AUEC in the 2006 M.C.A., *see supra* nn. 23, 24, 53, and "unprivileged enemy belligerent" in the 2009 M.C.A., *see supra* n. 58, do not determine guilt or inflict punishment as a bill of attainder.

### (2) Lack of Judicial Trial

Finally, appellant argues that, because the AUEC status "was devised in the midst of an intensely contested Congressional election and the fifth anniversary of the September 11th Attacks," the M.C.A. did not establish a "regularly constituted court." Brief for Appellant 36. Although appellant alleges that the M.C.A. substituted a legislative for a judicial determination of guilt, nothing in his arguments "suggest that Congress was intent on encroaching on the judicial function of punishing an individual for blameworthy offenses." *Nixon*, 433 U.S. at 479, 97 S.Ct. 2777.[140]

■ Though more recent cases analyze whether punishment was administered without a judicial trial, historically, the inquiry and concern was whether the legislative enactment created "the deprivation without any of the ordinary forms and guards provided for the security of the citizen in the administration of justice by the established tribunals." *Cummings*, 71 U.S. at 323, 71 U.S. 277. Congress properly acted within its enumerated power to enact legislation that gives substantive and procedural rights for the administration of justice in this case. Congress had no obligation under the Bill of Attainder Clause to establish courts or military commissions or tribunals identical to an Article III court.

### B. Conclusion

■ The M.C.A. is not a bill of attainder, as it lawfully establishes comprehensive procedures for the impartial adjudication of guilt required by the Constitution and the law of armed conflict.

### XIII. EQUAL PROTECTION

■ We resolve this assignment of error against appellant for the reasons stated in *Hamdan*, 801 F.Supp.2d at 1313–23, 2011 WL 2923945 at *44–*50.

### XIV. WAIVER OF ASSIGNMENTS OF ERROR I, III, IV AND V

The Government asserts that appellant waived the First Amendment, *Ex Post Facto*, Bill of Attainder, and Equal Protection challenges raised in his appeal by failing to raise those issues below. Brief for Appellee 3–5. Specifically, the Govern-

---

**140.** It is noteworthy that two Branches of our Government have found, after considerable debate, and the passage of several years that prosecution of AUECs by military commission under the M.C.A. is not abusive or unconstitutional, as our Court in *Hamdan* stated:

> Justice Breyer suggested the President seek Congressional authorization for military commissions when those procedures are inconsistent with the UCMJ stating, "Indeed, Congress has denied the President the legislative authority [under Article 36, UCMJ] to create military commissions of the kind at issue here. Nothing prevents the President

from returning to Congress to seek the authority he believes necessary." *Hamdan*, 548 U.S. at 636, 126 S.Ct. 2749. In response, Congress passed the 2006 M.C.A., and President Bush signed the Act into law. On October 28, 2009, President Obama signed into law the 2009 M.C.A. With the enactment of the 2009 M.C.A., two different Presidents and two different Congresses have spoken on the issue of how military commissions should be conducted.
*Hamdan*, 801 F.Supp.2d at 1262, 2011 WL 2923945 at *7 (quoting *Hamdan*, 548 U.S. at 636, 126 S.Ct. 2749) (Breyer, Kennedy, Souter, and Ginsburg, JJ., concurring).

ment argues appellant's failure to raise these issues at trial, trial defense counsel's express waiver of "all pretrial motions of any kind," and confirmation of that waiver in response to the military judge's explicit inquiry waives further consideration of those issues. *Id.* (citing *United States v. Mezzanatto*, 513 U.S. 196, 200–01, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995); *Peretz v. United States*, 501 U.S. 923, 936, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991), and 2007 M.M.C., Part II, R.C.M. 905(e)).

Appellant responds that the Government is wrong for three reasons. Appellant's Reply of 12 November 2009 at 2–7. First, appellant's challenges are not subject to implied waiver. Specifically the First Amendment challenge issue addresses the constitutional interests of society as a whole, and as such appellate courts are "obligat[ed] to make an independent examination of the whole record in order to make sure the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* at 2–3 quoting *Bose Corp. v. Consumers Union of the U.S.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). He also asserts the *Ex Post Facto*, Bill of Attainder and Equal Protection challenges are jurisdictional in nature and thus not subject to waiver. *Id.* citing *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (First Amendment); *Milhouse v. Levi*, 548 F.2d 357 (D.C.Cir.1976) (*Ex Post Facto*); *United States v. Jones*, 527 F.2d 817 (D.C.Cir. 1975) (Due Process).

Second, the record does not support a conclusion that he knowingly or voluntarily waived those issues or empowered trial defense counsel to do so on his behalf. *Id.* at 3–6. Specifically, that trial defense counsel's acknowledgements that appellant did not wish to be represented by counsel, "to have no further communication with counsel," and that appellant did not "authorize[ ] [trial defense counsel] to speak on his behalf or to represent him in any way . . . ." reflect that trial defense counsel was not empowered to waive those issues. Appellant also argues that "[the military judge effectively] allowed him to represent himself," that he raised the issues in controversy in colloquies with the military judge, that the military judge did not inform him of the purported waiver or ask "what he wanted to do," and instead broadly referred to his "boycott" as preserving appellate challenges to the Military Commissions Act (MCA). *Id.*

■■■ Third, application of waiver is a matter of discretion for this Court and our duty to ensure that findings are correct in law and fact counsels against waiver.[141]

## A. The Law

The 2006 M.C.A. does not explicitly address waiver or forfeiture of issues not raised at trial, such as at issue here. However, R.M.C. 905(e) states: "[f]ailure by a party to raise defenses or objections or to make motions or requests which must be made before pleas are entered under section (b)[142] of this rule shall con-

---

141. *Id.* at 6–7 (citing *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)); 10 U.S.C. § 950f(d) (2009); *United States v. Britton*, 26 M.J. 24, 27 (C.M.A.1988); *United States v. Claxton*, 32 M.J. 159, 162 (C.M.A.1991); *United States v. Hilton*, 27 M.J. 323, 325–26 (C.M.A.1989); *United States v. Sheehan*, 512 F.3d 621, 628 (D.C.Cir.2008).

142. "The following must be raised before a plea is entered: (1) Defenses or objections based on defects (other than jurisdictional

defects) in the preferral, forwarding, investigation, or referral of charges; (2) Defenses or objections based on defects in the charges and specifications (other than any failure to show jurisdiction or to charge an offense, which objections shall be resolved by the military judge at any time during the pendency of the proceedings; (3) Motions to suppress evidence; (4) Motions for discovery under R.M.C. 701 or for production of witnesses or evidence; or (5) Motions for severance of charges or accused." R.M.C. 905(b).

stitute waiver [and] Other motions, requests, defenses, or objections, except lack of jurisdiction or failure of a charge to allege an offense, must be raised before the commission is adjourned ... and, unless otherwise provided in this Manual, failure to do so shall constitute waiver."

■ The principles of "waiver" and "forfeiture" are similarly applied in U.S. Courts and Courts–Martial. *See* Federal Rules of Criminal Procedure 52(a), (b); 10 U.S.C. § 859(a) and R.C.M. 905(b). "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.' " *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)); *see also United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F.2009). "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." *Olano*, 507 U.S. at 733, 113 S.Ct. 1770 (citations omitted).

■ The distinction between the terms "waiver" and "forfeiture" is important. "If an appellant has forfeited a right by failing to raise it at trial, courts review for plain error." *Gladue*, 67 M.J. at 313 (citations omitted). *See also supra* p. 1219. When an appellant knowingly and voluntarily waives a known right at trial, it is generally "extinguished and may not be raised on appeal." *Gladue*, 67 M.J. at 313 (citing *Olano*, 507 U.S. at 733–34, 113 S.Ct. 1770).) The authority and responsibility of service Courts of Criminal Appeals to determine whether the findings and sentence "should be approved," includes discretionary authority "to determine the circum-

stances, if any, under which it would apply waiver or forfeiture." *Nerad*, 69 M.J. at 146–47 (*citing United States v. Claxton*, 32 M.J. 159, 164 (C.M.A.1991)(approving Court of Criminal Appeals decision ordering rehearing in light of evidentiary error under circumstances in which waiver would ordinarily preclude relief).

## B. Analysis

The Government's argument and appellant's reply raise potentially complex and wide-ranging issues including applicability of the principles of "waiver" and "forfeiture" to a military commission convened under the 2006 M.C.A., and of defense counsel's authority and responsibility when an accused voluntarily absents himself from a proceeding having repeatedly recorded his objections to counsel's performance of any role as his defense counsel.

At trial the appellant failed to "make the timely assertion of" the First Amendment, *Ex Post Facto*, Bill of Attainder, and Equal Protection challenges before the military commission. There were no specific motions, requests, defenses, or objections to that effect raised before the commission was adjourned as required by R.M.C. 905(e). The record also reveals ambiguity surrounding detailed defense counsel's authority to act in appellant's stead when he "waived all motions," and the absence of explicit, on the record discussion of the effect of, or appellant's understanding of his voluntary absence on motions, defenses or objections.

Having previously addressed the substance of appellant's challenges and having found those challenges without merit, we need not decide whether he forfeited or waived those challenges.

## XV. SENTENCE APPROPRIATENESS

Appellant argues that as a "media man," he was effectively sentenced to "life with-

out parole for producing a video, writing speeches and providing tech-support." Brief on Sentence Appropriateness for Appellant 3. He contends that the sentence imposed is inappropriately severe for the offenses of which he was convicted and in comparison to sentences of other "closely related cases involving al Qaeda members, who were sentenced to brief terms of years for personally perpetrating acts of violence." *Id.* He further asserts that his "detention will continue irrespective of whether he is sentenced or even convicted of any crime," and that "this Court should reduce [his] sentence to a reasonable term of years that reflects the comparative seriousness of his conduct rather than the offensiveness of his beliefs." *Id.* at 1.

The Government responds that the adjudged sentence is fair and just given appellant's character and the nature and seriousness of his crimes, and requests this Court to affirm the sentence, as approved by the convening authority. The Government also asserts that appellant mischaracterizes his sentence to confinement as "life without parole" and erroneously suggests that the President is deprived of authority to grant clemency or parole in such a case.

 We find both appellant's characterization of his conduct, advanced with a decidedly content-neutral view, and his arguments unpersuasive. We also decline to entertain appellant's argument that he will be indefinitely detained regardless of his conviction and sentence, as it is irrelevant. This is a matter for the political branches and beyond the scope of our authority and responsibility in determining sentence appropriateness. 2009 M.C.A. § 950f(d).

## A. Applicable Law

The 2009 M.C.A. requires this Court to make a *de novo* determination of the appropriateness of the sentence imposed. 2009 M.C.A. § 950f(d). "[We] may affirm only such ... sentence or such part or amount of the sentence, as [we find] correct in law and fact and determine[ ], on the basis of the entire record, should be approved." *Id.* This mandate, unparalleled in the federal civilian sector, mirrors that exercised by the military service Courts of Criminal Appeals in review of certain courts-martial.[143] Accordingly, we consider decisions of those service courts and of the United States Court of Appeals for the Armed Forces particularly persuasive precedent on this issue. We adopt as our own the following fundamental premises articulated and applied by those courts.

 Each sentence is judged "on the basis of the nature and seriousness of the offense and the character of the offender."[144] We may affirm only such sentence that we: "(1) find[ ] correct in law; (2) find[ ] correct in fact; and (3) determine[ ], on the basis of the entire record, should be approved."[145] In determining

**143.** *See* 10 U.S.C. § 866(b), Uniform Code of Military Justice (Service Courts of Criminal Appeals review the record in each trial by court-martial referred by The Judge Advocate General, including cases in which the approved sentence includes death, a punitive discharge or confinement for one year or more); 10 U.S.C. § 866(c) ("In cases referred to it, the Court of Criminal Appeals ... may affirm only such ... sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved"); *United States v. Lacy*, 50 M.J. 286, 287–88 (1999) ("The power to determine whether a sentence should be approved has no direct parallel in the federal civilian sector....").

**144.** *United States v. Baier*, 60 M.J. 382, 383 (C.A.A.F.2005) (citation omitted); *United States v. Mamaluy*, 10 U.S.C.M.A. 102, 27 C.M.R. 176, 181, 1959 WL 3587 (1959); *see also Hamdan*, 801 F.Supp.2d at 1263–65, 2011 WL 2923945 at *9.

**145.** *Nerad*, 69 M.J. at 141 (footnote omitted) (citing *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F.2002); 10 U.S.C. § 866(c)); *see also* 10 U.S.C. § 950f(d).

whether a sentence should be approved, our authority is "not legality alone, but legality limited by appropriateness." *United States v. Nerad*, 69 M.J. 138, 141 (C.A.A.F.2010) (citation omitted). This authority "is a sweeping Congressional mandate to ensure a fair and just punishment for every accused." *United States v. Baier*, 60 M.J. 382, 384–85 (C.A.A.F.2005) (citation omitted). In determining sentence appropriateness, we must consider the "entire record," which includes the allied papers, as well as the record of trial proceedings. *See United States v. Healy*, 26 M.J. 394, 395 (C.M.A.1988).

We are not required to engage in sentence comparison between specific cases:

> except in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.... [Closely related cases include] coactors involved in a common crime, [persons] in a common or parallel scheme, or some other direct nexus between the [individuals] whose sentences are sought to be compared .... appellant bears the burden of demonstrating that any cited cases are "closely related" to his or her case and that the sentences are "highly disparate." If the appellant meets that burden ... then the Government must show that there is a rational basis for the disparity.

*United States v. Lacy*, 50 M.J. 286, 288 (1999) (citing *United States v. Ballard*, 20 M.J. 282, 286 (C.M.A.1985)); *see also United States v. Brock*, 46 M.J. 11, 13 (C.A.A.F.1997).

"The power to review a case for sentence appropriateness, which reflects the unique history and attributes of the military justice system, includes but is not limited to considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F.2001). In execution of this highly discretionary function, we are neither required to, nor precluded from, considering sentences in other cases, even when those cases are not "closely related." [146]

## B. Analysis

### 1. The Offense and the Offender

Appellant was convicted, contrary to his pleas, of: (1) providing material support and resources including himself to al Qaeda, an international terrorist organization then engaged in hostilities with the United States; (2) conspiring with bin Laden and other members and associates of al Qaeda to, *inter alia*, commit murder in violation of the law of war, attack civilians and civilian objects, commit terrorism, and provide material support for terrorism; and (3) soliciting various persons to commit these same offenses.

All charged offenses allege a nexus to al Qaeda during the period February 1999 through December 2001. The nature and seriousness of these offenses are manifest in the charges themselves. The objects of both the conspiracy and solicitation charges include: committing murder in violation of the law of war, attacking civilians and civilian objects, committing ter-

---

146. *United States v. Ballard,* 20 M.J. 282, 286 (C.M.A.1985); *see also United States v. Wacha,* 55 M.J. 266, 267 (C.A.A.F.2001)(*"Lacy* required Courts of Criminal Appeals 'to engage in sentence comparison with *specific cases* .... in those rare instances in which sentence appropriateness can be fairly determined *only* by reference to disparate sentences adjudged in closely related cases.' Nothing in *Lacy* or its progeny suggests any limitation on a Court of Criminal Appeals' discretion to consider and compare other courts-martial sentences when that court is reviewing a case for sentence appropriateness and relative uniformity." (emphasis in original; citations omitted)).

rorism, and providing material support for terrorism. At trial, the members were presented with overwhelming, uncontested evidence that appellant was guilty, with much of the evidence provided by appellant in the form of voluntary admissions to investigators. Appellant also essentially admitted the same in his unsworn statement to the members during the presentencing hearing.

In his voluntary statements to investigators, appellant admitted on multiple occasions to traveling to Afghanistan with the intent to join al Qaeda, undergoing military-type training at an al Qaeda sponsored camp, and meeting with bin Laden following his training. During that meeting, appellant admitted discussing bin Laden's views on Islam and jihad against the United States, agreeing with those views, and then pledging personal loyalty to bin Laden. He then joined al Qaeda as a member, worked in al Qaeda's media office, and eventually took charge of that office, where he performed a number of acts to recruit, to incite others to join al Qaeda, and to indoctrinate prospective al Qaeda recruits into the al Qaeda Plan.

Appellant readily admitted developing and producing a videotape, at the personal request of bin Laden, capitalizing on al Qaeda's perfidious attack on the USS COLE in an effort to recruit and indoctrinate prospective members into al Qaeda. That videotape identified the United States as a source of Muslim suffering world-wide and demanded, as a religious duty, other Muslims to migrate to Afghanistan and engage in jihad against the United States and others. It was also described as one of the most, if not the most, important propaganda products produced by al Qaeda to recruit, incite and motivate potential terrorists including suicide bombers.

Evidence that al Qaeda was responsible for the 9/11 attacks on the United States was also overwhelming and uncontested by appellant. The record clearly reflects that 19 men recruited by al Qaeda hijacked 4 commercial airliners and crashed those aircraft into the Pentagon in Washington D.C., the World Trade Center in New York, and into a field in Pennsylvania. Those attacks resulted in the deaths of thousands of people. Appellant's conduct is directly linked to those attacks in that he facilitated the personal pledges of loyalty to bin Laden of two 9/11 hijackers/pilots, Muhammed Atta and Ziad al Jarrah, and prepared their propaganda declarations styled as "martyr wills." Also, he maintained and operated the media equipment used to inform bin Laden of completion of those attacks, and, at bin Laden's personal request, he researched the economic effect of those attacks on the United States and provided that research to bin Laden.

Appellant was also convicted of intentionally providing material support or resources to al Qaeda, an international terrorist organization engaged in hostilities against the United States, knowing that al Qaeda had engaged in or engages in terrorism, including the August 1998 attacks on U.S. embassies in Kenya and Tanzania. These attacks also resulted in hundreds of deaths, thousands of injuries, and extensive property damage. The members concluded by legal and competent evidence beyond a reasonable doubt that appellant, with the requisite knowledge and intent, provided himself as a member to al Qaeda, traveled to Afghanistan to join al Qaeda, met with al Qaeda leadership, underwent military-type training at an al Qaeda sponsored camp, and met with and pledged personal loyalty to bin Laden. The members also found, beyond a reasonable doubt, that appellant provided services in direct support of bin Laden and al Qaeda including: preparing various propaganda products intended for al Qaeda recruiting;

indoctrination training and inciting persons to commit terrorism; facilitating the pledges of loyalty to bin Laden and preparing the "martyr wills" for two suspected September 11, 2001 hijackers/pilots; researching the economic effect of those attacks on the United States and providing the results to bin Laden; and operating and maintaining data processing equipment and media communications equipment for the benefit of bin Laden and other al Qaeda leaders.

The record reflects that appellant was in his 30s, married with a family, intelligent, well-educated, and that he traveled to Afghanistan to join al Qaeda with knowledge that al Qaeda had engaged in terrorism and was engaged in hostilities with the United States. The record also reflects that, armed with that knowledge and following military-like training provided by al Qaeda, appellant fulfilled his desire to join al Qaeda after personally meeting with Saif-al Adel and bin Laden and discussing their beliefs and goals. He pledged loyalty to bin Laden and remained devoted to bin Laden and al Qaeda throughout the charged timeframe and for more than six years following his capture and detention up to the day he was sentenced. Appellant's words and actions at trial, particularly his unsworn statement to the members, reveal his unwavering commitment to violence, including the intentional killing of civilians and attacks on protected persons and places. Tr. 963–80 (appellant's unsworn statement); Appellate Ex. 19 (appellant's Declaration of Renewal of the Allegiance to Usama Bin Laden).

The military commission judge properly advised the members that in determining an appropriate sentence they should consider that society recognizes five principle reasons for the sentence of those who violate the law: (1) rehabilitation of the wrongdoer, (2) punishment of the wrongdoer, (3) protection of society from the wrongdoer, (4) preservation of societal order, and (5) deterrence of the wrongdoer and those who know of his crimes and his sentence from committing the same or similar offenses. Tr. 949–50. The military commission judge properly instructed the members on the presentencing procedures including the evidence and appellant's unsworn statement. Tr. 949–51, 961–62 (sentencing instructions); 2007 M.M.C., Part II, R.M.C. 1001.

We are unmoved by appellant's argument that he was a "media man," who was sentenced to confinement for "life without parole for producing a video, writing speeches and providing tech-support," and that his being a "shock-jock" does not make him deserving of life without parole. Sentence Appropriateness Brief for Appellant 3–4. We also decline appellant's invitation to assess the appropriateness of the sentence from his perspective, a perspective which deliberately displaces the incitement to violence intended by the propaganda he produced, in deference to focus on the technical skills used in producing that propaganda. This argument grossly understates the significance of appellant's contributions to al Qaeda, and appellant's own opinion thereof. Both perhaps, were best summed up in appellant's own words "I asked bin Laden for a martyrdom operation, suicide operation, but he refused. The reason why he refused was that [ ] recruiting people through media gets you more people than suicidal attacks (sic)," Tr. 978–79, and that "I was [to be the 20th hijacker], but bin laden refused." Tr. 195. Appellant's contributions to al Qaeda were of strategic significance to recruiting, indoctrination, retention, and inciting others to support or join al Qaeda. He was more valuable in media or strategic communications than in suicide operations. In the case of two 9/11 hijackers/pilots, he directly facilitated their quest to kill themselves

and as many others as they could in furtherance of al Qaeda's goals.

■ After carefully considering the entire record of trial, the nature and seriousness of these offenses, and the matters presented by appellant, we find the sentence to be appropriate for this offender and his offenses.

## 2. Closely–Related Cases

Appellant also asserts that the sentence is inappropriately severe in comparison to closely-related cases involving al Qaeda members, who were sentenced to brief terms of years for personally perpetrating acts of violence. Appellant notes that, of the three individuals sentenced by military commission at the time of filing, he is the only one to receive a life sentence, a sentence that he contends is tantamount to confinement for life without the possibility of parole.

Appellant argues that there were two "closely related cases involving al Qaeda members, who were sentenced to brief terms of years for personally perpetrating acts of violence." Sentence Appropriateness Brief for Appellant 3. In the first case, *United States v. Hamdan,* Hamdan was sentenced to 66 months confinement and served less than five months post-trial punitive confinement, after applying credit for time served. Appellant asserts that Hamdan "was convicted on the basis of being an armed body guard to bin Laden and an al Qaeda weapons courier." *Id.* at 4. In the second case, *United States v. Hicks,* appellant asserts that "the members returned a seven-year sentence for which all but nine months was suspended pursuant to a guilty plea agreement." *Id.* Appellant contends that "Hicks conceded that, despite owing allegiance as an Australian to a coalition allied to the United States, he shopped himself around to various terrorist organizations in Afghanistan and ultimately served as a Taliban fighter,

guarding their positions and personally engaging coalition forces in combat." *Id.*

■ Appellant has failed to sustain his burden of demonstrating that the Hicks case was "closely related" to his case. Appellant did not establish that he and Hicks were "involved in a common crime," or that they were "in a common or parallel scheme," nor did he prove any other "direct nexus between [himself and Hicks]." *Lacy,* 50 M.J. at 288. Additionally, Hicks was involved in "fighting with the Taliban," pleaded guilty, and accepted some responsibility for his actions, thereby providing a rational basis for any disparity in sentencing, even assuming the cases were "closely related." Even a cursory comparison of the two cases reveals significant differences in that Hicks pleaded guilty and was found guilty of only one specification of one charge, providing material support to terrorism, and the suspended sentence was predicated on multiple conditions of his cooperation. Military Commission Order Number 1, DoD, Office of the Military Commissions (1 May 2007).

Appellant's argument with respect to Hamdan bears a closer resemblance in that both were members of al Qaeda who pledged loyalty to bin Laden and provided varying forms of support directly to bin Laden and al Qaeda. Neither membership in an organization such as al Qaeda nor conduct in support of al Qaeda, standing alone, shall mandate treatment as "closely related." However, as both appellant and Hamdan were members of al Qaeda who performed substantial duties in direct support of and in close proximity to bin Laden, we will assume without deciding that these cases are "closely related." Based upon the variance in the sentences we will also assume that the sentences are "highly disparate" and determine whether "there is a rational basis for the disparity." *Lacy,* 50 M.J. at 288.

Under the facts presented, the basis for a disparity in sentence is readily apparent. While Hamdan may appropriately be referred to as a foot soldier, who provided personal services including physical security and driver services for bin Laden as well as courier services in transporting weapons, appellant is clearly of strategic significance to al Qaeda's "propaganda and recruiting efforts." Appellee's Sentence Appropriateness Brief at 4. Appellant was more significant to al Qaeda's broader purposes and sustainment as a terrorist enterprise and his impact both more insidious and more likely to have a significant impact than Hamdan. Although Hamdan no doubt contributed to al Qaeda's activities, his impact was more localized and limited, and he lacked appellant's technical acumen and strategic vision. Appellant's conduct was more strategic and international in scope, and he intended to inspire and motivate an untold number of individuals to join or otherwise provide support to al Qaeda. His behavior and statements at trial show no remorse and reflect his limited rehabilitative potential.

 We conclude that each aforementioned distinction provides "a rational basis for the disparity" in the sentences. *Id.* Accordingly, we find the sentence correct in law and fact, and on the basis of the entire record, conclude that it should be approved.

## XVI. CONCLUSION

The findings and approved sentence are affirmed.

BRAND, GALLAGHER, SIMS, PERLAK, and ORR, JJ., concur.

Judge SIMS, filed a separate opinion, concurring.

Judge SIMS concurring.

Although I concur in the analysis and the result reached by the majority, I write separately to emphasize the long-standing public position of the United States Army regarding the issue of whether the offenses in question in appellant's case, as defined by Congress in the Military Commissions Acts of 2006 and 2009, were properly recognized as existing war crimes. From 1956 onward the United States Army has consistently and explicitly recognized the following acts as being war crimes punishable under international law:

1. Conspiracy to Commit a War Crime;
2. Direct Incitement of a War Crime;
3. Attempted Commission of a War Crime; and
4. Complicity in the Commission of a War Crime.

*See* Field Manual 27–10, *The Law of Land Warfare*, Ch. 8, § II, *Crimes under International Law*, ¶ 500 (July 1956) (1956 FM 27–10).[147] As such, this field manual pre-

---

**147.** 1956 FM 27–10, Ch. 8, § II, ¶¶ 499–500 provide:

**498. Crimes Under International Law.** Any person, whether a member of the armed forces or a civilian, who commits an act which constitutes a crime under international law is responsible therefor and liable to punishment. Such offenses in connection with war comprise: a. Crimes against peace. b. Crimes against humanity. c. War crimes.

Although this manual recognizes the criminal responsibility of individuals for those offenses which may comprise any of the foregoing types of crimes, members of the armed forces will normally be concerned, only with those offenses constituting "war crimes."

**499. War Crimes.** The term "war crime" is the technical expression for a violation of the law of war by any person or persons, military or civilian. Every violation of the law of war is a war crime.

**500. Conspiracy, Incitement, Attempts, and Complicity.** Conspiracy, direct incitement, and attempts to commit, as well as complicity in the commission of, crimes against peace, crimes against humanity, and war crimes are punishable.

dates the existence of al-Qaeda, the birth of appellant, the events of September 11, 2001, the enactment of the Military Commissions Acts, and appellant's trial by military commission. Although the manual does not have the force of binding legal precedent, it nonetheless serves as persuasive evidence of the view of the United States as to the state of the law of armed conflict from the aftermath of World War II, through the Cold War, and to the present.

Accordingly, when a person such as appellant chooses to commit any of the aforementioned acts against the United States, he or she should not be surprised to find themselves in the custody of the United States military facing trial by military commission for these long-standing violations of the law of war.